## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**STATE OF NEW MEXICO; and**
**THE CITY OF ALBUQUERQUE**

      **Plaintiffs,**

v.                                                                    Case No. _____

**KEVIN K. MCALEENAN,**
**Acting Secretary of the Department of Homeland**
**Security and Commissioner of Customs and Border**
**Protection, in his official capacity;**
**MARK A. MORGAN,**
**Acting Director, U.S. Immigration and**
**Customs Enforcement, in his official capacity;**
**MATTHEW T. ALBENCE,**
**Deputy Director, U.S. Immigration and Customs**
**Enforcement, in his official capacity;**
**NATHALIE R. ASHER,**
**Executive Associate Director for Enforcement and Removal**
**Operations, U.S. Immigration and Customs Enforcement,**
**in her official capacity; and**
**CARLA L. PROVOST,**
**Chief of Border Patrol, in her official capacity,**

      **Defendants.**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

The State of New Mexico, by and through the Governor's Office of General Counsel, and

the City of Albuquerque, by and through the City Attorney's Office, hereby submit this Complaint

for declaratory and injunctive relief and damages.  As grounds for this pleading, Plaintiffs state as

follows.

1

## INTRODUCTION

1.      This case arises from the federal government's sudden and unlawful abandonment of its longstanding Safe Release policy, under which it provided needed assistance to asylum seekers—who are legally present in the United States by virtue of their asylum claims and related federal law—in reaching their final destinations while they waited for their claims to be processed. Without any prior notice or opportunity for input, the federal government effectively transferred its basic humanitarian obligations to state and local governments, leaving asylum seekers and accompanying family members in New Mexico localities without adequate means to travel to a final destination or basic life necessities, such as food, clothing, and healthcare.

2.      The State of New Mexico, and the City of Albuquerque, have been profoundly impacted by this change in longstanding federal policy. Thus far in 2019, tens of thousands of asylum seekers and family members that would have formerly received assistance with basic necessities and provided the means to travel to their final destinations all over the country have been left to fend for themselves in border-adjacent New Mexico towns. In order to prevent a potentially significant humanitarian and/or public health crisis, New Mexico state and local governments have been forced to step in and provide the basic assistance to these people that the federal government has callously (and without prior warning) refused to provide at a cost of millions of dollars. These efforts by state and local governments are continuing at great cost and with no end in sight because the complete discontinuation of services by all governmental entities could prove more catastrophic.

3.      The Plaintiffs seek a judicial declaration that Defendants' sudden change in policy violated procedural and substantive provisions of the Administrative Procedure Act ("APA") and was therefore unlawful.

4.      The Plaintiffs also seek preliminary and permanent injunctions requiring Defendants to resume providing the assistance to asylum seekers and their families that they provided prior to the unlawful change in federal policies.

## JURISDICTION AND VENUE

5.      This Court has Federal Question Jurisdiction pursuant to 28 U.S.C. § 1331 because this matter arises under the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

6.      This Court is authorized to award the requested declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C §§ 2201-2202 and the APA, 5 U.S.C. § 706.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).  A substantial part of the events giving precipitating this action occurred in this District, and each Defendant is a United States officer sued in his/her official capacity.

## PARTIES

8.      Plaintiff State of New Mexico is situated along the U.S.-Mexico border.  Due to its location, New Mexico is one of the primary entry points for persons seeking asylum in the United States.

9.      Plaintiff City of Albuquerque is a home rule municipality in the State of New Mexico.  Albuquerque is the primary transportation hub in New Mexico and the state's largest city.

10.     Defendant Kevin K. McAleenan is the Acting Secretary of the United States Department of Homeland Security (referred to hereafter as "DHS") and is sued in his official capacity.  The DHS Secretary directs each of the component agencies within DHS, including the United States Immigration and Customs Enforcement (referred to hereafter as "ICE").  The DHS

Secretary is responsible for the administration of immigration laws and policies pursuant to 8 U.S.C. § 1103, including those laws and policies regarding the detention and release of asylum seekers.

11.     Defendant McAleenan is also the Commissioner of United States Customs and Border Protection (referred to hereafter as "CBP") and is sued in his official capacity. The Commissioner of CBP directs all of the departments within CBP, which is the nation's primary border control organization. The Commissioner of CBP oversees, directs, and coordinates policies and operations along the nation's southern border, including those policies and operations regarding the detention and release of asylum seekers.

12.     Defendant Mark A. Morgan is the Acting Director of ICE and is sued in his official capacity. ICE is the sub-agency that operates the federal government's immigration detention system. The ICE Director directs the administration of ICE's detention policies and operations, including those policies and operations regarding the detention and release of asylum seekers.

13.     Defendant Matthew T. Albence is the Deputy Director of ICE and is sued in his official capacity. The ICE Deputy Director oversees and coordinates ICE's day-to-day operations, including those policies and operations regarding the detention and release of asylum seekers.

14.     Defendant Nathalie R. Asher is the Executive Associate Director for ICE's Enforcement and Removal Operations (referred to hereafter as "ERO"). The ERO Executive Associate Director oversees, directs, and coordinates policies and operations throughout the nation's ERO field offices and sub-offices, including those policies and operations regarding the detention and release of asylum seekers.

15.     Defendant Carla L. Provost is the Chief of the United States Border Patrol (referred to hereafter as "USBP") and is sued in her official capacity. USBP is the mobile, uniformed law

4

enforcement arm of CBP. The Chief of USBP directs and supervises the implementation of DHS, ICE, and CBP policies. The Chief of USBP is responsible for the enforcement of immigration laws and policies, including those laws and policies regarding the detention and release of asylum seekers.

## FACTUAL BACKGROUND

**A.    The process of seeking asylum under the Safe Release policy.**

16.    During the last few years, an influx of children and adults from several countries in Central and South America began migrating to the United States' southern border in order to seek protection in the U.S. through the asylum process.

17.    Typically, asylum seekers present themselves at a Port of Entry (referred to hereafter as "POE"), or in locations along the border between POEs. A substantial number of the asylum seekers in recent years have presented themselves at POEs or other points along the portion of the U.S.-Mexico border that abuts El Paso, Texas and the State of New Mexico, including the Santa Teresa, Antelope Wells, Columbus, and El Paso POEs, which are in or immediately abutted by New Mexico.

18.    Thereafter, they are processed by USBP, CBP, and/or ICE (collectively referred to hereafter as "Immigration Officers"). During this initial encounter, Immigration Officers obtain background information, biometric data, and conduct a background check. Immigration Officers also undertake an initial interview with persons seeking asylum to assess whether a viable fear of persecution has been made.

19.    If Immigration Officers determine that a facially valid claim of asylum has been lodged, then asylum seekers may either be (1) released from custody and given a Notice to Appear (referred to hereafter as "NTA") in immigration court; or (2) detained pending a credible fear

interview.  Those asylum seekers who are released from custody will typically reside with family

members or sponsors while awaiting their appearance in immigration court.

20.    Many asylum seekers have family members or sponsors within the U.S., but have

no means of communicating with them prior to entry into the U.S.  To address this problem, and

in accordance with its responsibility for immigration oversight, the federal government

implemented a policy known as "Safe Release" or "Coordinated Release" (referred to hereafter as

"Safe Release") approximately ten years ago.   Under the Safe Release policy, Immigration

Officers assisted asylum seekers by confirming travel plans, coordinating assistance to them from

NGOs, facilitating communication with family members, often providing food, water, and

healthcare, and otherwise ensuring that asylum seekers had a means to reach their final destinations

in the U.S.

21.    Further, in accordance with Safe Release, Immigration Officers would transport

asylum seekers directly to the departure points for their pre-arranged mode of transportation, such

as bus stations, train stations, and airports, in an effort to facilitate an orderly release process.

These departure points were typically located within the closest POE metropolitan areas.

22.    Asylum seekers would generally arrive at their final destinations within three days

of their initial detention.

**B.      The federal government terminates or alters the Safe Release policy without  notice, opportunity for input, or other procedural safeguards.**

23.    In October 2018, the federal government abruptly abandoned the Safe Release

policy.  Defendants did this without warning or notice, and entities that would suffer significant

financial harm, such as Plaintiffs and other state and local governments, were not consulted and

did not otherwise participate in the process or procedure that led to the termination or change.

24.     Thereafter, beginning in April 2019, Immigration Officers began releasing asylum seekers in Las Cruces, New Mexico.  The asylum seekers were left without any mode of transportation to their final destination or any means of meeting their basic needs, such as food and healthcare.  During 2019, federal Immigration Officers have released approximately 9,000 asylum seekers into Las Cruces, New Mexico, a small city of about 100,000 people.

25.     Similarly, beginning in May 2019, Immigration Officers began releasing asylum seekers in Deming, New Mexico.   The asylum seekers were left without any mode of transportation to their final destination or any means of meeting their basic needs, such as food and healthcare.   During 2019, federal Immigration Officers have released approximately 4,700 asylum seekers into Deming, New Mexico, a town of approximately 14,000 people.

26.     Albuquerque has also realized a dramatic  influx of asylum seekers in recent months.  In March 2019, approximately three hundred asylum seekers, about half of whom were children, were bused to Albuquerque.  Currently, Albuquerque receives approximately between 150 and 250 asylum seekers per week.

27.     The influx of asylum seekers into the State and the City of Albuquerque is expected to continue over the coming months, if not years.

28.     Both the State and the City of Albuquerque have been obligated to devote significant resources to fill the vacuum created by the federal government's derogation of its duty to administer the immigration system and asylum claims.

C.     **The State of New Mexico has been harmed by the abrupt termination of, or change to, the federal government's Safe Release policy.**

29.     Beginning in 2019, the State of New Mexico has been forced to dedicate significant resources to addressing the substantial and predictable humanitarian and public health

consequences of the federal government's abrupt termination of or change to its Safe Release policy.

30.     Various government agencies in the State of New Mexico have stepped up to provide resources and staff to assist in humanitarian efforts made necessary by the termination of or change to the Safe Release Policy.  The New Mexico Office of the Attorney General, the New Mexico Children, Youth and Families Department, and the New Mexico Department of Homeland Security and Emergency Management (hereafter referred to as "DHSEM") have dedicated staff time and resources to responding to human trafficking reports from asylum seekers.  DHSEM and the New Mexico Department of Workforce Solutions have dedicated staff time and resources to coordinating travel plans for asylum seekers.  The New Mexico Department of Public Safety has employed its staff for enhanced law enforcement activities in affected communities.  The New Mexico Department of Health has deployed members of the New Mexico Medical Reserve Corps to assist with public health issues related to the influx of asylum seekers.  The New Mexico General Services Division and the New Mexico Department of Transportation have assisted in transporting asylum seekers by providing vans and drivers to transport individuals to travel hubs.

31.     The State of New Mexico has also paid out $750,000 in emergency grants to local governments—including local governments in Deming, Luna County, and Las Cruces—to assist those governments in dealing with the consequence of the termination of or change to the Safe Release Program.

**D.      The City of Albuquerque has been harmed by the abrupt termination of or change to the federal government's Safe Release policy.**

32.     A vast array of Albuquerque individuals and entities has also responded to the Defendants' termination of the Safe Release policy and taken on Defendants' federal responsibilities without federal funding to support such efforts. In Albuquerque, these entities

include nonprofits, religious institutions, other faith-based entities, medical professionals, the State

of New Mexico, and the City.

33.     Since March 2019, the City has contributed by assisting in the massive coordination

efforts that are required to deal with the weekly arrival and departure of homeless, foreign, asylum

seekers who need shelter, food, clothing, travel and navigation assistance, and medical care.

34.     Because of the pressures now facing the City and its residents due to Defendants'

termination of the Safe Release policy, the City passed a special appropriation in the amount of

$250,000.00 to contribute to this humanitarian effort.

## LEGAL BACKGROUND

35.     The Government of the United States possesses broad powers to set rules

surrounding immigration and to determine the procedures and policies applicable to admitting or

not admitting would-be immigrants to the United States, including those who request asylum. See

Arizona v. United States, 567 U.S. 387, 394-97 (2012).

36.     Federal law requires immigration agencies to give individuals who present

themselves at POEs and express a desire to apply for asylum or a fear of persecution in their home

countries the opportunity to seek protection in the United States without unreasonable delay under

a variety of circumstances. See, e.g., 8 U.S.C. § 1157 (admission of refugees processed overseas);

8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1231(b)(3) (restriction of removal to a country where

individual's life or freedom would be threatened); 8 C.F.R. §§ 208.16-18 (protection under the

Convention Against Torture).

37.     To that end, federal law provides that any noncitizen "who is physically present in

the United States or who arrives in the United States" has a statutory right to apply for asylum,

irrespective of such individual's status. 8 U.S.C. § 1158(a)(1). The INA also specifies processes

that must be followed when an individual expresses a desire to seek asylum or a fear of returning to his or her or their home country. See 8 U.S.C. § 1158(d)(1) ("The Attorney General shall establish a procedure for the consideration of asylum applications filed [by individuals physically present in the United States or who arrive in the United States].").

38.     Federal law requires Immigration Officers to follow certain mandatory procedures when processing asylum requests. See 8 U.S.C. § 1225(b). These procedures require that asylum seekers be in some manner "detained" by the federal government. See, e.g., 8 U.S.C. § 1225(b)(1)(A)(ii) (requiring that an asylum seeker "shall be detained for further consideration of the application for asylum" when a credible fear of persecution is found by an asylum officer); 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (requiring that an asylum seeker "shall be detained" when no credible fear of persecution is found by an asylum officer). Federal immigration laws do not in any manner authorize or empower the federal government to transfer custody or responsibility for asylum seekers to state or local governments.

39.     The APA authorizes suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The APA requires that federal agencies conduct notice and comment rulemaking before engaging in action that impacts substantive rights. 5 U.S.C. §§ 553, 706(2)(D). The APA also provides relief for agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

**CLAIM FOR RELIEF No. 1**
**(Violation of the APA: Notice and comment rulemaking [5 U.S.C. §§ 553, 706(2)(D)])**

40.     Plaintiffs incorporate the preceding paragraphs as though they were fully stated herein.

41.     DHS, ICE, CBP, and USBP are agencies under the APA, and the termination of—or a change to—the Safe Release policy, and actions in furtherance of the termination or change, constitute rules subject to rulemaking requirements under the APA.

42.     In terminating or changing the subject policy, the above-described federal agencies, and Defendants who in their official capacity are in charge of the agencies, have levied clear and distinct burdens on the Plaintiffs affecting individual rights and obligations, including increased costs and expenditures that must be incurred by state and local governments to avoid potential humanitarian and public health crises that could reasonably result from the policy change or termination, as described above.

43.     The APA requires administrative agencies to follow notice-and-comment rulemaking procedures to promulgate substantive rules. See 5 U.S.C. § 553.  The APA defines "rule" broadly to include: "[T]he whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes . . . practices bearing on any of the foregoing."  5 U.S.C. § 551(4).

44.     The termination or change in the Safe Release policy constitutes a substantive rule subject to the APA's required notice-and-comment procedures.

45.     As the policy change or termination was undertaken without first submitting the action for notice and public comment, Defendants and the federal agencies they oversee have violated section 553 of the APA, and their actions constitute unlawful rulemaking.

46.     Defendants' APA violation has caused, and will continue to cause, harm to the Plaintiffs and their residents through the diversion of the resources of State and local governments

11

and other direct financial expenditures necessitated by the termination of or change in the Safe Release policy.

## CLAIM FOR RELIEF No. 2
### (Violation of the APA: Agency action that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law [5 U.S.C. § 706(2)(A)])

47.     Plaintiffs incorporate the preceding paragraphs as though they were fully stated herein.

48.     Under 5 U.S.C. § 706(2), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law.

49.     The termination or change in the Safe Release policy constitutes final agency action that is reviewable by the Court because it does not appear to be of a tentative or interlocutory nature and determined the rights and obligations of state and local governments by effectively requiring them to take on the functions formerly assumed by the federal government.

50.     The termination or change in the Safe Release policy was arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, the termination or change in policy deviated from federal regulations and violated constitutional and statutory procedural rights, and Defendants failed to articulate a reasonable explanation—or indeed to provide any prior explanation or warning—for their actions.  See FCC v. Fox TV Stations, Inc., 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

51.     In assessing Defendants' actions under the arbitrary-and-capricious standard, a court must "consider whether the [agency's] decision was based on a consideration of the relevant

12

factors and whether there has been a clear error of judgment." <u>Citizens for Alts. v. United States</u> <u>DOE</u>, 485 F.3d 1091, 1098 (10th Cir. 2007) (internal quotation marks and citation omitted). Defendants have not met that standard in this case because they have not considered the relevant factors in deciding to terminate or change the Safe Release policy. Defendants have failed to consider important aspects of the issue, including the reasons and arguments in support of the Safe Release policy that were previously considered and made by the federal agencies Defendants oversee.

52.     Defendants also disregarded the reliance interests engendered by the Safe Release policy.  Where, as here, serious reliance interests are at stake, Defendants must, in addition to demonstrating that "there are good reasons" for the new policy, offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." <u>FCC</u>, 556 U.S. at 515; <u>see also</u> <u>Smiley v. Citibank (S.D.), N.A</u>, 517 U.S. 735, 742 (1996) ("Sudden and unexplained change or change that does not take account of legitimate reliance on prior interpretation, may be 'arbitrary, capricious [or] an abuse of discretion,' 5 U.S.C. § 706(2)(A)." (citations omitted)).  Defendants have failed to fulfill these fundamental obligations under the APA.

53.     The unlawful termination of, or change to, the Safe Release policy has unfairly shifted the resulting burdens to the Plaintiffs and their residents.  Defendants' APA violation has caused, and will continue to cause, harm to the Plaintiffs and their residents through the diversion of the resources of State and local governments and other direct financial expenditures necessitated by the termination of or change in the Safe Release policy.

**CLAIM FOR RELIEF No. 3**
**(Violation of procedural due process rights under the U.S. Constitution)**

54.     Plaintiffs incorporate the preceding paragraphs as though they were fully stated herein.

55.     Under the Fifth Amendment to the United States Constitution, no person may be deprived of life, liberty, or property without due process of law.

56.     The Plaintiffs have constitutionally-protected interests in the expenses they have incurred and will incur, and funds that they have been forced to expend and will expend, as a result of Defendants' unlawful termination of, or change to, the Safe Release policy.

57.     Defendants' actions unlawfully deprive the Plaintiffs of these and other constitutionally-protected interests without due process of law.  Such deprivation occurred with no notice or opportunity to be heard.

58.     Defendants have therefore violated the Fifth Amendment.

59.     The Plaintiffs were harmed and continue to be harmed by these constitutional violations through the diversion of the resources of State and local governments and other direct financial expenditures necessitated by the termination of or change in the Safe Release policy.

**CLAIM FOR RELIEF No. 4**
**(Declaratory and injunctive relief [28 U.S.C. §§ 2201-2202; 5 U.S.C. §§ 702-706])**

60.     Plaintiffs incorporate the preceding paragraphs as though they were fully stated herein.

61.     The termination or change in the Safe Release policy was unlawful under the APA and violated Plaintiffs' constitutional rights by failing to provide even minimal levels of due process and imposing an unlawful policy change without any explanation or warning.

62.     This Court should enjoin Defendants from implementing this unlawful policy termination or change and it should enter an order declaring unlawful Defendants' actions with respect to the termination or change of the Safe Release policy.

## RELIEF REQUESTED

Plaintiffs respectfully request that the Court grant them the following relief:

A.     Vacate and set aside the termination of, or change in, the Safe Release policy and any other related action taken by Defendants and the agencies they oversee;

B.     Enter a declaratory judgment stating that the actions of terminating or changing the Safe Release policy by Defendants and the agencies they oversee are void and without legal force or effect;

C.     Enter a declaratory judgment stating that the actions of terminating or changing the Safe Release policy by Defendants and the agencies they oversee are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and where not taken in compliance with the procedures required by the APA;

D.      Issue preliminary and permanent injunctions requiring Defendants, the agencies they oversee, as well as their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, to provide asylum seekers and their accompanying family members equivalent assistance to that provided under the Safe Release policy;

E.     Require Defendants' agencies to reimburse Plaintiffs the expenses they have incurred, and will incur, because of Defendants' unlawful actions;

F.     Award Plaintiffs reasonable attorneys' fees as permitted by law; and

G.     Grant such further relief as the Court deems just and proper.

Respectfully submitted,

Matthew L. Garcia,
*Chief General Counsel to Governor Michelle Lujan Grisham*
Jonathan J. Guss
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trial, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2214


_____ /s/ _____
Esteban A. Aguilar, Jr.,
*Albuquerque City Attorney*
Winter L. Torres
*Deputy City Attorney*
Lindsay Van Meter
*Assistant City Attorney*
1 Civic Plaza
Room 4072
Albuquerque, NM 87102
(505) 768-4500