# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO and THE
CITY OF ALBUQUERQUE,

        Plaintiffs,

vs.                                             No. CIV 19-0534 JB\SCY

KEVIN MCALEENAN, Acting
Secretary of the Department of
Homeland Security, in his official
capacity; MARK A. MORGAN,
Acting Director, U.S. Immigration
and Customs Enforcement, in his
official capacity; MATTHEW T.
ALBENCE, Deputy Director, U.S.
Immigration and Customs
Enforcement, in his official capacity;
NATHALIE R. ASHER, Executive
Associate Director for Enforcement
and Removal Operations, U.S.
Immigrations and Customs
Enforcement, in her official capacity;
and CARLA L. PROVOST, Chief of
Border Patrol, in her official capacity,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss and Opposition to Plaintiffs Motion For Preliminary Injunction and Supporting Memorandum, filed August 12, 2019 (Doc. 10)("MTD"). The Court held a hearing on December 11, 2019. See Clerk's Minutes at 1, filed December 11, 2019 (Doc. 28). The primary issues are: (i) whether Plaintiffs State of New Mexico and City of Albuquerque have Article III standing to bring their action to enjoin Defendants Kevin McAleenan, Mark A. Morgan, Matthew T. Albence, Nathalie R. Asher, and Carla L. Provost's practice of abandoning parole asylees in cities and towns throughout New

Mexico; (ii) whether sovereign immunity under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, protects the Defendants; (iii) whether the challenged agency action is reviewable under the APA; (iv) whether the State of New Mexico and the City of Albuquerque have alleged a property or liberty interest that the Due Process Clause of the Fifth Amendment to the Constitution of the United States of America protects; (v) whether the Court should grant New Mexico and Albuquerque's oral motion to amend the Complaint for Declaratory and Injunctive Relief and Damages, filed June 10, 2019 (Doc. 1)("Complaint"); and (vi) whether the Court should grant a preliminary injunction. The Court concludes that: (i) New Mexico and Albuquerque have Article III standing; (ii) sovereign immunity protects the Defendants against New Mexico and Albuquerque's APA claim; (iii) the challenged agency action is unreviewable under the APA; (iv) New Mexico and Albuquerque have not alleged a property or liberty interest that the Due Process Clause protects; (v) amending the Complaint would be futile; and (vi) because the Court lacks subject-matter jurisdiction for New Mexico and Albuquerque's APA claim, and because New Mexico and Albuquerque do not state a constitutional claim for which relief can be granted, the Court will not grant the requested preliminary injunction. The Court accordingly dismisses the Complaint without prejudice as to New Mexico and Albuquerque's APA claims, and with prejudice as to New Mexico and Albuquerque's constitutional claims.

### FACTUAL BACKGROUND

In the summer of 2019, the State of New Mexico and the City of Albuquerque filed this challenge to the federal government's decision to stop aiding asylum seekers trying to reach their final destinations. See Complaint at 1. Recently, an influx of adults and children from Central and South American countries have sought asylum in the United States of America. See Complaint ¶ 16, at 5. Immigration agencies typically interview and process these asylum seekers at their

Ports of Entry.  See Complaint ¶¶ 17-18, at 5.  If immigration officers determine that the asylum seeker has presented a facially valid claim, the asylum seekers may be released from custody with a Notice to Appear in immigration court, or they are detained pending a credible fear interview.[1] See Complaint ¶ 19, at 5-6.

About ten years before the lawsuit's filing, the United States implemented a policy known as "Safe Release" that "assisted asylum seekers by confirming travel plans, coordinating assistance to them from [non-governmental organizations], facilitating communication with family members, often providing food, water, and healthcare, and otherwise ensuring that asylum seekers had a means to reach their final destinations."  Complaint ¶ 20, at 6.  Many asylum seekers have family members or sponsors in the United States but cannot communicate with them before seeking asylum.  See Complaint ¶ 20, at 6.  Under this policy, immigration agencies transported asylum seekers to bus stations, train stations, and airports near their ports of entry.  See Complaint ¶ 20, at 6.  Asylum seekers "would generally arrive at their final destination within three days of their initial detention."  Complaint ¶ 22, at 6.

The federal government ended the Safe Release policy in October, 2018, without warning, notice, or consultation with potentially affected entities.  See Complaint ¶ 23, at 6.  In April and May, 2019, immigration agencies began releasing asylum seekers in New Mexico towns near the

---

[1]A noncitizen arriving at a United States Port of Entry is subject to expedited removal proceedings if a Customs & Border Patrol officers concludes that the noncitizen "is inadmissible for misrepresenting a material fact or lacking necessary documentation."  8 U.S.C. § 1225(b)(1)(A)(i).  The Department of Homeland Security may remove the noncitizen "without further hearing or review," unless the noncitizen "indicates an intention to apply for asylum . . . or a fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(i).  When a noncitizen indicates an intent to apply for asylum, "the officer shall refer the [noncitizen] for an interview with an asylum officer. . . ."  8 U.S.C. § 1225(b)(1)(A)(ii).  A noncitizen will be removed if "the officer determines that [a noncitizen] does not have a credible fear of persecution. . . ."  8 U.S.C. § 1125(b)(1)(B)(iii).

United Mexican States border without food, healthcare, or any mode of transportation to their final destination.  See Complaint ¶ 24, at 7.  The federal government released approximately 9,000 asylum seekers into Las Cruces, New Mexico, in 2019, which has a population of around 100,000.  See Complaint ¶ 24, at 7.  Approximately 4,700 asylum seekers were released into Deming, New Mexico, in 2019, which has a population of about 14,000. See Complaint ¶ 25, at 7.  "Albuquerque has also realized a dramatic influx of asylum seekers" and receives about 150 to 250 asylum seekers per week.  Complaint ¶ 26, at 7.  It expects this flow to continue.  See Complaint ¶ 27, at 7.

New Mexico and the City of Albuquerque "have been obligated to devote significant resources to fill the vacuum created by the federal government's derogation of its duty to administer the immigration system and asylum claims."  Complaint ¶ 28, at 7.  New Mexico alleges that it "has been forced to dedicate significant resources to addressing the substantial and predictable humanitarian and public health consequences of the federal government's abrupt termination of or change to its Safe Release policy."  Complaint ¶ 29, at 7-8.  Various New Mexico government agencies have provided resources and staff to address problems arising out of Safe Release's end.  See Complaint ¶ 30, at 8.  New Mexico has provided $750,000.00 in grants to local governments to help mitigate the effects of the United States' decision to end the Safe Release program.  See Complaint ¶ 31, at 8.

Albuquerque alleges that "[a] vast array of Albuquerque individuals and entities have also responded to the Defendants' termination of the Safe Release policy and taken on Defendants' federal responsibilities without federal funding to support such efforts."  Complaint ¶ 32, at 8.  Albuquerque has assisted coordination efforts to handle the flow of asylum seekers.  See Complaint ¶ 33, at 9.  Albuquerque has also issued a $250,000.00 special appropriation to help asylum seekers.  See Complaint ¶ 34, at 9.

## **PROCEDURAL BACKGROUND**

The Defendants ask the Court to dismiss the Complaint for lack of standing, lack of subject-matter jurisdiction, and for failure to state a claim.  See MTD at 1.  New Mexico and Albuquerque argue that they have standing, the Court has subject-matter jurisdiction, and they have established a procedural due process claim.  See Response to Defendants' Motion to Dismiss and Opposition to Plaintiffs' Motion for Preliminary Injunction at 2-3, filed September 20, 2019 (Doc. 16)("Response").  They also seek leave to add substantive due process and equal protections claims.  See Response at 3.

1.    **The MTD.**

The Defendants first argue that New Mexico and Albuquerque lack Article III standing. See MTD at 12.  They argue that the New Mexico and Albuquerque "lack a judicially cognizable injury," because the challenged action "does not command the State or its Cities to take, or refrain from taking, any action" and is instead injury from the United States' lack of regulation "'of *someone else.*'"  MTD at 12-13 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992)(emphasis in Lujan v. Defenders of Wildlife)).  The Defendants further argue that New Mexico and Albuquerque's arguments "would seem to conflict with the general principle that a plaintiff 'lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'"  MTD at 13 (quoting Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973), and citing Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 897 (1984)).  They also argue that the Complaint "ignores the legal implications of dual sovereignty," MTD at 13, and that it is inconsistent with the Constitution that "a State (or City) has a legally-protected interest in avoiding effects flowing from the federal government's actions regarding individuals who happen to be in that State or City . . . ," MTD at 14.

The Defendants next argue that the Court should dismiss New Mexico and Albuquerque's APA claims, because they are not "'arguably within the zone of interests to be protected or regulated *by the statute . . . in question.*'" MTD at 15 (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 396 (1987)(emphasis in MTD)). They argue that neither New Mexico nor Albuquerque is subjected to any regulatory action. See MTD at 16. They also contend that the Immigration and Nationality Act ("INA") does not protect local governments "from the incidental costs stemming from the exercise of discretion to temporarily parole migrants, including asylum seekers, into the United States." MTD at 16 (quoting Fed'n for Am. Immigration Reform, Inc. v. Reno, 93 F.3d 897, 899, 904 (D.C. Cir. 1996)).

Next, the Defendants argue that they are entitled to sovereign immunity under 5 U.S.C. § 701(a)(1) and (a)(2) of the APA. See MTD at 17. Section 701(a)(1) states that sovereign immunity applies to the extent that "statutes preclude judicial review," while § 701(a)(2) states that sovereign immunity applies to the extent that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)-(2). They argue that the INA precludes judicial review, because ending the Safe Release policy was a discretionary decision the Attorney General made, see MTD at 18, and 8 U.S.C. § 1252(a)(2)(B)(ii) bars judicial review of "'any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in [their] discretion . . . ,'" MTD at 18 (quoting 8 U.S.C. § 1252(a)(2)(B)(ii)).

They argue that the decision to end the Safe Release policy is committed to agency discretion by law, because the Department of Homeland Security has discretion to temporarily parole aliens, and the statute authorizing parole "does not itself provide a meaningful standard against which to judge the agency's exercise of discretion." MTD at 19 (citing 8 U.S.C. § 1182(d)(5)(A); Heckler v. Chaney, 470 U.S. 821, 830, 831 (1985)). The Defendants further assert

- 6 -

that "the express statutory grant of discretion to DHS to temporarily parole aliens into the United States does not at all require DHS to provide travel assistance to parolees," suggesting that there is "no standard at all" to judge the Department of Homeland Security's exercise of discretion. MTD at 20. They also note that "the express grant of discretion to DHS to temporarily parole migrants, including asylum seekers, into the United States *generally* necessarily includes the discretion to parole them *into New Mexico and Albuquerque in particular*." MTD at 20 (emphasis in original).

The Defendants then argue that ending the Safe Release program is unreviewable under the APA, because it is not a final agency action. See MTD at 21 (citing 5 U.S.C. § 704). They contend that it "is not a definitive statement of the agency's position; it does not have the status of law; and the question it raises is not a legal one." MTD at 21-22. The Defendants argue that it is therefore not, as New Mexico and Albuquerque allege, a "rule" subject to review. MTD at 22.

The Defendants next argue that New Mexico and Albuquerque have not identified a procedural due process violation. See MTD at 22. They argue that New Mexico and Albuquerque do not have constitutional liberty or property interests in "'expenses [they have] incurred and will incur, and funds that [they have] been forced to expend and will expend.'" MTD at 22 (quoting Complaint ¶ 59, at 14). They contrast this case with County of Santa Clara v. Trump, 250 F. Supp. 3d 497 (N.D. Cal. 2017)(Orrick, J.), in which the Honorable William Orrick, United States District Judge for the Northern District of California, concluded that two counties had a property interest in federal funds that Congress had already appropriated and the counties had already accepted -- despite an executive order purporting to make the counties ineligible to receive them. See MTD at 23; 250 F. Supp. 3d at 536. The Defendants argue that, in contrast, New Mexico and Albuquerque do not allege that they have any "legitimate claim of entitlement to any particular federal funds or

funding." MTD at 23-24.

Finally, the Defendants argue that the Court should not grant a preliminary injunction. See MTD at 24. They note that, "[w]here a movant seeks a mandatory rather than a prohibitory injunction, which would alter rather than preserve the status quo, he is generally subject to a higher burden." MTD at 26 (citing SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1097 (10th Cir. 1991)). The Defendants state that, because a preliminary injunction "is an extraordinary remedy, 'it is the exception rather than the rule.'" MTD at 26 (citing GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984)).

### 2. The Response.

New Mexico and Albuquerque respond and request that the Court deny the MTD. See Response at 1. They first argue that they "meet all elements of Article III standing by any conventional measure." Response at 6. They assert that New Mexico is entitled to "special solicitude" in the standing analysis, Response at 6 (citing New Mexico v. Dep't of the Interior, 854 F.3d 1207, 1219 (10th Cir. 2017); Massachusetts v. EPA, 549 U.S. 497, 518, 520 n.17 (2007)), and jurisdiction is appropriate "'in cases directly affecting the property rights and interests of a State' and when the 'substantial impairment of the health and prosperity of the towns and cities of the state' are at stake," Response at 7 (quoting Massachusetts v. EPA, 549 U.S. at 520 n.17). They contend that this affect is present here, because the federal government's decision has "caused imminent public health and safety crises in towns and cities in New Mexico, which have in turn forced the State to redirect finite resources and tap into its funds." Response at 7. New Mexico and Albuquerque next discuss Texas v. United States, 809 F.3d 134, 151-55 (2015) aff'd by an equally divided court sub nom. United States v. Texas, 136 S. Ct. 2271, 2272 (2016), in which the United States Court of Appeals for the Fifth Circuit granted Texas special solicitude and held that

Texas had standing to challenge "sudden, unlawful immigration rule changes." Response at 8. They assert that Albuquerque's "'proprietary interests'" also give Albuquerque standing. Response at 9 (quoting Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d 1123, 1176 (D.N.M. 2015)(Browning, J.)("Jarita Mesa")). They argue that, as in Jarita Mesa and Catron County Board of Commissioners v. U.S. Fish and Wildlife Service, 75 F.3d 1429, 1433-34 (10th Cir. 1996), the Court should find standing, because "the federal government's acts and omissions implicated interests crucial to local entities." Response at 9.

New Mexico and Albuquerque then argue that they have alleged an injury sufficient for standing analysis purposes. See Response at 10. They cite the "staff time and resources" each has expended and argue they have "also been injured by the capricious shifts in federal government policies on asylum seekers." Response at 10. They argue that "[f]ederal courts have routinely held that the injury in fact requirement is satisfied by state and local authorities asserting financial injuries like Plaintiffs' injuries in this case," Response at 11, and discuss Texas v. United States, 809 F.3d 134, and Texas v. United States, 328 F. Supp. 3d 662 (S.D. Tex. 2018)(Hanen, J.), in which courts found Texas had standing where it would incur significant costs as a result of the federal government's immigration policies, see Response at 11. In addition to these direct injuries, New Mexico and Albuquerque also argue that they have established procedural injuries. See Response at 11. According to New Mexico and Albuquerque, they suffered procedural injury, because the Defendants failed to follow procedures that the APA and Constitution require before ending the Safe Release program. Response at 12.

New Mexico and Albuquerque also argue that they satisfy standing's causation and redressability requirements. See Response at 12. They say causation is satisfied, because:

The end or change of Safe Release was directly responsible for an influx of asylum

seekers who were left in Plaintiffs' jurisdictions without a means of traveling to their destinations and without basic necessities or services. Compl. ¶¶ 24-28. Plaintiffs were -- and are -- compelled to assist the asylum seekers to avoid potential humanitarian, public safety, and public health crises that could result from stranding large groups of migrants throughout New Mexico. Plaintiffs' expenditures to assist these individuals and prevent a crisis are the inevitable consequence of Defendants' decision to end or alter Safe Release without notice or consultation and, thereby, effectively abandon paroled asylum seekers in Plaintiffs' jurisdictions.

Response at 13. They argue that the Defendants' failure to follow APA procedure also caused procedural injuries. See Response at 13-14. New Mexico and Albuquerque state that redressability is satisfied, because their "imminent economic harm" "can be redressed by an order enjoining the end of Safe Release" and requiring proper procedures for future changes to the program. Response at 14.

New Mexico and Albuquerque then argue that the Defendants did not "raise an availing argument against Plaintiffs' standing." Response at 14. They distinguish Lujan v. Defenders of Wildlife by arguing that they have shown "concrete and easily ascertainable harms." Response at 15. They also argue that, contrary to the MTD, they are not challenging prosecutorial decisions but a decision to "foist" a federal program's responsibilities on state and local governments. Response at 15. Finally, New Mexico and Albuquerque note that they are not challenging individual asylum or parole decisions and argue that Virginia ex rel. Cuccinelli v. Sebelius, 656 F.3d 253 (4th Cir. 2011), is inapposite, because they are alleging that the Defendants violated federal law. Response at 15-16.

Next, New Mexico and Albuquerque argue that they are within the zone of interests that the INA protects. See Response at 16 (citing Clarke v. Sec. Indus. Ass'n, 479 U.S. at 399). They contend that they are within this zone, because the "Plaintiffs' interest in this case are at least arguably related to several INA provisions, particularly those pertaining to asylum procedures."

Response at 17.  Citing 8 U.S.C. § 1158(d)(1) and 8 U.S.C. § 1182(d)(5)(A), they argue that the INA "must mean that paroled asylum seekers: (a) may require humanitarian assistance; and (b) may need to be provided with the means to efficiently reach and be returned from the place to which they have been paroled."  Response at 18.  They argue that, "[i]f the federal government exercises its right to parole individuals over which it effectively has custody for 'humanitarian' reasons, a corresponding abdication of any humanitarian assistance leaves state and local governments responsible for individuals who have been paroled into their jurisdictions."  Response at 19.  They also note that courts have found the zone of interest test satisfied in analogous cases. See Response at 19-20 (citing East Bay Sanctuary Covenant v. Trump, 909 F.3d 1219, 1244 (9th Cir. 2018); Hawaii v. Trump, 859 F.3d 741, 766 (9th Cir. 2017)).

New Mexico and Albuquerque then rebut the Defendants' arguments concerning the zone of interest.  See Response at 20.  They argue that the Defendants have mischaracterized their claim as a challenge to the Department of Homeland Security's decision to parole individual asylum seekers rather than contesting "the federal government's established obligation to provide humanitarian assistance to paroled asylum seekers" and the improper procedures the United States followed in ending the Safe Release program.  Response at 20.  They also distinguish one of the Defendants' cases, Federation for American Immigration Reform v. Reno.  See Response at 21-22.  Unlike that case, New Mexico and Albuquerque argue that they are not challenging a decision to admit or parole individuals or groups of individuals.  See Response at 21.  Instead, they say that they are challenging whether the United States may stop providing humanitarian assistance to asylum seekers without warning, forcing state and local governments to provide the same relief. See Response at 21.  This interest, they contend, is concrete.  See Response at 21.

New Mexico and Albuquerque also argue that they are entitled to APA review.  See

Response at 22.  They argue that 5 U.S.C. § 701(a)(1) does not bar review, because, rather than challenging the Attorney General's parole power or the outcome for an individual alien, "they are asserting their own rights to procedural protections under the APA."  Response at 23.  They also argue that 5 U.S.C. § 1252(a)(2)(B), which precludes review for any immigration "decision or action" involving some discretion is "not intended to preclude structural or constitutional challenges to the manner in which the parole system has been arranged."  Response at 23-24 (citing McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 490-94 (1991); Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999); Iddir v. INS, 166 F. Supp. 2d 1250, 1255 (N.D. Ill. 2001)(Gottschall, J.)).  New Mexico and Albuquerque assert that 5 U.S.C. § 1252(a)(2)(D) permits review for challenges involving "'constitutional claims or questions of law' in individual removal decisions or actions."  Response at 24 (quoting 5 U.S.C. § 1252(a)(2)(D) and citing Tuong Huan Van Dinh v. Reno, 197 F.3d 427, 431-32 (10th Cir. 1999)). They distinguish the Defendants' case on this subject, Mohsenzadeh v. Kelly, 276 F. Supp. 3d 1007 (S.D. Cal. 2017), as challenging "a discrete decision related to an individual removal case."  Response at 24.

Next, New Mexico and Albuquerque argue that 5 U.S.C. § 701(a)(2) does not bar their APA claims either.  See Response at 25.  They assert that INA provides "at least one meaningful standard against which to measure the termination or alteration of Safe Release: 'Urgent Humanitarian Reasons.'"  Response at 25 (quoting 8 U.S.C. § 1182(d)(5)(A)).  They argue that, "even if Defendants established Safe release outside the auspices of traditional notice and comment rulemaking," ending Safe Release is still reviewable as an agency's broad or general enforcement based on a legal interpretation.  See Response at 26 (citing Casa de Md. v. U.S. Dep't of Homeland Sec., 924 F.3d 684, 699 (4th Cir. 2019)).  The Defendants' "utter silence," New Mexico and Albuquerque argue, favor such a finding.  Response at 26 (citing FCC v. Fox TV Stations, Inc.,

556 U.S. 502, 515 (2009); <u>NAACP v. Trump</u>, 298 F. Supp. 3d 209, 238 (D.D.C. 2018)(Bates, J.)).

Next, New Mexico and Albuquerque argue that ending Safe Release is reviewable "'final agency action.'"  Response at 26 (quoting 5 U.S.C. § 704).  They argue that the Defendants "do not cite any facts or examples from case law" to support their contrary argument and that they have met their own pleading burden.  Response at 26.  They note that the Defendants do not deny that they created the Safe Release program and then changed its rules, and they assert that the rule change has had direct effects on their interests and has "the status of law because legal consequences flowed to both the State and the City."  Response at 27.  Further, "immediate compliance was expected because, as the federal government ceded its responsibilities, other governmental instrumentalities had to instead carry those burdens."  Response at 28.

New Mexico and Albuquerque then argue that they have pled a viable due process claim. <u>See</u> Response at 28.  They cite the expenses that they have and will expend after Safe Release's termination, as well as "their sovereignty and home rule," as their constitutionally protected interests.  Response at 28.  They argue that the consequences of ending Safe Release without warning "blurs the lines of political accountability" in a way that implicates anti-commandeering concerns.  Response at 29 (citing <u>Nat'l Fed'n of Indep. Bus. v. Sebelius</u>, 567 U.S. 519, 677-78 (2012)).  New Mexico and Albuquerque also seek leave to amend the Complaint to add substantive due process and equal protection claims.  <u>See</u> Response at 29.  They also note that, while they requested preliminary and permanent injunctions in the Complaint, they have not yet filed a motion seeking any injunctive relief, and "the Court need not decide a motion that has not been filed." Response at 30.

###     3.     <u>The Reply</u>.

The Defendants reply.  <u>See</u> Reply to Plaintiff's Response to Motion to Dismiss  at 1 (Doc.

16), filed October 18, 2019 (Doc. 20)("Reply").  They first argue that, because "the alleged discontinuation of assistance to paroled migrant[] . . . was not directed at" New Mexico and Albuquerque "or their residents," Albuquerque and New Mexico have suffered no injury in fact. Reply at 2.  The Defendants accordingly assert that New Mexico and Albuquerque are not the object of the Department of Homeland Security's "action or inaction," rendering New Mexico and Albuquerque's standing "'substantially more difficult' to establish."  Reply at 2 (quoting Lujan v. Defs. of Wildlife, 504 U.S. at 562).  The Defendants assert that New Mexico and Albuquerque have not "overcome this significant hurdle," because the "Supreme Court [of the United States of America] has made clear that 'self-inflicted' injuries to a State's fisc cannot form the basis of Article III standing."  Reply at 2-3 (quoting Pennsylvania v. New Jersey, 426 U.S. 660, 664 (1976) and citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 418 (2013)).  The Defendants state that New Mexico and Albuquerque have not identified any legal requirement that forced them to continue the Safe Release program's work, and assert that their argument that they were compelled to offer these services to stave off future harms is too speculative to constitute an injury.  See Reply at 3 (citing S.W. Env't Ctr. v. Sessions, 355 F. Supp. 3d 1121, 1133 (D.N.M. 2018)(Johnson, C.J.).  Any potential harm "due to future influxes of migrants," the Defendants argue, is caused not by the Defendants' policies but rather "is the result of the surge of migrants at the border." Reply at 3.

The Defendants next seek to distinguish Texas v. United States.  See Reply at 4.  The Defendants contend that, in that case, a preexisting state law necessitated that Texas incur costs in response to federal policy, and Texas could avoid those costs only if it repealed the law.  See Reply at 4 (citing Texas v. United States, 809 F.3d at 159).  This legal mandate, the Defendants argue, rendered Texas' asserted injury "not self-inflicted."  Reply at 4 (citing California v. Azar, 911 F.3d

558 (9th Cir. 2018)).  The Defendants also say that, in subsequent litigation, the United States

District Court for the Southern District of Texas concluded that Texas had standing "based on the

costs of state-provided social services '*required by federal law*.'"  Reply at 4 (quoting Texas v.

United States, 328 F. Supp. 3d at 700 (Texas II)(emphasis in Reply and not in Texas v. United

States).  The Defendants aver that, in contrast, New Mexico and Albuquerque voluntarily assist

migrants paroled in New Mexico, which is "precisely the manufactured standing that did not exist

in *Texas I* [and] *Texas II*."  Reply at 4.

      The Defendants next argue that New Mexico and Albuquerque have suffered no procedural

injury.  See Reply at 5.  The Defendants contend that the APA does not afford New Mexico and

Albuquerque a procedural right, because the APA "requires rule making only for substantive

rules," of which the "so-Called Safe Release policy" is not one.  Reply at 5 (citing 5 U.S.C. § 553).

The Defendants say that New Mexico and Albuquerque "have identified no substantive rule,

memorandum, or directive memorializing" the Safe Release policy "or otherwise explained why

any change in practice would require formal notice and comment rule making under the APA."

Reply at 5.  The Defendants also argue that, even if New Mexico and Albuquerque have established

a procedural right, they have no "interest in the DHS's discretionary parole decisions regarding

migrants," because their expenditures are voluntary.  Reply at 5 (citing Summers v. Earth Island

Inst., 555 U.S. 488, 496 (2009)).  The Defendants contend that, because there is not procedural

injury, New Mexico and Albuquerque are not entitled to any relaxed standard for redressability.

See Reply at 5 (citing Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir.

1996)).

      The Defendants next argue that New Mexico and Albuquerque cannot bring a parens

patriae action on their citizens' behalf against the United States.  See Reply at 6 (citing Alfred L.

Snapp & Son v. Puerto Rico ex rel. Barez, 458 U.S. 592, 610 n.16 (1982)). Only the United States, the Defendants argue, may "'represent its citizens and ensure their protection under federal law in federal matters.'" Reply at 6 (quoting Ctr. for Biological Diversity v. U.S. Dep't of Interior, 563 F.3d 466, 477 (D.C. Cir. 2009)). The Defendants argue that in New Mexico and Albuquerque's cited case, Massachusetts v. United States Department of Education, the Honorable Trevor N. McFadden, United States District Judge for the United States District Court for the District of Columbia, concluded that Massachusetts v. Environmental Protection Agency does not contradict "long standing Supreme Court precedent precluding" states' parens patriae standing. Reply at 5 (citing 340 F. Supp. 3d 7, 14-15 (D.D.C. 2018)(McFadden, J.)). The Defendants acknowledge that "other courts have reached different conclusions" but assert that New Mexico and Albuquerque cite no binding authority enabling New Mexico and Albuquerque's parens patriae standing. Reply at 6 (citing Wyoming v. U.S. Dep't of Interior, 674 F.3d 1220, 1232 (10th Cir. 2012); Aziz v. Trump, 231 F. Supp. 3d 23 (E.D. Va. 2017)(Brinkema, J.)). The Defendants contend that New Mexico and Albuquerque's challenge to the Department of Homeland Security's "exercise of its parole authority, committed to its discretion by statute, is precisely the type of claim prohibited by Supreme Court precedent." Reply at 6-7 (citing Massachusetts v. Mellon, 262 U.S. 447, 485 (1923)). The Defendants contend that states are entitled special solicitude in the standing analysis only to protect "quasi-sovereign or proprietary interest[s]," and the Defendants aver that New Mexico and Albuquerque claim no such interest in the Department of Homeland Security's parole authority. Reply at 7. The Defendants further assert that special solicitude does not relieve New Mexico and Albuquerque from establishing a concrete injury, traceable to the Defendants. See Reply at 7 (citing Wyoming v. U.S. Dep't of Interior, 674 F.3d at 1239).

The Defendants turn to their argument that New Mexico and Albuquerque lack prudential

or statutory standing under the APA, because they are the INA's intended beneficiaries. See Reply at 7. The Defendants assert that the INA's text, structure, and purpose do not demonstrate congressional intent to permit states to "invoke incidental and attenuated effects of the federal government's parole decisions in order to contest their procedural validity." Reply at 7. Instead, the Defendants contend that the INA "specifically commits the parole decision to agency discretion and allows for parole 'under such conditions as [the agency] may prescribe'" and renders such discretion judicially unreviewable. Reply at 8 (quoting 8 U.S.C. § 1182(d)(5)(A) and citing 8 U.S.C. § 1252(a)(2)(B)(ii)). The Defendants also assert that the INA endows the agency with discretion not just whether to parole asylees but also as to such parole's conditions. See Reply at 8. This "preclusion," the Defendants argue, "affirmatively establishes that [Congress] did not intend to permit states or cities to sue to challenge the agency's discretionary decisions regarding parole or the conditions of parole." Reply at 8. The Defendants contend that New Mexico and Albuquerque do not "identify anything in the INA that suggests congressional intent to permit suit by states or cities" regardless whether the agency's parole decisions impose costs or burdens on states and cities. Reply at 8-9 (citing E. Bay Sanctuary Covenant v. Trump, 932 F.3d 742, 768 (9th Cir. 2018); Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1243 (10th Cir. 2008)).

The Defendants next develop their argument that the Department of Homeland Security's parole practices are not judicially reviewable under the APA. See Reply at 9. First, the Defendants contend that APA does not authorize judicial review when a statute exempts agency actions from judicial review or when a statute places agency action within the agency's discretion. See Reply at 9. The Defendants contend that the Department of Homeland Security's parole decisions "fit squarely under both of these exceptions." Reply at 9. The Defendants aver that § 1252 addresses far more than individual immigration proceedings but rather contemplates a multitude of

discretionary decisions by the Attorney General of the United States and the Secretary of the Department of Homeland Security. Reply at 9 (citing Van Dinh v. Reno, 197 F.3d at 432). The Defendants accordingly assert that New Mexico and Albuquerque's argument "that they can obtain review where individuals directly impacted by the decisions cannot [obtain review] has no support in the statute." Reply at 10. The Defendants concede that § 1252(a)(2)(B)(ii)'s judicial review bar "is not limitless," but assert that the statute precludes judiciary review of actions or decisions statutorily specified as discretionary. See Reply at 10 (citing Kucana v. Holder, 558 U.S. 233, 237 (2010)). The Defendants say that, because § 1182(d)(5) endows the agency with plenary discretion regarding parole decisions and conditions, § 1252(a)(2)(B)(ii) precludes judicial review of the Department of Homeland Security's contested actions. See Reply at 10. The Defendants also assert that 5 U.S.C. § 701(a)(2) bars judicial review, because § 1182(d) provides no meaningful standard by which to gauge the agency's parole decisions. See Reply at 10. The Defendants argue that § 1182(d)(5)(A)'s "'urgent humanitarian reasons'" standard does not enable meaningful evaluation, because urgent humanitarian reasons "are a basis for parole [but] do not speak to the conditions of parole." Reply at 10 (quoting 8 U.S.C. § 1182(d)(5)(A)).

As a second reason that the agency's parole decisions are unreviewable, the Defendants contend that any changes which the Department of Homeland Security made regarding parole conditions or travel assistance do not amount to final agency action. See Reply at 11 (citing 5 U.S.C. § 704). The Defendants assert that New Mexico and Albuquerque "identif[y] no definitive statement of agency position regarding the assistance provided to paroled migrants." Reply at 11. Instead, the Defendants aver that the Department of Homeland Security's "discretionary parole authority" enables it to adjust parole conditions to adapt to evolving asylee flows and "operations demands at the border." Reply at 11.

Finally, the Defendants contend that the Department of Homeland Security's parole practices do not implicate New Mexico's or Albuquerque's procedural due process interests. See Reply at 12. State and local sovereignty and home rule, the Defendants argue, are not recognized property or liberty interests which require procedural due process protections. See Reply at 12. The Defendants seek to distinguish the Supreme Court precedent regarding the anti-commandeering doctrine by arguing that they "have not commanded or coerced Plaintiffs to take any action or adopt any particular policy or even conditioned federal funds on any actions by" New Mexico or Albuquerque. Reply at 12 (citing Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. at 577-78). The Defendants aver that only federal compulsion implicates New Mexico and Albuquerque's asserted constitutional interests, and the Defendants contend that such coercion is absent here. See Reply at 12. The Defendants accordingly assert that the Court should grant the MTD, and deny New Mexico and Albuquerque leave to amend the Complaint. See Reply at 12-13.

### 4. The Hearing.

The Court held a hearing. See Draft Transcript of Hearing at 1:23 (taken December 11, 2019)("Tr.").[2] The Defendants began by summarizing their arguments. See Tr. at 3:21-6:17 (Lucero). The Defendants characterized the primary issue before the Court as whether "there was a rule or regulation or statute or some type of rule making process." Tr. at 3:21-24 (Lucero). The Defendants argued that, because there was no such rule or process, New Mexico and Albuquerque lack standing to pursue this case. See Tr. at 3:24-4:5 (Lucero). The Defendants acknowledged

---

[2]The Court's citations to the Draft Transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

the Safe Release Program's ten-year duration but asserted that neither statutes nor regulations mandate the Safe Release Program, or prevent its abandonment. <u>See</u> Tr. at 4:8-11 (Lucero). The Defendants averred that, in response to the Department of Homeland Security ceasing the Safe Release Program, New Mexico and Albuquerque "took it upon themselves to fulfill some type of humanitarian aid which is commendable" but was not at the federal government's behest. Tr. at 4:11-14 (Lucero). In doing so, the Defendants asserted, New Mexico and Albuquerque suffered no judicially cognizable injury. <u>See</u> Tr. at 6:2-5 (Lucero). The Defendants stated that the Department of Homeland Security's parole practice "may be wrong but it still doesn't rise to the level of giving this Court standing to hear the arguments presented in the Complaint or in the Response." Tr. at 6:14-17 (Lucero).

New Mexico responded, first by discussing "four overarching considerations." Tr. at 7:11 (Guss). First, New Mexico argued that the Defendants "have not made a [rule] 12(b)(1) attack on the facts underlying subject matter jurisdiction," and so New Mexico and Albuquerque are entitled to rule 12(b)(6)'s plaintiff-friendly presumptions. Tr. at 7:13-122 (Guss). Second, New Mexico said that it does not challenge the Department of Homeland Security's individual, discretionary parole decisions, but rather "the system of parole" that § 1182 mandates and "the policy change from Safe Release late last year." Tr. at 8:12-20 (Guss). Third, New Mexico argued that this policy change "abdicated the federal government's responsibility to provide for [asylees] who have been paroled for urgent humanitarian reasons," as the statute prescribes. Tr. at 8:24-9:3 (Guss). New Mexico contended that, while the Department of Homeland Security is endowed with discretion as to whether to parole asylees, it does not have discretion about providing humanitarian aid and assistance to those it paroles. <u>See</u> Tr. at 9:17-22 (Guss). New Mexico asserted that, when the Department of Homeland Security leaves "hundreds of [asylum seekers] in a bus station in

Deming in the middle of summer without any assistance [or] any way to get to their sponsors or family members, . . . it's not an option for [local and state] authorities to ignore that issue or ignore those people." Tr. at 10:1-7 (Guss). New Mexico contends that the agency's new parole practice imposes costs upon state and local authorities "regardless of whether we proactively provide that kind of assistance or whether it's assistance that we have to provide when there is an emergency." Tr. at 10:8-12 (Guss). Fourth, New Mexico asserted that the Defendants made a new administrative exhaustion argument in their opening statement which was not made previously in the briefs. See Tr. at 10:12-16 (Guss). New Mexico contended that the APA "creates a presumption" that agency actions are judicially reviewable. Tr. at 10:20-22 (Guss).

The Defendants turned to their standing argument. See Tr. at 12:11-13 (Lucero). The Defendants asserted that, before the Safe Release Program, asylum-sponsors -- and not the federal government -- would take financial responsibility for paroled asylees. See Tr. at 13:14-22 (Lucero). Although the Department of Homeland Security began providing such assistance, the Defendants contended that they ceased providing assistance because of an influx of asylum-seekers at the southern border. See Tr. at 14:2-4 (Lucero). The Defendants describe the situation at the border as "just a nightmare" and asserted that, "if the Court were to dictate to the Director of Homeland Security [] that we have to go back to the way it was, it negates the discretion that they have in trying to process people at the border." Tr. at 26:19-24 (Lucero). The Defendants asserted that, although the Department of Homeland Security must care for asylees in its custody, "there is no provision in the statutes or in the regulations" that require it to care for paroled asylees. Tr. at 8-11 (Lucero). The Defendants argued, similarly, that the federal government has not instructed or mandated New Mexico and Albuquerque, "either verbally" or by regulation, to care for "these poor people that are coming from foreign countries." Tr. at 15:7-12 (Lucero). The

Defendants accordingly contended that "there were no rules to change" when the Department of Homeland Security stopped assisting paroled asylees and, because there has been no change in rules or regulations, the Court lacks jurisdiction. Tr. at 17:3 (Lucero). See id. at 17:19-21 (Lucero).

New Mexico responded that its legally protected interest is in "controlling state and local Government funds and controlling the resources of those Governments." Tr. at 18:22-25 (Guss). New Mexico described marshalling its resources -- both financial and human -- to care for paroled asylees, and asserted that "those are actual harms that have been suffered by both the city and the state." Tr. at 19:11-12 (Guss). See id. at 19:1-11 (Guss). New Mexico contended that an injunction requiring the Defendants to resume the Safe Release program would redress those harms. See Tr. at 20:6-10 (Guss). New Mexico argued that Massachusetts v. Environmental Protection Agency supports its standing argument, because, just as Massachusetts lacked independent power to "negotiate a treaty with another country" to address agency nonregulation, New Mexico cannot create its own immigration system to address the Department of Homeland Security's treatment of paroled asylees within New Mexico. Tr. at 21:12-14 (Guss). See id. at 21:19-22:3 (Guss). New Mexico pointed to Massachusetts v. EPA's footnote 17 to argue that a state may litigate as parens patriae when the federal government's violation of a federal statute harms the state's citizens collectively. See Tr. at 22:7-13 (Guss). New Mexico contended that it satisfies that standard, because it alleges an APA violation through which the federal government is harming New Mexico's sovereign interests. See Tr. at 22:14-18 (Guss).

Albuquerque added that "there are two facts essentially that the City would assert standing on." Tr. at 23:11-12 (Torres). Albuquerque first contended that it has a duty, through its state-derived police power, to "promote the health, safety, and welfare of everyone within our

jurisdiction," regardless how people arrive there.  Tr. at 23:13-17 (Torres).  Second, Albuquerque contended that it has "proprietary interests" in maintaining itself as an immigrant-friendly city, as its charter directs.  Tr. at 23:22-24:1 (Torres).

The Defendants turned to their APA standing argument.  <u>See</u> Tr. at 28:5-9 (Court, Lucero).  The Defendants asserted that, to invoke the APA, New Mexico must demonstrate that the Department of Homeland Security's treatment of paroled asylees is "a final agency decision."  Tr. at 28:9-12 (Lucero).  The Defendants stated that "the state and the city didn't give the agency an opportunity to address the discretionary action that they took in order to create an [APA] review," which demonstrates the lack of a final agency decision.  Tr. at 29:2-8 (Lucero).  The Defendants asserted that New Mexico and Albuquerque "skipped a step," but acknowledged that they were uncertain whether New Mexico and Albuquerque would have APA standing had they challenged administratively the Department of Homeland Security's treatment of paroled asylees.  Tr. at 30:24-31:4 (Lucero).  The Defendants nonetheless contended that, because New Mexico and Albuquerque did not raise such an administrative challenge, "we have no record, and usually under an APA review there is a record that the Court reviews."  Tr. at 31: 5-7 (Lucero).  The Defendants also criticized New Mexico and Albuquerque's directly filing the Complaint without filing a Freedom of Information Act request about the Department of Homeland Security's alleged policy change: "That's not the way you sue the federal government."  Tr. at 31:21-22 (Lucero).  <u>See id.</u> at 31:10-17 (Lucero).

New Mexico responded that the Defendants do not raise the administrative-exhaustion argument in the briefs and characterized the Defendants as positing a circular argument that "the federal government can provide no notice and no process and then . . . once the agency action happens, you can't sue them because they have no provided any notice or process."  Tr. at 33:3-7

(Guss). The Court asked New Mexico how the Court acquires jurisdiction over an APA claim "if there is no administrative report" to review. Tr. at 33:8-11 (Court). The Court noted that, in APA cases, it acts as an appellate court, whereas here New Mexico and Albuquerque ask the Court to function as a trial court in determining what administrative decisions the Department of Homeland Security has made. See Tr. at 33:12-18 (Court). New Mexico cited Grand Canyon Trust v. Public Service Company, 283 F. Supp. 2d 1249 (2003)(Black, J.), for the proposition that "no written policy statements are required as the basis for an APA claim." Tr. at 21-23. New Mexico nonetheless expressed skepticism that "there is no written record of a change in policy that resulted in literally thousands of people being physically left in part of New Mexico." Tr. at 36:6-9 (Guss). New Mexico also contended that, in New Mexico's requested injunctive relief, the Court could "order the agency to go through the agency process" anew. Tr. at 35:14-17 (Guss). Although New Mexico acknowledged that, typically, the burden to "go through the APA process" is on those who challenge administrative action, New Mexico argued that this burden applies only where an agency provides advance notice and opportunity to participate. Tr. at 37:3-5 (Guss). New Mexico said that the Department of Homeland Security provided ten to twelve hours' notice to local jurisdictions before releasing paroled asylees. See Tr. at 37:9-11 (Guss). Such short notice, New Mexico argued, rendered it impossible to follow typical APA process. See Tr. at 37:13-15 (Guss). Although New Mexico could not cite to controlling caselaw to support this proposition, it noted that the Defendants raised this argument for the first time at the hearing. See Tr. at 38:20-22 (Guss).

Albuquerque added that courts test agency-decision finality not by whether the decision is memorialized but rather by "whether the agency has completed its decision-making process . . . and whether the resulting action has had a direct impact on the rights of the parties involved." Tr.

at 41:3-7 (Torres). Albuquerque contended that, here, "both the state and the city . . . had a direct and immediate impact," with ten to twelve hours' notice before "the first bus loads of 300 people on Easter weekend." Tr. at 41:11-14 (Torres). Albuquerque echoed New Mexico's skepticism that the Department of Homeland Security could begin such large-scale release of paroled asylees "without having some writing that we are not yet aware of." Tr. at 41:17-21 (Lucero). Albuquerque also cited <u>Franklin v. Massachusetts</u>, 505 U.S. 788 (1992), to support New Mexico's APA-process rebuttal. <u>See</u> Tr. at 42:1-4 (Torres).

 The Defendants responded that, while the APA represents Congress' intent to provide states and the public with the means to challenge administrative rules and regulations, Congress also recognized that agency leaders must be afforded leeway to make "day-to-day" decisions. Tr. at 43:3-7 (Lucero). The Defendants asserted that "this Safe Release policy was just that, it was a policy that was initiated by one administration and a second administration came in and changed it." Tr. at 43:12-15 (Lucero). The Defendants contended that, for this change, "there is no requirement that the full-blown rule process take place." Tr. at 43:15-16 (Lucero). The Defendants stated that no formal rules or regulations embody the Safe Release program, and argued that this absence further evidences the program's discretionary nature. <u>See</u> Tr. at 45:11-16 (Lucero). The Defendants argued that requiring the Department of Homeland Security to "reimplement the Safe Release policy . . . would be [] contrary to how Congress . . . decided . . . which rules would be codified, and which would be left up to the discretion of the agency." Tr. at 46:10-14 (Lucero). Doing so, the Defendants averred, would amount to the Court "telling an agency, on almost everything, how they should do something, because somebody is offended that that policy has changed." Tr. at 46:16-19 (Lucero). The Defendants argued that, for similar reasons, the APA bars New Mexico and Albuquerque's suit. <u>See</u> Tr. at 47:11-13 (Lucero). The Defendants

- 25 -

contended that they found no cases "that would allow the Court to really act as a trial court with respect to some type of administrative action." Tr. at 47:21-24 (Lucero). Doing so, the Defendants contended, would result in the Court writing an "advisory opinion" telling the agency director to "go back and redo something he or she found to be discretionary." Tr. at 48:11-15 (Lucero).

New Mexico responded that "it's not an advisory opinion for a court to determine what notice and comment procedures . . . [were] required for an agency to make a significant change of policy." Tr. at 49:2-6 (Guss). New Mexico acknowledged that agencies routinely engage in unreviewable, discretionary actions, but asserted that the "agency is not necessarily . . . the entity that gets to decide whether something does or does not comply with the APA." Tr. at 50:15-17 (Guss). To determine whether a given action is within an agency's unreviewable discretion, New Mexico contended that 5 U.S.C. § 701(a)(2) provides the "guiding principles." Tr. at 51:1-4 (Guss). See id. at 50:22-25 (Court). New Mexico contended that courts interpret narrowly § 701(a)(2) to ensure agency fidelity to statutory authority. See Tr. at 51:7-13 (Guss). New Mexico acknowledged that the INA's § 1182(d)(5)(A) endows the agency with parole discretion "on a case-by-case basis," Tr. at 51:15-16 (Guss), but argued that the statute's guiding principle -- "urgent humanitarian reasons," 8 U.S.C. § 1182(d)(5)(A) -- "impl[ies] some basic requirement that the Government provide some basic assistance to people that they've acknowledged have urgent humanitarian reasons for being" paroled, Tr. at 51:23-52:1 (Guss). New Mexico argued that "those two sections together create some policeman responsibility for the federal government to provide some assistance." Tr. at 53:3-5 (Guss). Section 1182(d)(5)(A)'s instructions, New Mexico asserted, mean that Congress did not commit asylee parole entirely to the Department of Homeland Security's discretion, and so the agency's asylee parole policy "enjoys the presumption the being reviewable under the APA." Tr. at 54:2-5 (Guss).

The Defendants argued that New Mexico stretches to read § 1182(d)(5)(A) as constraining the Department of Homeland Security's agency-wide discretion when the statute refers primarily to individual parole proceedings. See Tr. at 55:3-10 (Lucero). Section 1182(d)(5)(A), the Defendants opined, addresses asylees in need of medical service and does not provide that all paroled asylees are entitled to humanitarian assistance. See Tr. at 55:14-16 (Lucero). Further, the Defendants argued that the standards to which New Mexico points do not provide the Court with a workable test to gauge the propriety of the agency's actions. See Tr. at 56:20-24 (Lucero).

Responding to the Defendants' arguments that their asylee parole practices are not final agency decisions, New Mexico argued that the Court can infer final agency decision, because that Department of Homeland Security's changes to its parole practices are so logistically demanding. See Tr. at 59:3-9 (Guss). Specifically, New Mexico contended that the agency satisfies § 704's test for final agency actions, because the agency's decision to "drop off . . . 10,000 people" requires such significant planning and follow-through that it may not reasonably be described as tentative or temporary. Tr. at 59:7-10 (Guss). Albuquerque added that the Department of Homeland Security provided advance notice of similar practices in San Diego, California, although lack of discovery prevents it from ascertaining whether the agency did so in New Mexico. See Tr. at 63:23-64:3 (Torres). Such advance notice, Albuquerque asserted, demonstrates the planning and agency decision-making that precipitated the agency's change in asylee parole. See Tr. at 64:5-8 (Torres). Albuquerque contended that it is entitled to discover the agency's "writings . . . or communications" pertaining to its asylee parole practices, although Albuquerque contended that such an administrative record is not necessary for the Court to identify a final agency action. See Tr. at 66:13-16 (Torres).

New Mexico asserted that "legal consequences have flowed to the state and to local

- 27 -

governments," which are duty-bound to "prevent a public health crisis." Tr. at 59:16-23 (Guss). Albuquerque added that the Department of Homeland Security's decision to abandon the Safe Release Program "had the status of law because [Albuquerque] had no other choice but to" coordinate and provide for the asylee's care. Tr. at 64:18-23 (Torres). Albuquerque accordingly contended that the agency's leaving paroled asylees within the City's boundaries implicated not just the asylum-seekers themselves, but also the City's "proprietary and sovereign" interests. Tr. at 64:23-24 (Torres). See id. at 65:2-6 (Torres). New Mexico further asserted that Congress intended that the agency's action be reviewable, because Congress statutorily imposed standards upon the Department of Homeland Security's handling of asylee parole. See Tr. at 62:23-63:6 (Guss).

The parties disagreed whether New Mexico and Albuquerque may plead their due process claims separately from their APA claims. Albuquerque contended that, even if it is not entitled to discovery to pursue its APA claim, its separate due process claim entitles it to discover evidence of the agency's decision-making process. See Tr. at 67:3-9 (Torres). The Defendants disagreed and argued that New Mexico and Albuquerque did not couch their due process claim within their contention that the agency violated the APA, as the APA requires. See Tr. at 69:25-70:4 (Lucero). New Mexico responded with skepticism that "a statute could somehow limit somebody's ability to assert a constitutional right." Tr. at 73:12-14 (Guss). New Mexico clarified that its procedural due process claim asserts a violation of the Tenth Amendment to the Constitution of the United States of America's anti-commandeering principle. See Tr. at 74:11-14 (Guss). New Mexico contended that, because it is forced to care for paroled asylees, the federal government is commandeering state executive officials to carry out federal policy. See Tr. at 74:17-21 (Guss). Because New Mexico must marshal its resources to care for paroled asylees and "run what is in

effect a federal program," New Mexico contended that "there is some right to at least some form of notice and opportunity to be heard." Tr. at 74:24-75:2 (Guss). New Mexico argued, alternatively, that its due process claim asserts a proprietary right to manage its resources and asserted that the Fifth Amendment to the Constitution of the United States of America guarantees this right. See Tr. at 75:14-17 (Guss). Albuquerque added that it asserts both liberty and proprietary interests in its due process claim. See Tr. at 83:1-6 (Torres). Albuquerque contended that the Defendants current parole practices require Albuquerque to abandon its longstanding policy of treating migrant families with respect and dignity. See Tr. at 83:10-18 (Torres). The Defendants responded that the Department of Homeland Security paroles asylees on an individual basis, and it conditions parole on each asylee obtaining a sponsor to pay for the asylee's care. See Tr. at 77:16-24 (Lucero). The Defendants averred that New Mexico voluntarily assumed its role as the paroled asylees' sponsor, and so the federal government has not commandeered the State's resources. See Tr. at 78:10-14 (Lucero). "It's harsh," the Defendants stated, "but . . . it's never easy" to "bring a suit against the United States." Tr. at 78:14-16 (Lucero).

At the Court's invitation, the Defendants turned to their argument that New Mexico and Albuquerque are not entitled to injunctive relief. See Tr. at 78:20-23 (Court, Lucero). The Defendants contended that injunctive relief is inappropriate, because New Mexico and Albuquerque are unlikely to prevail on the merits, and because New Mexico and Albuquerque did not seek an evidentiary hearing, which shows that the New Mexico and Albuquerque are not suffering immediate, irreparable harm. See Tr. at 79:8-10; id. at 79:18-22 (Lucero). New Mexico and Albuquerque declined to rebut the Defendants' assertions, because New Mexico and Albuquerque had not yet moved to immediate injunctive relief. See Tr. at 80:14-16 (Torres).

Toward the hearing's end, Albuquerque requested that, if the Court grants the Motion, it

dismiss this case without prejudice so that Albuquerque "can seek whatever administrative record might actually exist." See Tr. at 84:21-25 (Torres). Albuquerque also noted its desire to amend the Complaint to allege that the Department of Homeland Security is abandoning paroled asylees in New Mexico and other states that have expressed opposition to the Trump Administration's immigration policies. See Tr. at 84:8-12 (Torres). Albuquerque asserted that this alleged retaliation implicates the First and Fourteenth Amendments to the Constitution of the United States of America's associational, substantive due process, and equal protection guarantees. See Tr. at 84:11-14 (Torres).

Closing, the Defendants reiterated their commendations for New Mexico and Albuquerque's humanitarian efforts, but argued that, where federal jurisdiction is concerned, "it's policy over practice." Tr. at 86:4-6 (Lucero). The Defendants also averred that permitting New Mexico and Albuquerque to amend the Complaint would be futile, because the same jurisdictional bars would apply. See Tr. at 86:16-20 (Lucero).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the

alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions. First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss. See Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M.2012) (Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)); Robbins v. Oklahoma, 519 F.3d at 1247. Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the face of the complaint. See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The defense of limitations is the affirmative defense that the complaint's uncontroverted facts is most likely to establish. See 5 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004). If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6). See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945) (Phillips, J.); Andrew v. Schlumberger Tech. Corp., 808 F. Supp. 2d 1288, 1292 (D.N.M.2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute. The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion. Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954) (Major, J.)(holding that once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense). It appears that, from caselaw in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates. See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.). Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted it. See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1198-99, 1234-38 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue. Standing has two components. First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies. Second, standing has a prudential component. See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists). The burden of establishing standing rests on the plaintiff. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998). The plaintiff must "allege . . . facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing." FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and

quotations omitted). Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record." Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted). "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record." Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

1.    **Article III Standing.**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies." San Juan Cty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc). See U.S. Const. art. III, § 2. "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" Wyoming ex rel. Crank v. United States, 539 F.3d at 1241 (quoting Massachusetts v. EPA, 549 U.S. at 539 (internal quotation marks omitted). "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing." San Juan Cty., Utah v. United States, 503 F.3d at 1171. To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v.

Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).  In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.  484 F.3d at 1285.  The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Systems v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.  See 416 F.3d at 1154.  Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions.  416 F.3d at 1155.  Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.  See 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct that the statute prohibits.  See Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006).  "This does not necessarily mean that a statute must

be enforced against the plaintiff before he can sue." Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)). Where a plaintiff can show a "credible threat of prosecution," they can sue for prospective relief against enforcement. Winsness v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267). Thus, to satisfy Article III, the "plaintiff's expressive activities must be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement." Winsness v. Yocom, 433 F.3d at 732 (internal quotations omitted). See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights").

## 2. **Prudential Standing.**

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007). Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of persons who may invoke the courts' decisional and remedial powers." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted). Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential

standing. The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l v. Static Control Components, 572 U.S. 118, 127 (2014). Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l v. Static Control Components, 572 U.S. at 127. Notably, the Supreme Court stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)). Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (internal quotation marks and citations omitted). This "lenient approach" preserves the APA's flexible judicial-review provisions. Lexmark Int'l v. Static Control Components, 527 U.S. at 130.

## **LAW REGARDING THE APA'S JUDICIAL REVIEW PROVISIONS**

The Court reviews agency actions under the APA, 5 U.S.C. §§ 701-706. The APA describes the exclusive mechanism -- unless another statute provides an alternative or supplemental mechanism -- by which the federal district courts may review the actions of federal administrative agencies. See Webster v. Doe, 486 U.S. 592, 607 (1988)(Scalia, J., dissenting). "The [APA] makes final agency action for which there is no other adequate remedy in a court subject to judicial review." Utahns for Better Transp. v. United States Dep't of Transp., 305 F.3d 1152, 1164 (10th Cir. 2002). Because the INA does not provide a private right of action, courts

review final agency action under the APA. See Utah Envtl. Cong. v. Bosworth, 443 F.3d 732, 740 (10th Cir. 2006).

1. **The APA Does Not Impart Subject-Matter Jurisdiction, but It Waives Sovereign Immunity.**

The APA does not, through § 702, create an independent basis of subject-matter jurisdiction. See Eagle-Picher Indus., Inc. v. United States, 901 F.2d 1530, 1531 (10th Cir. f1990). It allows for judicial review of final agency action only if there is also an independent basis for subject-matter jurisdiction. See Colo. Dep't of Soc. Servs. v. Dep't of Health & Human Servs., 558 F. Supp. 337, 339 (D. Colo. 1983)(Matsch, J.). Notably, before a court may review a party's grievance, the party must demonstrate that statutes do not preclude judicial review and that the law does not commit the action to agency discretion. See Heckler v. Chaney, 470 U.S. at 828. Section 702 waives sovereign immunity, and makes clear that suits under the APA are for equitable relief only and not for damages. See 5 U.S.C. § 702.

Through 5 U.S.C. § 702, Congress provided "a general waiver of the government's sovereign immunity from injunctive relief." United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 n.8 (10th Cir.1996). "This waiver is not limited to suits under the Administrative Procedure Act." Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005).

> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis. Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.

Gilmore v. Weatherford, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012)(internal citations and quotation marks omitted). See Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 186 (D.C. Cir. 2006)(holding

that "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not");

Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996)(holding the same).

**2.     District Courts Must Treat Cases Arising From Agency Actions as Appeals.**

Pursuant to Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals.  In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." 42 F.3d at 1580.  See Wyoming v. United States Dep't of Interior, 587 F.3d 1245, 1251 n.2 (10th Cir2009) (quoting Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580).  District courts may not entertain motions for summary judgment or any other procedural devices that shift the appellant's substantial burden -- arbitrary-or-capricious review for questions of fact and Chevron deference for questions of statutory interpretation -- onto the agency.  See Olenhouse v. Commodity Credit Corp., 42 F.3d at 1579-80.

**3.     The Standard of Review for Factual Issues Is Arbitrary-or-Capricious Review -- Also Known as "Substantial Evidence" Review.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," and, in appeals from formal proceedings, unless they are "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). Although these standards appear different, the modern view is that they are the same, and that a decision is arbitrary and capricious if substantial evidence does not support it.  See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984).  In reviewing a decision under the arbitrary-or-capricious standard, the court reviews the entire administrative record—or at least those portions of the record that the parties

provided -- but it may not consider materials outside of the administrative record.[3] <u>See</u> 5 U.S.C. § 706.

> In cases where Congress has provided for judicial review without setting forth the standards to be used or procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most cases, no de novo proceedings may be had.

<u>Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision</u>, 934 F.2d 1127, 1137 (10th Cir.1991).

<u>See</u> Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency." (emphasis added)). The court should not pass judgment on the wisdom or merits of the agency's decision. <u>See</u> <u>Colo. Envtl. Coal. v. Dombeck</u>, 185 F.3d 1162, 1172 (10th Cir. 1999). To fulfill its function under the arbitrary-or-capricious standard of review, however, a reviewing court should engage in a "thorough, probing, in-depth review" of the administrative record. <u>Wyoming v. United States</u>, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation omitted). The Tenth Circuit explained the relevant standard of review as follows:

> In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. We consider an agency decision arbitrary and capricious if
>
> > the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[3]Section 706(2)(F) of the APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."

Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1167 (omission in original)(citations omitted)(quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))(internal quotation marks omitted). The standard of review requires the district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions." Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580. While the court may not invent a reasoned basis for the agency's action that the agency did not give, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(citations omitted). The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings. See Sec. Exchange Comm'n v. Chenery Corp., 318 U.S. 80 (1943).

### 4. The Standard of Review for Legal Issues Varies Depending Upon the Source of Law That the Agency Is Interpreting.

In promulgating and enforcing regulations, agencies must interpret the content of the Constitution, statutes, and their own previously enacted regulations. The federal judiciary accords considerable deference to agencies' interpretations of their own organic statutes -- the statutes Congress has tasked an agency with enforcing, from which it derives its authority to act. See United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994). This deference is known as Chevron deference, named after the first case adopting the approach, Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Chevron deference involves a two-step process,[4] first asking whether the

---

[4]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all. See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006). Step zero asks: (i) whether the agency is Chevron-qualified, meaning

statutory provision in question is clear and then, if it is not, asking whether the agency's

interpretation of the unclear statute is a reasonable one.  As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative
> agency interpretations of their organic statutes laid down by the Supreme Court in
> Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837,
> (1984).  Those directives require that we first determine whether Congress has
> directly spoken to the precise question at issue.  If the congressional intent is clear,
> we must give effect to that intent.  If the statute is silent or ambiguous on that
> specific issue, we must determine whether the agency's answer is based on a
> permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of a Veterinary Drug, 22 F.3d at

238 (citation omitted).

A number of policy considerations animate Chevron deference, among them: (i) statutory

interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes, is

granting discretionary power to the agencies to fill in the statutory gaps; (ii) institutional

competency, i.e., that agencies are more competent than the courts at filling out the substantive

law in their field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately

headed by the President of the United States, can be held politically accountable for their

interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can

more efficiently promulgate the massive amount of interpretation required to maintain the modern

regulatory state than a unified but Circuit-fragmented federal judiciary can.

Last, courts afford agencies no deference in interpreting the Constitution.  See United

States West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional

---

whether the agency involved is the agency charged with administering the statute; (ii) whether the
decision fits within the category of interpretations afforded the deference; and (iii) whether
Congress intended the agency to "speak with the force of law" in making the decision in question,
United States v. Mead Corp., 533 U.S. 218, 229 (2001).  An affirmative answer to all three
inquiries results in the agency's decision passing step zero.

interpretation is not entitled to Chevron deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA."); Jarita Mesa Livestock Grazing Ass'n v. United States Forest Serv., 58 F. Supp. 3d 1191, 1237-41 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING 5 U.S.C. § 701(A) AND APA'S PRECLUSION OF JUDICIAL REVIEW

The APA's judicial review provisions are in 5 U.S.C. §§ 701-06.  Section 701(a) carves out two categories of agency decisions that are not subject to judicial review. It states that the APA's judicial review provisions do not apply "to the extent that -- (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).

1.    **Statutory Preclusion.**

The APA "creates a 'presumption favoring judicial review of administrative action.'" Sackett v. EPA, 566 U.S. 120, 128 (2012)(quoting Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984)). The APA's presumption of judicial review is overcome only when there is

"persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories v. Gardner, 387 U.S. 136, 140 (1967). Overcoming this presumption is a "heavy burden," Dunlop v. Bachowski, 421 U.S. 560, 567 (1975), and it is especially difficult for Congress to preclude judicial review of constitutional claims, see Cuozzo Speed Techs., LLC v. Lee, 136 S. Ct. 2131, 2141 (2016); Lepre v. Dep't of Labor, 275 F. 3d 59, 75 (D.C. Cir. 2001)(Silberman, J., concurring). The Supreme Court "'has found the standard met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is 'fairly discernible' in the statutory scheme.'" Block v. Cmty. Nutrition Inst., 467 U.S. at 351 (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 157 (1970)).

Absent express preclusion, courts may still find that a statute's regulatory scheme precludes judicial review. For example, in Block v. Community Nutrition Institute, the Supreme Court concluded that the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq., implicitly precluded dairy consumers from obtaining review of the Secretary of Agriculture's milk market orders. See 467 U.S. at 348. The Agricultural Marketing Agreement Act of 1937 permitted the Secretary of Agriculture to set minimum prices for milk products upon the consent of two-thirds of affected dairy producers. See 467 U.S. at 432. Consumers, meanwhile, had no right to participate in the administrative process establishing market orders. See 467 U.S. at 436. Dairy producers could obtain judicial review of these orders after exhausting administrative remedies. See 467 U.S. at 436. The Supreme Court concluded that allowing consumers to challenge the Secretary's orders "would severely disrupt this complex and delicate administrative scheme," because otherwise every producer who also consumed dairy could challenge the Secretary of Agriculture's orders without first exhausting administrative remedies. 467 U.S. at 438.

2.      **Committed to Agency Discretion By Law.**

The APA's exclusion of judicial review for action committed to agency discretion by law "is a very narrow exception." <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 410 (1971). As opposed to 5 U.S.C. § 701(a)(1) preclusion, which relies on evidence of Congressional intent, courts may conclude that, "even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." <u>Heckler v. Chaney</u>, 470 U.S. at 830. <u>See</u> <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. at 410 (citing S. Rep. No. 752, at 26 (1945)).

There is a tension between 5 U.S.C. § 701(a)(2), which precludes review for agency action "committed to agency discretion by law," and 5 U.S.C. § 706(2)(A), which authorizes courts to "set aside agency action, findings, and conclusions found to be . . . an abuse of discretion."   In attempting to explain this apparent conflict, the Supreme Court first stated that, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion,'" and discretion was committed to the agency under law.  <u>Heckler v. Chaney</u>, 470 U.S. at 830.  Writing in dissent in <u>Webster v. Doe</u>, Associate Justice Antonin Scalia argued instead that the phrase "committed to agency discretion by law" refers to the common law of judicial review of agency action.  486 U.S. at 609.  Thus, agency action is committed to its discretion by law not when there is no law for a court to apply, but when it is "of the sort that is traditionally unreviewable."  486 U.S. at 610. Justice Scalia argued that traditionally unreviewable issues "included principles ranging from the 'political question' doctrine, to sovereign immunity . . . , to official immunity to prudential limitations upon the courts' equitable powers, to what can be described no more precisely than a traditional respect for the functions of the other branches."  486 U.S. at 608-09.  <u>See</u> Charles H

Kochm Jr., <u>An Issue-Driven Strategy for Review of Agency Decisions</u>, 43 Admin. L. Rev. 511, 549-552 (1991).

The Supreme Court adopted Justice Scalia's explanation in <u>Lincoln v. Vigil</u>, 508 U.S. 182, 191 (1993)("Over the years, we have read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" (quoting 5 U.S.C. § 701(a)(2) and citing <u>Webster v. Doe</u>, 486 U.S. at 608 (Scalia, J., dissenting))). It concluded that 5 U.S.C. § 701(a)(2) precluded judicial review of the Indian Health Services' decision to reallocate funds from the Indian Children's Program, because the "allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion." <u>Lincoln v. Vigil</u>, 508 U.S. at 192. It compared an agency's lump-sum allocation to the decision whether to institute enforcement proceedings, noting that both require "'a complicated balancing of a number of factors which are peculiarly within its expertise.'" <u>Lincoln v. Vigil</u>, 508 U.S. at 191 (quoting <u>Heckler v. Chaney</u>, 470 U.S. at 831).

## **LAW REGARDING STATUTORY STANDING UNDER THE APA**

Plaintiffs suing under the APA must show that their complaint is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." <u>Ass'n of Data Processing Srv. Orgs. v. Camp</u>, 397 U.S. at 153. Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing. <u>See, e.g.,</u> <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak</u>, 567 U.S. at 224; <u>Hill v. Warsewa</u>, 947 F.3d 1305, 1309 n.3 (10th Cir. 2020). The Supreme Court has clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." <u>Lexmark Int'l</u>

v. Static Control Components, 572 U.S. at 127. Notably, the test "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" Lexmark Int'l v. Static Control Components, 572 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. at 225). Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 572 U.S. at 130 (internal quotation marks and citations omitted). See Air Courier Conference of Am. v. Am. Postal Workers Union, AFL-CIO, 498 U.S. 517 (1991)(concluding that postal employees are not within the zone of interests that the Private Express statutes, 18 U.S.C. §§ 1693-99 and 39 U.S.C. §§ 601-06, protect). This "lenient approach" preserves the APA's flexible judicial-review provisions. Lexmark Int'l v. Static Control Components, 572 U.S. at 130. There "need be no indication of congressional purpose to benefit the would-be plaintiff." Clark v. Sec. Industry Ass'n, 479 U.S. at 399-400. Finally, whether a plaintiff's interest is protected "is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies . . . ." Bennett v. Spear, 520 U.S. 154, 175-76 (1997). See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 883. But see Jonathan R. Siegel, Zone of Interests, 92 Geo. L.J. 317, 336-37 (2004).

The Court addressed a similar issue in Jarita Mesa Livestock Grazing Association v. U.S. Forest Service. In that case, the Court analyzed whether the National Environmental Policy Act's, 42 U.S.C. §§ 4331-70, zone of interests includes those of northern New Mexican ranchers. See 140 F. Supp. 3d at 1178-83. The Court concluded that NEPA's interests -- protecting the human environment --  did not include the ranchers' economic interests but did include their

"environmental, recreational, and cultural injuries." 140 F. Supp. 3d at 1183.

## ANALYSIS

New Mexico and Albuquerque challenge the Department of Homeland Security's recent practice of leaving paroled asylees in locations around New Mexico "without adequate means to travel to a final destination or basic life necessities, such as food, clothing, and healthcare." Complaint ¶ 1, at 2. The Court concludes that New Mexico and Albuquerque have Article III standing to bring this action, because they each allege concrete injuries, traceable to the Defendants' actions and -- at least theoretically -- redressable by favorable judicial decision.[5] The

---

[5]The Court also concludes that New Mexico and Albuquerque would have statutory standing under the APA, because their claims are within the INA's protected zone of interests. Because the INA does not contain a private right of action, New Mexico and Albuquerque must rely on the APA as the basis for their action. See Wyoming v. United States Dep't of Agric., 661 F.3d 1209, 1226 (10th Cir. 2011). The Court analyzes whether a plaintiff satisfies the zone-of-interest test first by "'discern[ing] the interests arguably . . . to be protected by the statutory provision at issue,' and then by 'inquir[ing] whether the plaintiff's interests affected by the agency action in question are among them.'"[5] Wyoming ex rel. Crank v. United States, 539 F.3d at 1243 (quoting Nat'l Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998)). The relevant statute at issue is the INA, and the Plaintiffs have not demonstrated that their interests fall within those that its parole provisions seeks to protect.

The INA statutory provision on which New Mexico and Albuquerque primarily rely states:

> The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). This provision's discernible interests "arguably" include several separate groups. See Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. at 130. The United States' interests are addressed; the statute grants the Attorney General the discretion to parole asylum seekers for "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). This vague

- 48 -

standard conceivably encompasses a wide range of public benefits, such as conserving resources otherwise spent on housing asylum seekers or allowing an individual to carry on their employment in the United States. Related, asylum seekers also have an identifiable interest that the statute protects, namely, spending the time between his or her entrance into the United States and their adjudication outside custody.

Aside from these two interests, the Court also concludes that states and cities "arguably" have an interest that 8 U.S.C. § 1182(d)(5)(A) protects. Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. at 130. The provision grants the Attorney General discretion to parole asylees for "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). This standard's vagueness does not mean that the statute protects -- and therefore confers statutory standing upon -- every public member. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. at 577; United States v. Richardson, 418 U.S. 166, 177-78 (concluding that a plaintiff lacked Article III standing for alleging a generalized grievance common to all members of the public). It means, however, that where a party, such as a state or local government, faces harm from the United States' decision to parole asylees, that party is within § 1182(d)(5)(A)'s interests. State and local governments, as the political subdivisions responsible for their residents' welfare, are well-suited to make these challenges. See Bank of Am. Corp. v. City of Miami, Fla., 137 S. Ct. at 1304-05 (concluding that the City of Miami had APA statutory standing as under the Fair Housing Act, 42 U.S.C. §§ 3601-14, to challenge local lending practices); Gladstone Realtors v. City of Bellwood, 441 U.S. 91, 110-11 (1979)(holding that a local government had Article III standing to challenge a private actor's practices that caused a "significant reduction in property values" that diminished its tax base and "threaten[ed] its ability to bear the costs of local government and to provide services"); New York v. United States Dep't of Homeland Sec., 408 F. Supp. 3d 334, 345 (S.D.N.Y. 2019)(Daniels, J.)(concluding that New York, Connecticut, and Vermont were within the INA's zone of interests to challenge a Department of Homeland Security rule redefining "public charge" for purposes of denying immigrants entry). Accordingly, although parties still must demonstrate a particularized injury to satisfy Article III standing requirements, parties such as state and local governments that can show that the United States' parole decisions were made contrary to "significant public benefit" under 8 U.S.C. § 1182(d)(5)(A), are at least "arguably" within the statute's zone of interests.

Having determined the interests that the INA protects, the Court turns to whether the Complaint alleges any protected interests. See Nat'l Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. at 492. New Mexico and Albuquerque present the following reasoning why their claims fall within the zone of interests that this provision of the INA seeks to protect:

> If the federal government exercises its right to parole individuals over which it effectively has custody for "humanitarian" reasons, a corresponding abdication of any humanitarian assistance leaves state and local governments responsible for individuals who have been paroled into their jurisdictions. The localized interests of these governments are necessarily impacted by a significant influx of people (left by the federal government) who urgently require humanitarian assistance, basic services, and transportation to meet the conditions of their parole. The policy impacts of such a dramatic change in local conditions are substantial for these governmental entities, quickly affecting where, why, and how governmental

resources are deployed.

Response at 18 (quoting 8 U.S.C. § 1182(d)(5)(A)). New Mexico and Albuquerque therefore argue that this provision means that some paroled asylum seekers require humanitarian assistance and may need help both reaching their destination and returning to where they were paroled. See Response at 18.

New Mexico and Albuquerque also cite Wyoming ex rel. Crank v. United States, East Bay Sanctuary Covenant v. Trump, and Hawaii v. Trump, as analogous cases in which Courts of Appeals have concluded that states alleged claims within the zone of interests which statutes intend to protect. See Response at 19-20. In Wyoming ex rel. Crank v. United States, Wyoming challenged the Bureau of Alcohol, Tobacco, and Firearms' ("ATF") interpretation of a provision in the Gun Control Act of 1968, 18 U.S.C. §§ 921-28. See 539 F.3d at 1239. Wyoming had passed a statute that modified the procedure for expunging misdemeanor convictions to restore federal firearm rights. See 539 F.3d at 1238. The ATF argued that federal law rather than state law governed whether misdemeanor records were expunged and stated that Wyoming's statute did not meet the federal definition. See 539 F.3d at 1239. The Tenth Circuit held that, because the Gun Control Act of 1968 "grants states significant latitude to determine the applicability of the Act by relying on state law, in part, to determine the classes of individuals that may not possess a firearm," Wyoming's interests were among those that Congress intended the Gun Control Act of 1968 to protect. 539 U.S. at 1244. Likewise, in East Bay Sanctuary Covenant v. Trump, 932 F.3d at 768, nonprofit organizations representing asylum seekers challenged a federal rule whose effect was "to make asylum unavailable to any alien who seeks refuge in the United States if she entered the country form Mexico outside a lawful port of entry." 932 F. 3d at 755. The United States Court of Appeals for the Ninth Circuit concluded that the INA protected these organizations' "interest in aiding immigrants seeking asylum" even though "the Organizations are neither directly regulated nor benefitted by the INA." 932 F.3d at 768. The Ninth Circuit cited provisions in the INA that illustrated that "Congress took steps to ensure that pro bono legal services of the type that the Organizations provide are available to asylum seekers." 932 F.3d at 768. These provisions, the Ninth Circuit concluded, support an inference that Congress intended that the plaintiffs were able to sue under the statute. See 932 F.3d at 769 (citing Hazardous Waste Treatment Council v. EPA, 861 F.2d 277, 283 (D.C. Cir. 1988)). Finally, in Hawaii v. Trump, Hawaii challenged an executive order which President Donald Trump issued that suspended entry into the United States of nationals from Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen. See 859 F.3d at 756. The Ninth Circuit concluded that Hawaii's interests in enrolling students and hiring faculty from these countries, as well as its interest "in effectuating its refugee resettlement policies and programs," are arguably within the INA's zone of protected interests. 859 F.3d at 766. The Supreme Court later vacated the Ninth Circuit's ruling, concluding that the executive order at issue had expired and thus no longer represented a live case or controversy. See Trump v. Hawaii, 138 S. Ct. 377 (2017). See also Trump v. Hawaii, 138 S. Ct. 2392 (2018)(upholding a later executive order's validity without analyzing the INA's zone of interests).

The Court agrees with New Mexico and Albuquerque that their interests in managing the public welfare place them inside the INA's parole provision's zone of interests. "'The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States . . . .'" Texas v. United States, 809 F.3d at 163 (quoting Arizona v. United States, 567 U.S.

Court also concludes, however, that it lacks subject-matter jurisdiction to review New Mexico and Albuquerque's claims under the APA, because New Mexico and Albuquerque do not challenge a "final agency action," and because Congress has not waived sovereign immunity for their claims. Finally, the Court concludes that New Mexico and Albuquerque fail to state a cognizable constitutional violation, because they lack a property interest in the Defendants' parole practices. Accordingly, the Court dismisses this action without prejudice.

## I.    NEW MEXICO AND ALBUQUERQUE HAVE ARTICLE III STANDING.

The Court deems New Mexico and Albuquerque's allegations as true for the purposes of the Motion.[6]  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  New Mexico and

_____

387, 397 (2012)).  Given the Court's discussion above concerning the injuries that New Mexico alleges, the Court concludes that New Mexico and Albuquerque are within the INA's zone of interests.  The Defendants argue that, although New Mexico and Albuquerque "may experience some costs as a result of the parole decisions, this does not demonstrate that Congress intended for Plaintiffs to enforce the parole provisions," Reply at 8-9, and they assert that New Mexico and Albuquerque "have failed to identify anything in the INA that suggests congressional intent to permit suit by states or cities," Reply at 8.  The Court notes, however, that the zone of interests test "is not meant to be especially demanding," Clarke v. Sec. Indus. Ass'n, 479 U.S. at 399, and it is applied alongside the presumption that Congress intends for agency action to be reviewable, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. at 225.

[6]The Defendants invoke rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  See Motion at 11.  Rule 12(b)(1) allows a party to raise the defense of a court's "lack of jurisdiction over the subject matter" by motion.  Fed. R. Civ. P. 12(b)(1).  The United States Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).  On a facial attack, a plaintiff is afforded a safeguard similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.  See Hill v. Vanderbilt Capital Advisors, LLC, 834 F. Supp. 2d 1228, 1241 (D.N.M. 2011)(Browning, J.)(citing Ruiz v. McDonnell, 299 F.3d at 1180).  Alternatively, when the attack is aimed at the jurisdictional facts themselves, a district court may not presume those allegations' truthfulness.  See Hill v. Vanderbilt Capital Advisors, LLC, 834 F. Supp. 2d at 1241.

Here, the Defendants do not attack the jurisdictional facts' veracity but rather assert that the facts, as New Mexico and Albuquerque allege, do not confer standing.  See Motion at 13; Reply at 2-7.  The Court, accordingly, construes the Motion as a rule 12(b)(1) attack on the

Albuquerque assert that this case "arises from the federal government's sudden and unlawful abandonment of its longstanding Safe Release policy, under which it provided needed assistance to asylum seekers . . . in reaching their final destinations while they waited for their claims to be processed." Complaint ¶ 1, at 2. New Mexico and Albuquerque allege that the United States, "[w]ithout any prior notice or opportunity to state and local governments, . . . transferred its basic humanitarian obligations to state and local governments" by abandoning paroled asylees around New Mexico and in Albuquerque. Complaint ¶ 1, at 2. New Mexico and Albuquerque allege that this sudden reversal forced them to provide emergency humanitarian care for thousands of migrants in the United States "by virtue of their asylum claims and related federal law." Complaint ¶ 1, at 2. New Mexico and Albuquerque allege that, had the Defendants maintained the Safe Release policy, the federal government would have assisted these thousands of migrants "to travel to their final destinations all over the country," leaving New Mexico and Albuquerque free to devote their resources to other chosen objectives. Complaint ¶ 28, at 7. New Mexico alleges that the Defendants, without notice, left approximately 4,700 asylum seekers in Deming, New Mexico, a town of about 14,000 people. See Complaint ¶ 25, at 7. Albuquerque asserts that it "receives approximately between 150 and 250 asylum seekers per week," at significant cost to Albuquerque's public services. Complaint ¶ 28, at 7. The Defendants characterize the complained-of behavior as the Department of Homeland Security's "discretionary decisions (1) whether to parole migrants, including asylum seekers, into the United States, and (2) whether

sufficiency of the Complaint's allegations as to subject-matter jurisdiction and a rule 12(b)(6) attack on the Complaint's sufficiency as a matter of law. The Court, accordingly, accepts as true all well-pled factual allegations in the Complaint, views those allegations in the light most favorable to New Mexico and Albuquerque as the non-moving parties, and draws all reasonable inferences in New Mexico and Albuquerque's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.

the provide travel assistance to such paroled migrants, including asylum seekers, upon their release." Motion at 12.

As the parties invoking federal jurisdiction, New Mexico and Albuquerque have the burden to establish standing. See Clapper v. Amnesty Int'l USA, 568 U.S. at 412. They must demonstrate an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. at 411. If either New Mexico or Albuquerque is vested with a procedural right, "that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Massachusetts v. EPA, 549 U.S. at 518.

## A. NEW MEXICO SATISFIES ARTICLE III'S CONSTITUTIONAL STANDING REQUIREMENTS.

If either New Mexico or Albuquerque satisfy Article III's case-or-controversy requirement and establishes standing, both may pursue this litigation. See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006). The Court, accordingly, addresses separately each Plaintiff's alleged injuries. New Mexico alleges a procedural injury, although it complains of the result of the Defendants' actions as well. New Mexico alleges a procedural injury for good reason, because "the mere allegation that Defendants are acting without authority or in violation of the law is insufficient to establish standing." State of Utah v. Babbitt, 137 F.3d 1193, 1205 (10th Cir. 1998). An asserted right to have the government follow the law is not enough, by itself, to invoke federal jurisdiction. See State of Utah v. Babbitt, 137 F.3d at 1205. To prevail on the merits, New Mexico must demonstrate that the Defendants' actions violated relevant statutory or constitutional authority; to "reach the merits," however, New Mexico "must first identify a concrete injury flowing from Defendants' allegedly harmful actions." State v. Utah v. Babbitt,

137 F.3d at 1205. New Mexico accordingly contends that "the abrupt termination of, or change to, the federal government's Safe Release policy" harmed New Mexico by forcing it to divert public resources that it would otherwise be free to devote to its chosen policy goals. Complaint at 7. New Mexico asserts that it has diverted significant human resources to caring for the unassisted asylees and has issued $750,000.00 in emergency grants to local governments to do the same. See Complaint ¶¶ 30-31, at 8. The Defendants respond that no federal rule, regulation, or law required New Mexico to make such expenditures, and so New Mexico "cannot manufacture standing through self-inflicted expenditures." Reply at 2.

New Mexico relies heavily on Texas v. United States to demonstrate that it has suffered an injury in fact. In that case, the Obama Administration, after several unsuccessful Congressional attempts to create a pathway to legal status for certain undocumented immigrants, announced a new executive policy -- Deferred Action for Childhood Arrivals ("DACA") -- on immigration enforcement. See Texas v. United States, 809 F.3d at 147. Styled as an exercise of prosecutorial discretion, DACA allowed the Department of Homeland Security to defer deportation proceedings against one million undocumented immigrants who met certain specified criteria. See 809 F.3d at 147. Later, after the United States House of Representatives refused to vote on a comprehensive immigration reform bill that had passed in the Senate, the Obama Administration again announced a new immigration policy, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), which allowed 4.3 million undocumented parents of minor United States citizens and lawful permanent residents to apply for deferred enforcement action. See 809 F.3d at 148. Texas and twenty-six other states challenged DAPA, asserting that the program violated the APA. See 809 F.3d at 146. Texas alleged, in part, that DAPA would enable its beneficiaries to apply for driver's licenses, and Texas would either incur costs in issuing these licenses, or, if it

refused to issue licenses to DAPA beneficiaries, risk its state law being subject to challenge as conflicting with, and thus being preempted by, the DAPA program. See Brief for Appellees at 29-31, Texas v. United States, 787 F.3d 733 (5th Cir. 2015). Notably, DAPA made no reference to state driver's license regimes -- Texas' asserted injury arose from DAPA's interaction with preexisting State law.

A divided panel for the United States Court of Appeals for the Fifth Circuit concluded that Texas alleged a sufficiently concrete injury to invoke Article III standing. See Texas v. United States, 809 F.3d at 162. The Fifth Circuit construed Texas' injury as both economic and sovereignty-based. See 809 F.3d at 155. Specifically, the Fifth Circuit noted the district court's finding that issuing the new driver's licenses would cost at least "several million dollars," while also concluding that "DAPA affects the states' 'quasi-sovereign' interests by imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses."[7] 809 F.3d at 153-55. The Fifth Circuit majority noted that, "[w]ithout 'special solicitude,' it would be difficult for a state to establish standing." 809 F.3d at 162. New Mexico accordingly and likewise asserts that it is entitled "special solicitude in this Court's standing inquiry." Response at 6 (citing New Mexico v. DOI, 854 F.3d at 1219).

The phrase "special solicitude" in the Article III standing context derives from

---

[7]The Fifth Circuit's ruling underscores the breadth of the special solicitude analysis. Although Texas challenged DAPA's conflict with its preexisting driver's license laws, the Fifth Circuit ruled in Texas' favor on the merits, upholding a nationwide injunction against the program in its entirety. See 809 F.3d at 188. Although a typical standing analysis would lend Texas standing to seek redress only for that harm, see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 185 (2000)("[A] plaintiff must demonstrate standing separately for each form of relief sought"), the Fifth Circuit concluded that Texas' quasi-sovereign interest in administering driver's licenses enabled it to challenge the federal immigration law's nationwide administration. See Texas v. United States, 787 F.3d 768-69.

Massachusetts v. EPA, in which the Supreme Court applied a relaxed version of the injury-in-fact, causation, and redressability requirements to allow the Commonwealth of Massachusetts to challenge the EPA's refusal to regulate greenhouse gas emissions. 549 U.S. at 520-26. The Supreme Court defined Massachusetts' injury as the "harms associated with climate change," including rising sea levels swallowing up Massachusetts' coastline. 549 U.S. at 522. The Supreme Court also referred to the damage that climate change would impose upon Massachusetts' infrastructure and public land, as well as projected "hundreds of millions of dollars" in "[r]emediation costs alone." See 549 U.S. at 522-23 nn.19-21. As Chief Justice Roberts noted in dissent, these costs are hardly particular to Massachusetts and may occur over a "century-long time horizon." 549 U.S. at 542 (Roberts, C.J., dissenting, joined by Scalia, Thomas, and Alito, J.J.).

Concluding that these injuries were sufficient to satisfy Article III standing, the Supreme Court, in an opinion written by Justice Stevens, and in which Justices Kennedy, Ginsburg, Souter, and Breyer joined, "stress[ed] . . . the special position and interest of Massachusetts" and asserted that States are "entitled to special solicitude in [the] standing analysis" when challenging federal administrative action. 549 U.S. at 518, 520. The Supreme Court did not fully explain why States enjoy "special solicitude" in garnering standing. See 549 U.S. at 537 (Roberts, C.J., dissenting)("[S]upport for any such 'special solicitude' is conspicuously absent from the Court's opinion"). Justice Stevens, writing for a 5-4 majority, cited three factors underlying States' special solicitude. First, States surrendered certain aspects of their inherent sovereignty when they joined the Union, which reduced their ability to police and remedy harms that other states cause.[8] See

---

[8]The Supreme Court relied on Georgia v. Tennessee Copper Co. to declare that, "[w]ell before the creation of the modern administrative state, we recognized that States are not normal litigants for the purposes of invoking federal jurisdiction." 549 U.S. at 518-19 (citing Georgia v. Tenn. Copper Co., 206 U.S. 230, 237 (1907)). The Court notes that Georgia v. Tennessee Copper

549 U.S. at 519. Second and similarly, the Constitution endows Congress with the sole power to negotiate with foreign governments, so states are unable to protect their citizens from international harms. See 549 U.S. at 519. Third, the Supreme Court focused on federal preemption, suggesting that States have a special interest in ensuring that federal agencies regulate in areas where federal law preempts States' ability to do so. See 549 U.S. at 519-20 (noting that the State's "exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted. These sovereign prerogatives are now lodged in the Federal Government.").[9]

Characterizing these interests, however, has proven difficult. Although Massachusetts asserted a property injury, see 549 U.S. at 522 (concluding that Massachusetts had suffered a "particularized injury in its capacity as a landowner"), the Supreme Court also relied on Massachusetts' procedural and quasi-sovereign interests[10] in forming its conclusion: "Given that

_____

Co. involved the Supreme Court's original jurisdiction to enforce State public nuisance law against a private party, whom the State of Georgia could not sue in its own courts because of a lack of personal jurisdiction. See 206 U.S. at 231-32, 236. The Supreme Court in that case recognized the State of Georgia's "quasi-sovereign" interest in enforcing state public nuisance law. 206 U.S. at 237. Dissenting, Chief Justice Roberts opined that Georgia v. Tennesee Copper Co. "had nothing to do with Article III standing." 549 U.S. at 537 (Roberts, C.J., dissenting).

[9]Notably, by the Supreme Court's rationale, the EPA did not cause Massachusetts sovereign injury, which was its inability to regulate greenhouse gas emissions. Rather, a federal statute -- the Clean Air Act -- preempted Massachusetts from regulating car emissions. As scholars have noted, Massachusetts would continue suffering this injury regardless of what regulatory actions the EPA took. See Tara Leigh Grove, When Can A State Sue the United States?, 101 Cornell L. Rev. 851, 891 (2016). Similarly, federal immigration law almost completely preempts State law in that arena. See, e.g., Arizona v. United States, 567 U.S. 387 (2012).

[10]The Supreme Court appears to use the term "quasi-sovereign rights" loosely, but, in the standing context, it refers to a State's sovereign interest in creating and enforcing its own law, and exercising "sovereign power over individuals and entities within the relevant jurisdiction." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. at 601. Quasi-sovereign rights are not to be confused with parens patriae standing, a State's authority to sue on behalf of its private citizens. The Supreme Court has provided that states cannot sue the federal government as parens patriae, because, in "that field, . . . it is the United States, and not the State, which represents

procedural right and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis," 549 U.S. at 520. The Supreme Court also relied upon Massachusetts procedural right to challenge the EPA's denial of its rulemaking petition. See 549 U.S. at 517-18 (stating that a litigant "afforded a procedural right to protect his concrete interests' . . . 'can assert that right without meeting all the normal standards'" (quoting Lujan v. Defenders v. Wildlife, 504 U.S. at 572 n.7)). Thus, it is not obvious whether States' special solicitude derives from their special position to assert procedural rights and ensure that the federal government performs regulatory responsibilities in which States cannot engage, or whether it derives from quasi-sovereign interests in regulating federal law's impact within states' borders. States are therefore likely entitled special solicitude in the standing analysis where they assert procedural injuries and allege that federalism impinges on States' quasi-sovereign interests. The Court concludes that New Mexico is not entitled to special solicitude, because New Mexico and Albuquerque do not assert a procedural right.

### 1. New Mexico Has Not Suffered a Procedural Injury.

As discussed, a State may be entitled to special solicitude when it asserts a procedural injury that implicates its quasi-sovereign interests. See Massachusetts v. EPA, 549 U.S. at 516-17. As Justice Scalia noted, procedural rights are "special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." Lujan v. Defenders of Wildlife, 504 U.S. at 572 n.7. To establish a procedural injury for standing, a party must establish a procedural right and demonstrate that the procedure on which that right is based is "designed to protect some threatened

---

[private citizens] as *parens patriae*." Massachusetts v. Mellon, 262 U.S. at 485-86.

concrete interest of [the party that is the ultimate basis of [its] standing." Lujan v. Defenders of Wildlife, 504 U.S. at 573 n.8. The plaintiff must accordingly demonstrate first that the agency-defendant was obliged to follow certain procedural requirements, and that "compliance with the procedural requirements *could* have better protected its concrete interests." WildEarth Guardians v. EPA, 759 F.3d 1196, 1205 (10th Cir. 2014)(emphasis in WildEarth Guardians v. EPA).

New Mexico argues that it has suffered a procedural injury, because the Defendants "fail[ed] to engage in mandatory procedures prior to ending or altering Safe Release." Response at 11. New Mexico contends that, by discontinuing the Safe Release policy without a formal rulemaking period, the Defendants violated the APA. See Response at 11. The Defendants assert that they were not obligated to follow such procedures. See Reply at 5. Specifically, the Defendants contend that their changes to the Safe Release policy do not amount to substantive rules and argue that the APA requires rulemaking procedure "only for substantive rules." Reply at 5 (citing 5 U.S.C. § 553). The Defendants further assert that that New Mexico identifies "no substantive rule, memorandum, or directive memorializing the so-called Safe Release policy, or otherwise explained why any change in practice would require formal notice and comment rule making under the APA." Reply at 5.

The APA allows any interested party the right to participate in the rulemaking process by submitting information or arguments pertinent to proposed administrative action. See 5 U.S.C. § 553. The APA thus requires an agency issuing a proposed rule to provide notice of the proposed rule and opportunity for public comment. See 5 U.S.C. §§ 552(b), 553(b). The APA's notice and comment period does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b). The notice and comment requirement applies only to substantive, or legislative rules, which are "rules issued by agencies

pursuant to statutory authority and which implement the statute; such rules create new rights and have the force and effect of law." Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1340 (4th Cir. 1995).

It is useful to consider precisely the administrative action about which New Mexico complains. "[A]pproximately ten years ago," the Department of Homeland Security "implemented a policy known as 'Safe Release' or 'Coordinated release,'" under which "Immigration Officers assisted asylum seekers by confirming travel plans, coordinating assistance to them from [non-governmental organizations], facilitating communication with family members, often providing food, water and healthcare, and otherwise ensuring that asylum seekers had a means to reach their final destinations in the U.S." Complaint ¶ 20, at 6. "In October 2018, the federal government abruptly abandoned the Safe Release policy . . . without warning or notice." Complaint ¶ 23, at 6. Beginning in April, 2019, immigration officials "began release asylum seekers" in New Mexico "without any mode of transportation to their final destination or any means of meeting their basic needs, such as food and healthcare." Complaint ¶ 24, at 7.

Here, the procedures at issue are insufficient for standing, because those procedures were not designed to protect "some threatened concrete interest of" New Mexico. Lujan v. Defenders of Wildlife, 504 U.S. at 573 n.8. The Court discusses more fully the INA infra, but it suffices to say that, although New Mexico and Albuquerque may assert injuries that arguably fall within the INA's zone of interests, the INA does not affirmatively confer rights upon the State of New Mexico. See Fed'n for Am. Immigration Reform, Inc. v. Reno, 93 F.3d at 899, 904. In this case the ultimate source of injury is two steps removed from the alleged procedural defect. New Mexico does not allege that the INA gives it a procedural right that New Mexico seeks to enforce; rather, New Mexico alleges that the Defendants' decision to parole asylees without humanitarian assistance was arbitrary and capricious and an abuse of discretion, because it resulted from a failure

to follow INA regulations. New Mexico's contentions relate to the Defendants' adherence to the applicable regulations, but New Mexico does not allege that the Defendants failed to comply with a procedural right that a statute or regulation provides. New Mexico's injury, accordingly, does not "result[] from the violation of a *procedural* right afforded to [it] by a statute and designed to protect [its] concrete interest." Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1157 (D.C. Cir. 2005)(emphasis in original). See also Lujan v. Defenders of Wildlife, 504 U.S. at 572 n.7. New Mexico must identify some other source of law, other than the APA's arbitrary and capricious standard, against which the Court may evaluate its claims: "If agency actions could be challenged as 'arbitrary and capricious,' without reference to any other standard, then § 701(a)(2)'s limitation on APA review would amount to no limitation at all, and noting would ever be 'committed to agency discretion by law.'" Lunney v. United States, 319 F.3d 550, 559 n.5 (2d Cir. 2003).

Further, the Defendants' post-parole practices regarding asylees is not a substantive rule subject to the APA's formal rulemaking requirements. New Mexico does not identify any formal declaration or memorialization of the Safe Release policy, and the Court is unable to locate any such record. There is, accordingly, no "public pronouncement" of the Department of Homeland Security's intention to provide post-parole assistance to asylees. AMREP Corp. v. FTC, 768 F.2d 1171, 1178 (10th Cir. 1985). Although the APA does not define what makes a rule substantive, the caselaw's definitions presume some sort of public pronouncement that informs or binds the agency, the public, or both. Substantive rules, for example, establish standards of conduct which have the force of law, and so require advance public notice. See Perez v. Mortgage Bankers Assn., 575 U.S. 92, 97 (2015). Alternatively, interpretive rules are those that "merely 'advise the public of the agency's construction of the statutes and rules which it administers.'" Azar v. Allina Health Servs., 139 S. Ct. 1804, 1811 (2019)(quoting Perez v. Mortgage Bankers Assn., 575 U.S. at 87).

Similarly, "general statements of policy," which the APA also exempts from formal rulemaking, are "'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" Lincoln v. Vigil, 508 U.S. at 197 (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31 (1979)). Each of these categories involves some publication or pronouncement not found here. Instead, the Department of Homeland Security's decision to end the Safe Release program closely resembles the agency's decision in Lincoln v. Vigil to end the Indian Children's Program. See Lincoln v. Vigil, 508 U.S. at 184. In that case, the Supreme Court concluded that, even if the decision to end the program could be considered a "rule" under the APA,

> it would be exempt from the notice-and-comment requirements of § 553. Termination of the Program might be seen as affecting the Service's organization, but "rules of agency organization" are exempt from notice-and-comment requirements under § 553(b)(A). Moreover, § 553(b)(A) also exempts "general statements of policy," which we have previously described as "'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'"

Lincoln v. Vigil, 508 U.S. at 197 (quoting Chrysler Corp v. Brown, 441 U.S. at 302 n.31). The Court concludes that, given the similarity in agency action between Lincoln v. Vigil and this case, and the lack of authority New Mexico and Albuquerque cite for the proposition that this action requires notice-and-comment rulemaking, New Mexico does not assert a procedural right, and thus is not entitled to special solicitude on that basis.

## 2.     New Mexico Seeks to Protect a Quasi-Sovereign Interest.

The doctrine of parens patriae "refers to the 'right of a State to sue . . . to prevent or repair harm to its "quasi-sovereign" interests.'"[11]   BP Am., Inc. v. Oklahoma, 613 F.3d 1029, 1031 n.*

---

[11]There is some conceptual confusion as to whether parens patriae and quasi-sovereign interests are synonymous.  Compare BP America, Inc. v. Oklahoma ex rel. Edmonson, 613 F.3d

(10th Cir. 2010)(quoting <u>Hawaii v. Standard Oil Co.</u>, 405 U.S. 251, 258 (1972)).  To "maintain [a

parens patriae] action, the State must articulate an interest apart from the interests of particular

private parties, *i.e.*, the State must be more than a nominal party.  The State must express a quasi-

sovereign interest."  <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez</u>, 458 U.S. at 607.

In <u>Massachusetts v. Mellon</u>, the Supreme Court held that a State cannot sue the federal government

to enforce private citizens' federal rights.  <u>See</u> 262 U.S. at 485-86.  It is the federal government,

and not the States, which represents private citizens as parens patriae regarding federal rights.  <u>See</u>

<u>Massachusetts v. Mellon</u>, 262 U.S. at 485-86.  Similarly, States lack standing to sue the federal

government to protect the States' citizens "from the operation" of federal law, <u>Massachusetts v.</u>

<u>Mellon</u>, 262 U.S. at 485 ("It cannot be conceded that a State, as *parens patriae*, may institute

judicial proceedings to protect citizens of the United States from the operation of the statutes

thereof"), but States may sue the federal government as parens patriae to enforce rights that a

federal statute guarantees, <u>see</u> <u>Massachusetts v. EPA</u>, 549 U.S. at 520 n.17.  States may sue to

protect their ability to enforce State law.  <u>See</u>, <u>e.g.</u>, <u>Texas v. United States</u>, 787 F.3d at 749;

<u>Wyoming v. United States</u>, 539 F.3d at 1239-40 (concluding that Wyoming had standing to

---

1029, 1031 n.* (10th Cir. 2010)(citing <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez</u>, 458 U.S. at 600-07), <u>with</u> <u>In re Trump</u>, 928 F.3d 360, 377-78 (4th Cir. 2019)("The District court also concludes that the District [of Columbia] and Maryland have *parens patriae* standing to protect the economic interests of their citizens . . . .  Finally, the district court concluded that the District and Maryland have standing based on injury to their quasi-sovereign interests, thus accepting the . . . argument that [t]heir injury is the violation of their constitutionally protected interest in avoiding entirely pressure to compete with others for the President's favor by giving his money or other valuable dispensations" (alteration in original, quotations omitted)).  The Court takes its cue, however, from the Supreme Court and the Tenth Circuit and concludes that, at least insofar as the injuries that New Mexico alleges, the two interests are synonymous in this case.  <u>See</u> <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez</u>, 458 U.S. at 607 (stating that, to "maintain [a parens patriae action], . . . the State must be more than a nominal party.  The State must assert a quasi-sovereign interest.")

challenge federal administrative action that "undermine[d its] ability to enforce its legal code").

Quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace[, but] . . . must be sufficiently concrete to create an actual controversy between the State and the defendant." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez, 458 U.S. at 602. A State has a quasi-sovereign interest in its citizens' general "health and well-being -- both physical and economic." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez, 458 U.S. at 607. New Mexico asserts that the Defendants' parole practices "have caused imminent public health and safety crises in towns and cities in New Mexico, which have in turn forced the State to redirect finite resources and tap into its funds." Response at 7. New Mexico contends that it seeks to protect generalized interests, "'rather than simply pressing suit on behalf of its individual residents.'" Response at 7 n.5 (quoting Vidal v. Duke, 295 F. Supp. 3d 127, 161-62 (E.D.N.Y. 2017)(Garaufis, J.)). The Defendants assert that Massachusetts v. Mellon forecloses New Mexico's standing to bring this action, asserting broadly that states have no parens patriae standing against the federal government. See Reply at 6. As discussed, Massachusetts v. Mellon does not wholly foreclose States' parens patriae standing, so long as States assert generalized, quasi-sovereign interests. See Sierra Club v. Two Elk Generation Partners, Ltd., P'Ship, 646 F.3d 1258, 1276 n.4 (10th Cir. 2011). Further, because the Court accepts as true all well-pleaded factual allegations, the Court assumes, for the Motion's purposes, that the influx of paroled asylees in New Mexico strains New Mexico's civil services infrastructure and has injured its quasi-sovereign interests.

The Defendants assert that the Supreme Court "has made it clear that 'self-inflicted' injuries to a State's fisc cannot form the basis of Article III standing." Reply at 3 (quoting Pennsylvania v. New Jersey, 469 U.S. 660, 664 (1976)). The Defendants cite Clapper v. Amnesty

International USA for the proposition that New Mexico cannot "'manufacture standing merely by inflicting harm on [itself]'" by providing state health services to paroled asylees.  Reply at 3 (quoting 568 U.S. at 418 (alteration added).  The Defendants' cited cases are inapposite.  First, in Pennsylvania v. New Jersey, the Supreme Court held that Pennsylvania could not invoke the Supreme Court's original jurisdiction by alleging that New Jersey had diverted taxes from Pennsylvania's treasury.  See 426 U.S. at 663.  Pennsylvania's injury was "self-inflicted," the Supreme Court held, because it had voluntarily decided to give tax credits to its residents who had paid taxes in New Jersey.  426 U.S. at 662-64.  The Supreme Court has long interpreted its original jurisdiction narrowly, even compared to the lower courts' Article III jurisdiction.  See, e.g., Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 286-87, 299-300 (1888); Georgia v. Stanton, 73 U.S. (6 Wall.) 50, 50, 76-77 (1867).  See also James E. Pfander, Rethinking the Supreme Court's Original Jurisdiction in State-Party Cases, 82 Cal. L. Rev. 555, 560-62 (1994).  As for Clapper v. Amnesty International USA, that case involved the Supreme Court rejecting private parties' "self-inflicted" injuries.  568 U.S. at 417-18.  There, private parties challenged the Foreign Intelligence Surveillance Act, asserting as injuries the costs they bore in protecting their sources' confidentiality in the face of surveillance.  See 568 U.S. at 401-02.  The Court concluded that such financial loss is not enough for standing, because the plaintiffs were not threatened with "certainly impending" surveillance."  568 U.S. at 417-18.  A case involving private parties' standing does not pertain to states' special solicitude in the standing analysis, and so does not guide the Court here.  To the contrary, courts tend to reject arguments that a State's injury is self-inflicted when a State asserts as injury its increased expenditure of government services.  See, e.g., Texas v. United States, 809 F.3d at 157-59; Pennsylvania v. Trump, 281 F. Supp. 3d 553, 568 (E.D. Pa. 2017)(Beetlestone, J.), aff'd, 930 F.3d 543 (3d Cir. 2019), cert. granted, No. 19-454, Jan. 17, 2020,

2020 WL 254168.

Further, the Defendants misunderstand New Mexico's asserted injury. It devotes significant resources towards caring for the abandoned asylees not merely to provide humanitarian aid but also -- and primarily -- because it recognizes that an influx of thousands of helpless, homeless individuals has the potential to wreak havoc on the public safety and health infrastructures of small towns throughout New Mexico. See Response at 7. The Defendants' post-parole practices accordingly harm New Mexico's quasi-sovereign interests in the health and safety of its citizens in general. Accordingly, New Mexico asserts a quasi-sovereign interest. Although New Mexico asserts injury to its quasi-sovereign interests, the Court concludes that New Mexico is not entitled to special solicitude in its standing analysis.[12]

### 3.    New Mexico Alleges a Sufficient Injury-in-Fact.

The special solicitude framework differs from traditional standing analysis primarily at the injury prong. New Mexico must therefore assert a concrete injury-in-fact, but the Supreme Court has, independently from its special solicitude framework, recognized that injuries to a state's fisc or sovereign interests satisfy Article III's case-or-controversies requirement. See Maine v. Taylor, 477 U.S. 131, 136 (1986)(holding that injury to a state's "interest in the continued enforceability

---

[12]The Court bases its conclusion on its reading of Massachusetts v. Environmental Protection Agency, and the Supreme Court's apparent reliance on Massachusetts' valid procedural injury and injuries to its quasi-sovereign interests. See Massachusetts v. EPA, 549 U.S. at 518. Additionally, the Court predicts that, were this issue to again come before the Supreme Court, the Supreme Court would shy away from Massachusetts v. Environmental Protection Agency's special solicitude analysis. Of the four dissenters in that case -- Chief Justice Roberts and Associate Justices Scalia, Thomas, and Alito, three remain on the Court, joined by at least one Justice who has indicated skepticism of the special solicitude framework. See Envtl. Integrity Project v. Pruitt, 709 F. App'x 12 (D.C. Cir. 2017)(per curiam)(unpublished)(Kavanaugh, Srinivasan, and Pillard, JJ.)

of its own statutes" was sufficient); <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez</u>, 458

U.S. at 607 (Injury to a state's quasi-sovereign interests is sufficient).  Although the Defendants

contend that New Mexico cannot bring a parens patriae action against the United States, <u>see</u> Reply

at 6, the Court concludes that New Mexico asserts -- in part -- its own injury, <u>see</u> <u>Texas v. United</u>

<u>States</u>, 809 F.3d at 155-56.  New Mexico asserts that the Defendants' parole practices require it to

expend its money and services on providing for thousands of paroled asylees that the Defendants

abandoned, without notice, in cities and towns throughout New Mexico.  <u>See</u> Complaint ¶¶ 28-31,

at 7-8.  "Economic injury is clearly a sufficient basis for standing."  <u>San Diego Cty. Gun Rights</u>

<u>Comm. v. Reno</u>, 98 F.3d 1121, 1130 (9th Cir. 1996).  <u>See</u> <u>Massachusetts v. EPA</u>, 549 U.S. at 523;

<u>Maryland v. Louisiana</u>, 451 U.S. 725, 739 (1981); <u>Texas v. United States</u>, 808 F.3d at 155-56.

Economic injury is the "paradigmatic" injury for Article III standing and often supports standing

for private litigants as a matter of course.  <u>Danvers Motor Co. v. Ford Motor Co.</u>, 432 F.3d 286,

291 (3d Cir. 2005)(Alito, J.).  States and municipalities may invoke financial injury just as readily.

<u>See</u> <u>Bank of Am. Corp. v. City of Miami</u>, 137 S. Ct. 1296, 1303 (2017)(municipality's "claims of

financial injury . . . specifically, lost tax revenue and extra municipal expenses" satisfies Article

III); <u>Wyoming v. Oklahoma</u>, 502 U.S. 437, 448 (1992).  Increased use of state-funded services is

an injury sufficient for Article III standing.  <u>See</u> <u>Pennsylvania v. President United States</u>, 930 F.3d

at 562.  New Mexico's asserted injury is not conjectural.  New Mexico says that the Attorney

General of New Mexico, the New Mexico Children, Youth and Families Department, and the New

Mexico Department of Homeland Security and Emergency Management "have dedicated staff

time and resources to responding to human trafficking reports from asylum seekers."  Complaint

¶ 30, at 8.  New Mexico asserts that it has devoted significant law enforcement resources to

"affected communities," and the New Mexico Department of Health has "deployed members of

the New Mexico Medical Reserve Corps to assist with public health issues related to the influx of asylum seekers." Complaint ¶ 30, at 8. New Mexico has also issued $750,000 in emergency grants to local governments "to assist those government in dealing with the consequence of the termination of or change to the Safe Release Program." Complaint ¶ 31, at 8.

The Defendants are correct that New Mexico's injuries are distinct from Texas' injuries in Texas v. United States, because, in that case, federal administrative action forced Texas to choose between amending its laws or incurring costs associated with maintaining state law in the face of federal agency action. See Texas v. United States, 787 F.3d at 748-50. The Fifth Circuit held that "Texas's forced choice between incurring costs and changing its fee structure is itself an injury." 787 F.3d at 749. Here, New Mexico identifies no preexisting State law that requires it to care for paroled asylees, while Texas pointed to preexisting State law allowing lawful permanent residents, as defined by federal law, to receive State driver's licenses. See 787 F.3d at 746. The Defendants accordingly argue that, unlike Texas's injury, the Court should not allow New Mexico to manufacture standing by voluntarily devoting resources to care for paroled asylees. See Reply at 4. The Court declines to accept the Defendants' argument for two reasons. The Fifth Circuit's analysis makes clear that Texas asserted two separate injuries in Texas v. United States. There was the financial cost of providing additional driver's licenses, but also its sovereign injury in being "pressured to change state law." 787 F.3d 733. It was this latter injury to which Texas' preexisting law pertained: while it could avoid financial loss "by requiring applicants to pay the full costs of licenses, it could not avoid injury altogether." Texas v. United States, 809 F.3d at 156. Here, while New Mexico could decide not to issue grants to local governments to address the influx of unassisted asylees or devote its human resources to those asylees' health and wellbeing, the Defendants' actions prompted New Mexico to "avoid potential humanitarian, public

- 68 -

safety, and public health crises" that would result from inaction.  Response at 13.  As the Fifth

Circuit noted, the "possibility that a plaintiff could avoid injury by incurring other costs does not

negate standing."  809 F.3d at 156-57.  New Mexico has alleged sufficient injury.

      **4.**      **<u>New Mexico's Injury is Fairly Traceable to the Defendants' Parole Practices</u>**.

New Mexico must demonstrate that its injury is fairly traceable to the Defendants' parole

practices.  <u>See</u> <u>Massachusetts v. EPA</u>, 549 U.S. at 517.  The Defendants direct their argument

primarily at the standing analysis' injury prong; they mention traceability and causation in their

briefing only in passing.  <u>See</u> Reply at 20.  New Mexico asserts that the Defendants' cessation of

the Safe Release policy is "directly responsible for an influx of asylum seekers who were left in

[New Mexico] without a means of traveling to their destinations and without basic necessities or

services."  Response at 13.

A State satisfies traceability where federal administrative action has a "direct and

predictable effect" on a State's interests and the State asserts as injury the action's harm to those

interests.  <u>Texas v. United States</u>, 787 F.3d at 752.  Alternatively, a State does not satisfy

traceability where an intervening, independent act causes the State's injury.  <u>See</u>, <u>e.g.</u>, <u>Clapper v.

Amnesty Int'l USA</u>, 568 U.S. at 517 n.7.  Nonetheless, courts have tolerated a relatively loose

causal connection in establishing traceability.  <u>See</u> <u>Pennsylvania v. President United States</u>, 930

F.3d at 564.  For example, the United States Court of Appeals for the Third Circuit concluded that

Pennsylvania's projected increased public services expenditures were traceable to federal

administrative action which allowed employers to forgo providing contraceptive coverage to

employees for religious reasons.  <u>See</u> <u>Pennsylvania v. President United States</u>, 930 F.3d at 564.

The Third Circuit was satisfied that the federal exemptions would prompt more women to use

State public services, meeting Article III's traceability requirement.  See 930 F.3d at 564.  Finally, New Mexico need not demonstrate that the Defendants are the proximate or but-for cause of New Mexico's injury-in-fact.  See Lexmark Int'l v. Static Control Components, Inc., 572 U.S. at 134 n.6 ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.").

Here, the Defendants' practice of leaving thousands of asylum seekers in cities and towns throughout New Mexico directly and predictably caused New Mexico's expenditures in caring for those asylees.  As in Pennsylvania v. President United States, federal administrative action that creates a void in public services predictably leads to increased demand for State resources.  The Court acknowledges that the Commonwealth's citizens represented the demand in Pennsylvania v. President United States, while asylees represent the demand for New Mexico's increased public services expenditures.  Causation is just as strongly present here, however, because the Defendants left those asylees in New Mexico.  The Pennsylvania women in Pennsylvania v. President United States would not have resorted to the Commonwealth's public services absent federal administrative action; here, absent the Defendants' abandoning paroles asylees, New Mexico's residents and municipalities would not need New Mexico to devote significant resources towards preventing a "public health and safety crisis" that an influx of unassisted asylees could cause.  Response at 7.  New Mexico's asserted injury is thus fairly traceable to the Defendants' treatment of paroled asylees.

### 5.    New Mexico's Requested Relief Would Redress its Injury.

The Supreme Court in Massachusetts v. EPA repeated Justice Scalia's assertion from Lujan v. Defenders of Wildlife that "a litigant to whom Congress has 'accorded a procedural right to protect his concrete interests . . . can assert that right without meeting all the normal standards for

redressability and immediacy.'" Massachusetts v. EPA, 549 U.S. at 517-18 (quoting Lujan v.

Defenders of Wildlife, 504 U.S. at 572 n.7). The Supreme Court also noted that a litigant vested

with a procedural right has standing "if there is some possibility that the requested relief will

prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." 549

U.S. at 518 (citing Lujan v. Defenders of Wildlife, 504 U.S. at 572 n.7). It is thus plausible, and

likely, that the Supreme Court in Massachusetts v. EPA relaxed its redressability and immediacy

standards based not on Massachusetts' entitlement to special solicitude, but rather because it

validly asserted a procedural right. Here, as discussed, Congress has not afforded New Mexico a

procedural right.[13] Accordingly, it must demonstrate more than some possibility that its requested

relief will cause the Defendants to reconsider their parole practices.

New Mexico seeks declaratory and injunctive relief.[14] See Complaint ¶¶ A-G, at 15.

---

[13]Nonetheless, the Supreme Court's examination of the redressability prong went beyond the EPA's potential reconsideration of its declination to regulate greenhouse gases, which was all Lujan v. Defenders of Wildlife requires, and considered the extent to which favorable administrative action would remedy Massachusetts' asserted injury-in-fact. See 549 U.S. at 525. There, the Supreme Court concluded that Massachusetts had demonstrated redressability despite the fact that EPA regulation would redress Massachusetts injury by small degrees. See 549 U.S. at 525. Similarly, the Fifth Circuit in Texas v. United States affirmed a nationwide injunction against an entire federal program, going beyond Texas' asserted injury, although Texas would have satisfied redressability for its procedural injury by showing that an injunction "could" prompt the Department of Homeland Security to reconsider the DAPA program. 809 F.3d at 161 (emphasis added).

[14]The Court notes that, although New Mexico and Albuquerque filed this suit on June 10, 2019, they have not pressed for preliminary injunctive relief. See Tr. at 11:9-19 (Court, Guss). When the Court noticed that New Mexico and Albuquerque sought a preliminary injunction, it directed its courtroom deputy to call the Plaintiffs New Mexico and Albuquerque to see if they wanted a hearing on their requested injunctive relief. Despite several calls by the Court's courtroom deputy, New Mexico and Albuquerque never requested a hearing on their preliminary injunction. When the Court inquired why New Mexico and Albuquerque had not pressed for preliminary injunctive relief, New Mexico responded that it "plan[ned] to do that at some point but we haven't done that yet partially because we would likely need some discovery to really inform the Court." Tr. at 11:16-19 (Guss). Were the Court considering a motion for injunctive

Although New Mexico alleges a procedural injury, New Mexico seeks a declaration that "the actions of terminating or changing the Safe Release policy by Defendants and the agencies they oversee are void and without legal force or effect," as well as an injunction requiring the Defendants to "provide asylum seekers and their accompanying family members equivalent assistance to that provided under the Safe Release policy." Complaint ¶¶ B, D, at 15. As discussed, New Mexico asserts, in part, a financial injury. Enjoining the Defendants' post-parole practices until their legality is adjudicated would avoid New Mexico's apparently ongoing financial burden of caring for unassisted paroled asylees. Further, New Mexico's requested declaratory relief, by itself, may alleviate its injury. See Franklin v. Massachusetts, 505 U.S. at 803 ("For purposes of establishing standing, however, we need not decide whether injunctive relief against the President was appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone."). New Mexico's requested relief could stop New Mexico's alleged financial injury, thus "likely" redressing its injury. Spokeo, Inc. v. Robbins, 136 S. Ct. 1540, 1546 (2016). As New Mexico demonstrates a sufficient injury-in-fact, traceable to the Defendants' conduct and redressable by a favorable result, New Mexico satisfies Article III's standing requirements.[15]

_____

relief on the merits, New Mexico and Albuquerque's delay in seeking injunctive relief would factor into the Court's consideration of whether New Mexico or Albuquerque would suffer irreparable harm in an injunction's absence.

[15]Although Albuquerque has standing to pursue this action because New Mexico has standing, see Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. at 52 n.2, the Court pauses to note that, if New Mexico did not have standing, Albuquerque would be able to satisfy Article III independently. Albuquerque alleges that it receives between 150 and 250 unassisted asylum seekers each week. See Complaint ¶ 26, at 7. Albuquerque asserts as injury the "vast array of Albuquerque individuals and entities" that have "responded to the Defendants' termination of the Safe Release policy and taken on Defendants' federal responsibilities without federal funding to support such efforts." Complaint ¶ 32, at 9. Albuquerque says that "these

entities include nonprofits, religious institutions, other faith-based entities, medical professionals, the State of New Mexico, and the City" of Albuquerque. Complaint ¶ 32, at 9. "Because of the pressures now facing the City and its residents due to Defendants' termination of the Safe Release policy, the City has passed appropriation in the amount of $250,000.00 to contribute to this humanitarian effort." Complaint ¶ 34, at 9. Albuquerque accordingly alleges financial injuries in its $250,000.00 appropriation and the efforts that its citizens have undertaken to aid the unassisted asylees. Unlike New Mexico, Albuquerque does not allege that the influx of asylees is straining its civil services infrastructure. Albuquerque thus appears to allege, at least in part, its interest as parens patriae to its citizens and nonprofits.

Federal courts typically hold that cities and municipalities may not sue as parens patriae. See, e.g., City of Sausalito v. O'Neill, 386 F.3d 1197, 98 (9th Cir. 2004)("As a municipality, Sausalito may not simply assert the particularized injuries to the 'concrete interests' of its citizens on their behalf."); City of New York v. Heckler, 578 F. Supp. 1109, 1123 (E.D.N.Y. 1984)(Weinstein, C.J.)("A city generally does not have parens patriae standing."). Cities typically lack parens patriae standing, because their political power derives from the State and so cities are not sovereign in and of themselves. See, e.g., Colo. River Indian Tribes v. Town of Parker, 776 F.2d 846, 848 (9th Cir. 1985)("[P]olitical subdivisions . . . cannot sue as parens patriae because their power is derivative and not sovereign."). Accordingly, the Tenth Circuit has directed that courts may look to State law to "determine whether [a city] has been authorized to represent a state's sovereign interests." Thiebaut v. Colo. Springs Utils., 455 F. App'x 795, 800 (10th Cir. 2011)(unpublished). In Housing Authority of the Kaw Tribe of Indians v. Ponca City, the Tenth Circuit concluded that a State agency lacked standing as parens patriae, because it presented "no authorization by the State of Oklahoma to represent the state's sovereign interest." 952 F.2d 1183, 1193 (10th Cir. 1991). Here, Albuquerque does not seek to represent New Mexico's sovereign interest, but rather its own interest -- Albuquerque seeks to vindicate the time and its residents have devoted towards caring for unassisted asylees. Because Albuquerque seeks to represent the interests of specific residents -- those engaged in caring for unassisted asylees -- rather than the interests of its residents generally, Albuquerque is not entitled to parens patriae standing. See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d at 1175 ("[C]ounties 'do not have standing as parens patriae to bring action against the Federal Government.'" (quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. at 610 n.16)).

Albuquerque also asserts a proprietary interest in its devoting "a significant appropriation" to support unassisted asylees within its boundaries. Response at 9. The term "proprietary" is not "confined to protection of its real and personal property, but includes a municipality's 'responsibilities, powers, and assets.'" Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d at 1176 (quoting City of Sausalito v. O'Neill, 386 F.3d at 1197). The Court has previously held that a county alleged sufficient injury-in-fact when it contended that a federal agency did not assess, contrary to its organizational statute's instructions, whether changes to grazing allotments would adversely impact the county's environment. See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d at 1146. The Court held that the county's allegation that the administrative action would change the county's "culture, its population, and its ability to advance its planning objectives to further [its ]heritage and culture[.]" Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service, 140 F. Supp. 3d at 1177. The Court also concluded that allowing the county to sue on its own behalf furthered federal statutory policy that

expressly contemplated local governmental involvement in environmental planning and management.  See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d at 1177.  The Court, accordingly, concluded that this injury satisfied Article III's standing requirements.

Albuquerque relies on the Court's holding in Jarita Mesa Livestock Grazing Association v. United States Forest Service and argues that the Defendants' "sudden change to Safe Release resulted in not only the emergency management and coordination of health and safety matters to asylum seekers, but also a significant appropriation."  Response at 9.  Albuquerque also alleges that the Defendants "may have sought to challenge the City's repeated, bipartisan resolve to maintain an immigrant-friendly city."  Response at 10.  The Defendants understand Albuquerque's proprietary interests differently and argue that Albuquerque has no "proprietary interest in how DHS exercises [its parole] authority."  Reply at 7.  The Defendants mistake Albuquerque's injury; although Albuquerque will ultimately need to demonstrate a procedural injury to prevail on the merits, it must assert a concrete injury to get to the merits.  To prevail on the merits, Albuquerque must demonstrate that the Defendants' actions violated relevant statutory authority; to "reach the merits," however, New Mexico "must first identify a concrete injury flowing from Defendants' allegedly harmful actions."  State v. Utah v. Babbitt, 137 F.3d at 1205.  See Trump v. Hawaii, 138 S. Ct. 2392, 2416 (2018)("The Government responds that plaintiffs' Establishment Clause claims are not justiciable because the Clause does not give them a legally protected interest in the admission of particular foreign nationals.  But that argument -- which depends upon the scope of plaintiffs' Establishment Clause rights -- concerns the merits rather than the justiciability of plaintiffs' claims.")

Although Albuquerque lacks a procedural right for the same reasons New Mexico lacks a procedural right, it asserts a cognizable injury-in-fact.  A city has standing to challenge federal administrative action when the city alleges harm to the city itself.  See, e.g., City of Olmsted Falls, OH v. F.A.A., 292 F.3d 261, 268 (D.C. Cir. 2002); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d at 1176.  In City of Sausalito v. O'Neill, the United States Court of Appeals for the Ninth Circuit concluded that a city had standing when it alleged injury to its human environment.  See 386 F.3d at 1197.  The federal agency's decision would increase traffic and crowds, affecting city-owned streets and municipal management objectives.  Further, the agency's decision to pursue a certain plan would "destroy the City's quiet, beauty, serenity and quaint and historic village character and attributes."  386 F.3d at 1198-98.  In all, the Ninth Circuit concluded that the city alleged cognizable aesthetic, management, public safety, economic, and natural resource harms that constituted proprietary injuries.  See 386 F.3d at 1199.  As the City of Sausalito in City of Sausalito v. O'Neill and the County of Rio Arriba in Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service had a cognizable interest in an "agency's decision [which] would potentially alter the make-up of the city's population and the city's ability to its advance its management objectives," Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d at 1177, here Albuquerque has a cognizable interest in federal administrative action that directs some 250 unassisted asylees into its boundaries each week, see Complaint ¶ 26, at 7.  Just as New Mexico is duty-bound to intercede to protect its citizens and municipalities from public health and safety crises that such an influx may cause, Albuquerque has also sought to protect its residents from the public health and safety crises that an influx of some 250 unassisted asylees per week

## II. THE DEPARTMENT OF HOMELAND SECURITY'S DECISION TO END ITS SAFE RELEASE PROGRAM IS NOT A FINAL AGENCY ACTION UNDER 5 U.S.C. § 704.

The Defendants argue that the Court should dismiss New Mexico and Albuquerque's claims, because discontinuing travel assistance for asylum seekers is not a "final agency action." Motion at 21. New Mexico and Albuquerque cite FTC v. Standard Oil Co., 449 U.S. 232 (1980), and argue that "final agency action" includes four characteristics. See Response at 26-27. They state these characteristics include: "(1) it is a 'definitive statement[] of the [agency]'s position;' (2) it 'has a direct and immediate effect on the day-to-day business of the complaining parties;' (3) it 'has the status of law;' and (4) 'immediate compliance with [its] terms was expected.'" Response at 26-27 (quoting FTC v. Standard Oil Co., 449 U.S. at 239-40). New Mexico and Albuquerque argue that the decision to end the Safe Release program meets all of these factors, because

> the rule change had direct financial and practical effects on the State and the City. Next, the rule change had the status of law because legal consequences flowed to both the State and the City in that each were obligated to, among other things, monitor and maintain the public health and guarantee public safety in their jurisdictions by providing humanitarian assistance. Finally, immediate compliance was expected because, as the federal government ceded its responsibilities, other governmental instrumentalities had to instead carry those burdens (with a significantly smaller tax base) to prevent imminent humanitarian crises.

Response at 27-28 (citations omitted). They also argue that ending Safe Release is similar to the agency action which Texas was able to challenge in Texas v. United States. Response at 27. The Defendants argue, in reply, that New Mexico and Albuquerque "have identified no definitive statement of agency position regarding the assistance provided to paroled migrants," Reply at 11, and deny further that the action satisfied the other prongs from FTC v. Standard Oil Co., Reply at 11-12.

---

might cause. Albuquerque has Article III standing to pursue this case.

There is a split among Courts of Appeals concerning the standard of review for challenges to "final agency action." The Tenth Circuit takes the position that, where a plaintiff challenges an agency action that is not challenge final, courts do not have subject-matter jurisdiction. See Kansas ex rel. Schmidt v. Zinke, 861 F.3d 1024, 1034 (10th Cir. 2017); Farrell-Cooper Mining Co. v. U.S Dep't of Interior, 864 F.3d 1105, 1109 (10th Cir. 2017)("'Pursuant to the APA, we have jurisdiction to review only final agency actions.'" (quoting McKeen v. U.S. Forest Serv., 615 F.3d 1244, 1253 (10th Cir. 2010))); Cure Land, LLC v. U.S. Dep't of Agric., 833 F.3d 1223, 1230-32 (10th Cir. 2016); Chem. Weapons Working Grp. v. U.S. Dep't of the Army, 111 F.3d 1485, 1494 (10th Cir. 1997). The Tenth Circuit is not alone in considering lack of finality a jurisdictional question. See San Francisco Herring Ass'n v. Dep't of the Interior, 946 F.3d 564, 571 (9th Cir. 2019)("In this circuit, the final agency action requirement has been treated as jurisdictional."); Texas v. Equal Employment Opportunity Comm'n, 933 F.3d 433, 441 n.8 (5th Cir. 2019)("In this circuit, whether an agency action is final is a jurisdictional issue, not a merits question."); City of New York v. U.S. Dep't of Defense, 913 F.3d 423, 430 (4th Cir. 2019)(Wilkinson, J., joined by Agee and Thacker, JJ.); Clayton Cty., Ga. v. FAA, 887 F.3d 1262, 1270 (11th Cir. 2018).

Numerous other Courts of Appeals, the United States Court of Appeals for the District of Columbia among them, have concluded that failure to challenge a final agency action means the plaintiff does not have a statutory cause of action under the APA, and not that courts lack subject-matter jurisdiction. See Dhakal v. Sessions, 895 F.3d 532, 538 (7th Cir. 2018); Jama v. Dep't of Homeland Sec., 760 F.3d 490, 494 n.4 (6th Cir. 2014); Chehazeh v. Attorney General of U.S., 666 F.3d 118, 125 n.11 (3d Cir. 2012); Sierra Club v. Jackson, 648 F.3d 848, 853-54 (D.C. Cir. 2011)(noting its conflicting precedent on the question, but concluding that the Court was bound to follow its earliest holding); Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 33 (1st Cir.

2007); <u>Trudeau v. Fed. Trade Comm'n</u>, 456 F.3d at 188-89 ("[A]lthough the absence of final agency action would not cost federal courts their jurisdiction . . . it would cost Trudeau his APA cause of action."); <u>Z St., Inc. v. Koskinen</u>, 44 F. Supp. 3d 48, 65 (D.D.C. 2014)(Jackson, J.)("[T]he statutory prerequisites to bringing an APA claim -- such as final agency action -- have no jurisdictional impact."). <u>See also</u> <u>Slater Park Land and Livestock, LLC v. U.S. Army Corps of Eng'rs</u>, __ F. Supp. 3d __, 2019 WL 5593306, at *2 (D. Colo. 2019)(Arguello, J.)(following D.C. Circuit precedent). If it were writing from a clean slate, the Court would analyze finality in this manner under rule 12(b)(6) rather than under rule 12(b)(1). The APA is not an independent grant of subject-matter jurisdiction, <u>see</u> <u>Califano v. Sanders</u>, 430 U.S. 99, 107 (1977), and The Tenth Circuit's current position in is tension with the Supreme Court's statement in <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500 (2006), that, "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." 546 U.S. at 516. <u>See</u> <u>Long Term Care Partners, LLC v. United States</u>, 516 F.3d 225, 238-39 (4th Cir. 2008)(Williams, J., concurring); <u>Sharkey v. Quarantillo</u>, 541 F.3d 75, 88 (2d Cir. 2008); Sundeep Iyer, Comment, <u>Jurisdictional Rules and Final Agency Action</u>, 125 Yale L.J. 785, 789 (2016). The Court, nevertheless, follows Tenth Circuit precedent and reviews this issue as a challenge to the Court's subject-matter jurisdiction.[16]

The proper standard for weighing whether an agency action is "final" is the two-prong test reiterated in <u>U.S. Army Corps of Engineers v. Hawkes Co.</u>, 136 S. Ct. 1807, 1813 (2016), rather than, as the Defendants' suggest, <u>FTC v. Standard Oil Co.</u>, 449 U.S. at 239-40. <u>See</u> <u>Cal. Cmtys.</u>

---

[16]The result would be the same under rule 12(b)(6), as the Court still would dismiss the claim; the only difference would be that under rule 12(b)(1) dismissal is without prejudice, while under rule 12(b)(6), the dismissal would be with prejudice.

Against Toxics v. EPA, 934 F.3d 627, 635 (D.C. Cir. 2019)(stating that U.S. Army Corps of Eng'rs v. Hawkes Co.'s test "remains finality's touchstone"); Tr. at 41:3-7 (Torres). U.S. Army Corps of Engineers v. Hawkes Co., is the more recent case, and FTC v. Standard Oil Co. only purported to summarize the Supreme Court's reasoning in Abbott Labs. v. Gardner, 387 U.S. at 149 , and not the proper test for finality. According to U.S. Army Corps of Engineers v. Hawkes Co., agency action must meet two characteristics to be considered final; "'[f]irst, the action must mark the consummation of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S. Ct. at 1813 (quoting Bennett v. Spear, 520 U.S. at 177-78).

      Ending the Safe Release program appears to be the culmination of the agency's decision-making process. It is not a "'tentative'" intermediate step in the agency's decisionmaking process. Impact Energy Res., LLC v. Salazar, 693 F.3d 1239, 1256 (10th Cir. 2012)(quoting Franklin v. Massachusetts, 505 U.S. at 797). Nor does it appear to be the ruling of a subordinate official that needs approval from the agency's head before it becomes final. See Cal. Cmtys. Against Toxics v. Envtl. Prot. Agency, 934 F.3d at 636; Impact Energy Res., LLC v. Salazar, 693 F.3d at 1256; Wyoming ex rel. Crank v. United States, 539 F.3d at 1243. There is also no suggestion, that the Department of Homeland Security's decision will be revised in the future, see Ctr. For Native Ecosystems v. Cables, 509 F.3d 1310, 1329-1330 (10th Cir. 2007), that an appeal is pending before the agency, see Farrell-Cooper Mining Co. v. U.S. Dep't of Interior, 864 F.3d at 1114, or "that any additional process on the [agency's] part [is] to follow," Tulsa Airports Improvement Trust v. FAA, 839 F.3d 945, 949 (10th Cir. 2016). See Los Alamos Study Group v. U.S. Dep't of Energy, 692 F.3d 1057 (10th Cir. 2012).

Turning to finality's second prong, the Court concludes that "'no rights or obligations have been determined'" and that "'no legal consequences will flow'" from the Department of Homeland Security's decision to end the Safe Release program. U.S. Army Corps of Engineers v. Hawkes Co., 136 S. Ct. at 1813 (quoting Bennett v. Spear, 520 U.S. at 178). This analysis is a "'pragmatic' inquiry," Ipsen Biopharmaceuticals, Inc. v. Azar, 943 F.3d 953, 956 (D.C. Cir. 2019)(quoting U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S. Ct. at 1815); Cure Land, LLC v. U.S. Dep't of Agric., 833 F.3d at 1230, and requires courts to review the "concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it," California Cmtys Against Toxics v. EPA, 934 F.3d at 637. The "legal consequences" factor has its origins in pre-APA doctrine concerning standing to challenge an administrative order. Rochester Tel. Corp. v. United States, 307 U.S. 125, 132 (1939). On its face, whether an agency action creates legal consequences does not appear to address finality concerns, and some courts have instead considered this factor as affecting the definition of "agency action" under § 551(13) rather than the meaning of "final" agency action under § 704. See City of New York v. United States Dep't of Def., 913 F.3d at 431; Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs, 714 F.3d 186, 193 (4th Cir. 2013). No matter what approach the Court takes, it cannot review the Department of Homeland Security's decision.

New Mexico and Albuquerque argue that the Department of Homeland Security's decision has created legal consequences, because they are "obligated to, among other things, monitor and maintain the public health and guarantee public safety in their jurisdictions by providing humanitarian assistance." Response at 28. New Mexico and Albuquerque point to no statute or constitutional provision, however, that imposes this legal requirement, and "[u]ntil legal consequences are fixed, agency action will not qualify as final." Impact Energy Res., LLC v.

Salazar, 693 F.3d at 1251 (Lucero, J., concurring). Instead, ending the Safe Release program "does not command [the plaintiffs] to do, or to refrain from doing, anything," "does not grant or withhold any authority, privilege, or license," "extend or abridge any power or facility," "subject the [plaintiffs] to any liability, civil or criminal," or "change the [plaintiff's] existing or future status or condition." United States v. Los Angeles & S.L.R. Co., 273 U.S. 299, 309-10 (1927)(Brandeis, J.). These sorts of legal consequences are necessary before a court can review "final agency action." Cure Land, LLC v. U.S. Dep't of Agric., 833 F.3d at 1231-32 (concluding that Bennett v. Spear's second prong was satisfied where a Finding of No Significant Impact under NEPA established the conservation program changes an agency could immediately implement); Wyoming ex rel. Crank v. United States, 539 F.3d at 1243 (concluding that legal consequences flow from a Bureau of Alcohol, Tobacco and Firearms and Explosives letter, because it prevents Wyoming individuals with expunged misdemeanor domestic violation convictions from owning firearms); Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1155-56 (10th Cir. 2004)(concluding that legal consequences flowed from an agency's decision, because it meant that the plaintiff could not develop land without further NEPA documentation from the Bureau of Land Management); Mobil Exploration & Producing U.S., Inc. v. Dep't of Interior, 180 F.3d 1192, 1197-99 (10th Cir. 1999). Ending the Safe Release program was, rather, "non-binding action," that "merely expresses an agency's interpretation, policy, or internal practice or procedure." Batterton v. Marshall, 648 F.2d 694, 702 (D.C. Cir. 1980). According to the D.C. Circuit,

> such actions or statements are not determinative of issues or rights addressed. They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities. They do not, however, foreclose alternate courses of action or conclusively affect rights of private parties.

Batterton v. Marshall, 648 F.2d at 702.

- 80 -

Section 551(13) also suggests that the agency's decision is unreviewable.  See 5 U.S.C. §§ 701(a)(2), 704.  The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent denial thereof, or failure to act."  5 U.S.C. § 551(13).  The APA further defines rules, orders, licenses, sanctions, and relief.  See 5 U.S.C. § 551(4), (6), (8), (10), (11).  Rules are defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ."  5 U.S.C. § 551(4).  "Failure to act," meanwhile, means "a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)."  Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004).  The phrase "agency action" is "a term of art that does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract.  Rather, the APA's definition of agency action focuses on an agency's *determination* of rights and obligations . . . ."  Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs, 714 F.3d at 193 (emphasis in original).  See Louisiana v. United States, 948 F.3d 317, 321 (5th Cir. 2020).

Lincoln v. Vigil reserved the question whether terminating the children's health program constituted a "rule," 508 U.S. at 196-97, but the Court concludes that the APA's "agency action" definition does not include the sort of discretionary, non-binding conduct at issue here.  In Lujan v. National Wildlife Defenders, 497 U.S. 871, for example, the Supreme Court dismissed a challenge to a Bureau of Land Management program, because it did not constitute an "agency action" under 5 U.S.C. § 702.  It noted:

> The term "land withdrawal review program" (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations.  It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in

reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA.

497 U.S. at 890. Likewise, in <u>Franklin v. Massachusetts</u>, the Supreme Court concluded that a report to the President was not "agency action" where "it is not promulgated to the public in the Federal Register, no official administrative record is generated, and its effect on reapportionment is felt only after the President makes the necessary calculations and reports the result to the Congress." 505 U.S. at 797. <u>See</u> <u>Colo. Farm Bureau Fed'n v. U.S. Forest Serv.</u>, 220 F.3d 1171, 1174 (10th Cir. 2000)(concluding that "non-binding assistance such as conducting and funding analyses and participating in public meetings is not agency action"). In this case, as in <u>Lujan v. National Wildlife Defenders</u>, New Mexico and Albuquerque have pointed to no order or regulation regarding the Safe Release program. There has been no publication in the Federal Register concerning the Safe Release Program, and it appears to have generated no administrative record. <u>See</u> <u>Franklin v. Massachusetts</u>, 505 U.S. at 797; Response at 25 n.12. Most importantly, there has been no "determination," <u>Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs</u>, 714 F.3d at 193, or an "identifiable agency order, regulation, policy or plan that may be subject to challenge," <u>ONRC Action v. Bureau of Land Mgmt.</u>, 150 F.3d 1132, 1136 (9th Cir. 1998). The Court is ill-suited, and not permitted, to engage in the "day-to-day agency management" New Mexico and Albuquerque request. <u>Norton v. S. Utah Wilderness All.</u>, 542 U.S. at 67. <u>See</u> <u>City of New York v. U.S. Dep't of Defense</u>, 913 F.3d at 431-32.

## III.    THE APA DOES NOT WAIVE SOVEREIGN IMMUNITY FOR NEW MEXICO AND ALBUQUERQUE'S CLAIMS.

New Mexico and Albuquerque can only sue the Defendants to the extent that they waived their sovereign immunity. <u>See</u> <u>United States v. Mitchell</u>, 463 U.S. 206, 212 (1983)("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a

prerequisite for jurisdiction.").  The APA is a limited waiver of sovereign immunity, but the APA

does not grant subject-matter jurisdiction.  See California v. Sanders, 430 U.S. at 105-07.  The

APA provides: "A person suffering a legal wrong because of agency action, or adversely affected

or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial

review thereof." 5 U.S.C. § 702.  The APA's waiver does not extend, however, when the relevant

statute "precludes judicial review" or when "agency action is committed to agency discretion by

law." 5 U.S.C. § 701(a)(1)-(2).  "In other words, before the waiver of sovereign immunity under

§ 702 of the APA applies, 'a party must first clear the hurdle of § 701(a).'" High Country Citizens

All. v. Clarke, 454 F.3d 1177, 1181 (10th Cir. 2006)(quoting Heckler v. Chaney, 470 U.S. at 828).

Judicial review is presumed under the APA, "but it may be overcome."  High Country

Citizens All. v. Clarke, 454 F.3d at 1181 (citing Block v. Cmty. Nutrition Inst., 467 U.S. at 349).

To overcome the reviewability presumption, Congress' intent to preclude judicial review must be

"fairly discernible" from the statutory scheme.  Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,

397 U.S. at 157.

> The congressional intent necessary to overcome the presumption [of reviewability]
> may [] be inferred from contemporaneous judicial construction barring review and
> the congressional acquiescence in it . . . or from the collective import of legislative
> and judicial history behind a particular statute . . . [or] by inferences of intent drawn
> from the statutory scheme as a whole.

Block v. Cmty. Nutrition Inst., 467 U.S. at 349 (citations omitted).

The Defendants contend that they are immune from New Mexico and Albuquerque's suit,

because the INA precludes judicial review, and because the complained-of agency action is

committed to the Department of Homeland Security's discretion.  See MTD at 17 (citing 5 U.S.C.

§ 701(a)(1) and (2)).  New Mexico and Albuquerque do not address directly the Defendants'

immunity assertion in the Response.  The Court notes that, although it concludes, infra, that judicial

- 83 -

review is not available under the APA, the APA's immunity-waiver applies to suits seeking review of an official's action even where review is not available under the APA. See Perry Capital LLC v. Mnuchin, 864 F.3d 591, 620 (D.C. Cir. 2017)("We have repeatedly and expressly held in the broadest terms that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." (internal quotations omitted)); B.K. Instrument, Inc. v. United States, 715 F.2d 713 (2d Cir. 1983).

New Mexico and Albuquerque's Complaint challenges the Department of Homeland Security's decision to end its Safe Release program. See Complaint ¶ 41, at 11. The Court concludes that Congressional intent to preclude review of such a decision is "fairly discernible" in the INA's statutory scheme. Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. at 157. See 5 U.S.C. § 701(a)(1). The Court also concludes that the law commits the decision to end the Safe Release program to agency discretion. See 5 U.S.C. § 701(a)(2). Accordingly, the INA precludes judicial review of all non-constitutional claims pursuant to § 701(a).

### A. THE INA PRECLUDES JUDICIAL REVIEW OF NON-CONSTITUTIONAL CHALLENGES TO THE AGENCY'S DECISION TO END ITS SAFE RELEASE PROGRAM.

The INA precludes judicial review of the agency's decision to end its Safe Release program. Section 1252(a)(2)(B)(ii) of Title 8 of the United States Code states that no court "shall have jurisdiction to review -- . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). The manner in which the United States paroles asylees is "specified" to be within the Attorney General's discretion. 8 U.S.C. § 1252(a)(2)(B)(ii). See 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may . . . parole . . . *under such conditions as he may*

*prescribe* . . . any alien applying for admission" (emphasis added)).  Accordingly, congressional

intent to preclude review of parole conditions is "fairly discernible."  <u>Ass'n of Data Processing

Serv. Orgs., Inc. v. Camp</u>, 397 U.S. at 157.

New Mexico and Albuquerque argue that 8 U.S.C. § 1252(a)(2)(B)(ii) does not bar review

of the decision to end the Safe Release program, because § 1252 is titled "Judicial review of orders

of removal," and § 1252(a)(2)(B)(ii) is titled "Denials of discretionary relief."  Response at 23.

These titles, New Mexico and Albuquerque argue, "imply discrete steps taken in individual

immigration proceedings" and "are not intended to preclude structural or constitutional challenges

to the manner in which the parole system has been arranged."  Response at 23 (citing <u>Reno v. Am.-

Arab Anti-Discrimination Comm.</u>, 525 U.S. at 482; <u>McNary v. Haitian Refugee Ctr., Inc.</u>, 498

U.S. at 490-94; <u>Iddir v. INS</u>, 166 F. Supp. 2d at 1255).  A statute's title or heading can help resolve

ambiguity, <u>see</u> <u>I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.</u>, 502 U.S. 183, 189 (1991), but there

is no ambiguity present here.  Section 1252(a)(2)(B) states that it applies "[n]otwithstanding any

other provision of law."  Paragraph (ii) states that the preclusion applies to "any other decision or

action . . . specified under this subchapter," which refers to 8 U.S.C. §§ 1151-1381.  The statute

therefore precludes any "structural" challenges to parole decisions and is not merely limited to

precluding review of removal orders.  Response at 23.  <u>See</u> <u>Van Dinh v. Reno</u>, 197 F.3d at 432

(concluding that § 1252(a)(2)(B)(ii) "addresses a multitude of jurisdictional issues" and "is not

limited in application only to review by the circuit courts of final orders of removal").  It still

permits, however, constitutional challenges to asylee parole conditions.  Section 1252(a)(2)(D)

states that "[n]othing in subparagraph (B) or (C), or in any other provision of this chapter . . . shall

be construed as precluding review of constitutional claims or questions of law raised upon a

petition for review."  8 U.S.C. § 1252(a)(2)(D).

## B. THE LAW COMMITS ASYLEE PAROLE CONDITIONS TO AGENCY DISCRETION.

The Defendants argue that the discretion to end the Safe Release program is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). See Motion at 18-20. They argue that the "statute authorizing parole does not itself provide a meaningful standard against which to judge the agency's exercise of discretion," that the statute does not require the Department of Homeland Security to provide travel assistance for parolees, and that the statute "necessarily includes the discretion to parole [asylees] *into New Mexico and Albuquerque in particular.*" Motion at 20 (emphasis in original). New Mexico and Albuquerque respond that the phrase "'urgent humanitarian reasons'" provides a meaningful standard by which to judge discretion. Response at 25 (quoting 8 U.S.C. § 1182(d)(5)(A)). They also argue that stopping or altering the Safe Release program "in utter silence" and with "no explanation" entitles them to judicial review. Response at 26 (citing FCC v. Fox TV Stations, Inc., 556 U.S. at 515; NAACP v. Trump, 298 F. Supp. 3d at 238.

The INA generally leaves the decision whether to parole individual asylees to the Attorney General's discretion, although parole may be granted only for "urgent humanitarian reasons" or for "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). These two qualifications provide a standard with which to review individual parole decisions, but they do not limit the Attorney General's discretion to order parole "under such conditions as he may prescribe." 8 U.S.C. § 1182(d)(5)(A). The absence of any statutory standard governing asylee parole conditions suggests that the law commits such decisions to agency discretion. See Heckler v. Chaney, 470 U.S. at 830.

The result in Lincoln v. Vigil confirms that New Mexico and Albuquerque may not

challenge the Defendants' termination of the Safe Release Program. In the late 1970s, the Indian

Health Service's Albuquerque office developed a pilot program to create treatment centers for

handicapped Indian children, which evolved into a program providing direct clinical services to

children on reservations. See 508 U.S. at 185-88. In 1985, after seven years, the Indian Health

Service ended the program. See 508 U.S. at 188. Handicapped Indian children who had received

treatment under the program sued for declaratory and injunctive relief. See 508 U.S. at 189. The

Supreme Court, in concluding that the decision whether to terminate the program was committed

to agency discretion, stated that "the allocation of funds from a lump-sum appropriation is another

administrative decision traditionally regarded as committed to agency discretion." 508 U.S. at

192. It concluded that an agency's fund allocation requires, like the decision to institute

enforcement proceedings in Heckler v. Chaney,

> requires "a complicated balancing of a number of factors which are peculiarly
> within its expertise": whether its "resources are best spent" on one program or
> another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether
> a particular program "best fits the agency's overall policies"; and, "indeed, whether
> the agency has enough resources" to fund a program "at all."

508 U.S. at 193 (quoting Heckler v. Chaney, 470 U.S. at 831). The agency thus was "'far better

equipped than the courts to deal with the many variables involved in the proper ordering of its

priorities.'" 508 U.S. at 193 (quoting Heckler v. Chaney, 470 U.S. at 831-32). While the Supreme

Court noted that Congress could always limit an agency's discretion, "as long as the agency

allocates funds from a lump-sum appropriation to meet permissible statutory objectives,

§ 701(a)(2) gives the courts no leave to intrude." 508 U.S. at 193.

Aside from 8 U.S.C. § 1182(d)(5)(A), there is no apparent statutory basis for the Safe

Release program. New Mexico and Albuquerque admit that they "do not know how Safe Release

began, as that knowledge is peculiarly within the federal government's possession," and they say

that they "will require discovery to make determinations about the source statute, as well as the criteria from which to measure discretion." Response at 25 n.12. The Court therefore concludes that, because there is no statutory law limiting asylee parole conditions, no clear statutory basis for the Safe Release program, and because the Attorney General's decision involves weighing "a number of factors which are peculiarly within [agency] expertise," the law commits the decision to end the Safe Release program to the Department of Homeland Security's discretion. Heckler v. Chaney, 470 U.S. at 831. See 5 U.S.C. § 701(a)(2).

New Mexico and Albuquerque's citations to cases requiring agencies to explain changes in policies are unavailing. See Response at 26. Sentences immediately before New Mexico and Albuquerque's cited quotes from FCC v. Fox TV Stations, Inc. and NAACP v. Trump make clear that the court in each case is expressing the unremarkable position that agencies conducting rulemaking must explain their decisions. See FCC v. Fox Television Stations, Inc., 556 U.S. at 515 ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); NAACP v. Trump, 298 F. Supp. 3d 209 ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. Thus, when an agency reverses a prior decision, it must 'provide a reasoned explanation for the change.'" (quoting Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016)). The Department of Homeland Security was not engaged in rulemaking when it ended its Safe Release program. Casa De Maryland v. U.S. Department of Homeland Security is no more helpful to New Mexico and Albuquerque. As discussed above, the decision to end the Safe Release program is not a "direct interpretation of the commands of the substantive statute" but is instead "the sort of mingled

assessment of fact, policy, and law . . . that are, as[Heckler v.] Chaney recognizes, peculiarly within the agency's expertise and discretion." Casa De Md. v. U.S. Dep't of Homeland Sec., 924 F.3d at 699.

## IV.    NEW MEXICO AND ALBUQUERQUE LACK A CONSTITUTIONALLY PROTECTED INTEREST IN THE DEFENDANTS' PAROLE PRACTICES.

To assert a procedural due process claim, New Mexico and Albuquerque must identify a constitutionally protected liberty or property interest. See Al-Turki v. Tomsic, 926 F.3d 610, 614 (10th Cir. 2019). New Mexico and Albuquerque allege that they "have constitutionally-protected interests in the expenses they have incurred and will incur, and funds that they have been forced to expend and will expend, as a result of Defendants' unlawful termination of, or change to, the Safe Release policy." Complaint ¶ 56, at 14. New Mexico and Albuquerque contend that the Defendants' "actions unlawfully deprive the Plaintiffs of these and other constitutionally-protected interests without due process of law," because "[s]uch deprivation occurred with no notice or opportunity to be heard." Complaint ¶ 57, at 14. The Defendants respond by arguing that New Mexico and Albuquerque have no constitutionally protected interest in how the Department of Homeland Security paroles asylees. See Reply at 12. New Mexico and Albuquerque's arguments to the contrary, the Defendants assert, are attempts to unilaterally translate their policy expectations into property interests. See Reply at 12. The Defendants further assert that, while New Mexico and Albuquerque assert a property interest in their expenditures, they "have identified no entitlement to an appropriation of federal funds or any legal requirement that such funds be expended." Reply at 12.

Typically, when the Court adjudicates an allegation that an agency acted unconstitutionally, the Court acts as a reviewing court, reviewing the administrative record. See,

e.g., Jarita Mesa Livestock Grazing Ass'n. v. U.S. Forest Serv., 58 F. Supp. 3d at 1237.  In the typical case, the presence of a constitutional claim does not take a court's review outside of the APA; Section 706(2)(B) specifically contemplates adjudication of constitutional issues, and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities.  Courts do not, however, defer to agencies in interpreting the Constitution.  See U.S. West, Inc. v. FCC, 182 F.3d at 1231 ("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . .  [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. at 190-91).

As discussed above, sovereign immunity bars New Mexico and Albuquerque's APA claim. The Plaintiffs also seek equitable relief for alleged constitutional violations from the Defendants in their official capacity.  "An action against federal employees in their official capacities is in effect a suit against the United States for which a waiver of sovereign immunity must exist." Cortez v. E.E.O.C., 585 F. Supp. 2d 1273, 1278 (D.N.M. 2007)(Browning, J.)(citing Hafer v. Melo, 502 U.S. 21, 31 (1991)).  Through 5 U.S.C. § 702, Congress provides a "general waiver of the government's sovereign immunity from injunctive relief."  United States v. Murdock Mach. and Eng'g Co. of Utah, 81 F.3d at 930 n.7.  "This waiver is not limited to suits under the Administrative Procedure Act."  Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1233.

> Whether plaintiffs' claims arise under the APA or common law is also immaterial with respect to the sovereign immunity analysis.  Under 5 U.S.C. § 702, the United States waives sovereign immunity as to actions "in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  As we held in *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005), § 702's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act."  *Id.* at 1233; *see also Hanson v. Wyatt*, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008)(Gorsuch, J.,

concurring) ("Section 702 is a waiver of sovereign immunity, but we have not treated Section 704 as a limit on that waiver." (citation omitted)).

<u>Gilmore v. Weatherford</u>, 694 F.3d at 1166 n.1. New Mexico and Albuquerque allege constitutional violations separate from the Defendants' alleged violations of the APA's rulemaking requirements. New Mexico and Albuquerque may therefore bring their constitutional claims separately, and not under the APA, against the Defendants without implicating sovereign immunity, because of the United States' general waiver, in 5 U.S.C. § 702, of sovereign immunity in suits seeking equitable relief. The United States' waiver of sovereign immunity in the APA extends to claims for "nonmonetary relief against federal officials and agencies," over which the Court has jurisdiction, such as those for equitable relief brought under 28 U.S.C. § 1331. <u>Simmat v. U.S. Bureau of Prisons</u>, 413 F.3d at 1232, 1236. When a plaintiff alleges "a cause of action that is independent of the APA, it may eschew the statutory requirements that apply only to APA claims and rely nevertheless on the APA's sovereign immunity waiver to support its contention that sovereign immunity does not block the court from exercising jurisdiction." <u>Z St., Inc. v. Koskinen</u>, 44 F. Supp. 3d at 65, <u>aff'd sub nom.</u> <u>Z St. v. Koskinen</u>, 791 F.3d 24 (D.C. Cir. 2015).

New Mexico and Albuquerque allege, principally, that the Defendants' abandonment of the Safe Release program violates New Mexico and Albuquerque's procedural due process rights. <u>See</u> Complaint ¶¶ 54-59, at 14. Specifically, New Mexico and Albuquerque assert a constitutionally protected interest in "expenses they have incurred and will incur, and funds that they have been forced to expend and will expend, as a result of Defendants' unlawful termination of, or change to, the Safe Release policy." Complaint ¶ 56, at 14. Although New Mexico and Albuquerque refer to only the Fifth Amendment's Due Process Clause in the Complaint, they further contend in the Response that they "have interests in their sovereignty and home rule."

Response at 28. New Mexico and Albuquerque opine that, "as a state and a political subdivision of a state," the United States cannot force them "to implement and pay for a federal regulatory program without having any say in the matter." Response at 28-29 (citing Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. at 677). The Court will first address New Mexico and Albuquerque's procedural due process claim.

### A. NEW MEXICO AND ALBUQUERQUE DO NOT ALLEGE A CONSTITUTIONALLY PROTECTED LIBERTY OR PROPERTY INTEREST.

To assert a valid procedural due process claim, New Mexico and Albuquerque must identify a constitutionally protected liberty or property interest.[17] See Al-Turki v. Tomsic, 926

---

[17]The Court notes that States' rights have traditionally been cabined as States' sovereign interest or as shorthand for the limits of federal power. See Timothy Zick, Statehood as the New Personhood: the Discovery of Fundamental "States' Rights", 46 Wm. & Mary L. Rev. 213, 216 (2004). The Tenth and Eleventh Amendments are the primary textual sources of States' constitutional rights, see Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 68 (1996); United States v. Darby, 312 U.S. 100, 124 (1941), while the Fifth Amendment -- the source of New Mexico and Albuquerque's procedural due process claims -- refers specifically to "person[s]," U.S. Const. amend. V. The former constitutional provisions limit the federal government's power while retaining States' residual power, while the latter constitutional provisions delineate individual rights. The Court posits that there is more than a semantic difference between rights and powers, as "rights, particularly 'fundamental' rights, differ from constitutional powers in important respects: rights are inflexible, whereas powers ebb and flow; rights (at least *inherent* ones) are implicit and unenumerated, whereas powers are textually grounded; and rights imply an aggressive judicial role, whereas powers generally implicate judicial deference to democratic processes." Timothy Zick, Statehood as the New Personhood: the Discovery of Fundamental "States' Rights", 46 Wm. & Mary L. Rev. at 226 (emphasis in original).

The Supreme Court has, however, recently afforded States protections that resemble individual constitutional rights. States' procedural due process protections rest primarily in requirements that Congress provide a clear and unambiguous intent to subject State officials to regulation. See, e.g., United States v. Lopez, 514 U.S. 549, 562 (1995); Gregory v. Ashcroft, 501 U.S. 452, 470 (1991). The Supreme Court has also concluded that Section 5 of the Fourteenth Amendment must give way to States' procedural rights. See City of Boerne v. Flores, 521 U.S. 507, 520 (1997). Accordingly, for the MTD's purposes, the Court analyzes New Mexico and Albuquerque's procedural due process claims as it would for any private litigant. As discussed infra, the Court does not take this approach with New Mexico and Albuquerque's potential First Amendment claim.

F.3d at 614.  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural-due-process rights were violated: (i) "Did the individual possess a protected property interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).  To have a legitimate property interest, New Mexico and Albuquerque "must have more than a unilateral expectation of" that interest, but rather must "have a legitimate claim of entitlement to it."  Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972).  A state or local government has a protected interest in congressionally appropriated funds, which the Supreme Court likens to a funds owed on a contract.  See Nat'l Fed. of Indep. Bus. v. Sebelius, 567 U.S. at 676 ("The legitimacy of Congress' power to legislate under the spending power [] rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'").  New Mexico and Albuquerque do not assert an interest in congressionally appropriated funds; rather, they assert an interest in their own funds. See Complaint  ¶ 56, at 14.  The Court understands New Mexico and Albuquerque to assert an interest in budgetary autonomy and their injury as the Defendants' actions that have driven New Mexico and Albuquerque to divert those funds to objectives they would otherwise forgo. Albuquerque and New Mexico do not cite any caselaw supporting their contentions.

The Court concludes that New Mexico and Albuquerque do not allege a constitutionally protected property interest.  No government makes budgetary decisions in a vacuum; the United States' action or inaction plays myriad roles in influencing State and local government's budgeting decisions.  Each such influence does not amount to a due process violation.  The Defendants cite County of Santa Clara v. Trump for the proposition that States and municipalities may have protected property interests in federal funds which Congress has already appropriated.  See MTD

at 23 (citing <u>Cty. of Santa Clara v. Trump</u>, 250 F. Supp. 3d 497). In that case, two counties sued

President Donald Trump to challenge an executive order's enforcement provision which would

prevent so-called "sanctuary cities"[18] from receiving federal funds. 250 F. Supp. 3d at 507. The

county-plaintiffs sought injunctive relief, and challenged the order, in part, on the ground that it

"seeks to deprive local jurisdictions of congressionally allocated funds without any notice or

opportunity to be heard." 250 F. Supp. 3d at 507. Relying on <u>National Federation of Independent</u>

<u>Businesses v. Sebelius</u>, the Honorable William J. Orrick, United States District Judge for the

Northern District of California, concluded that the counties "have a legitimate property interest in

federal funds that Congress has already appropriated and that the Counties have accepted" and

further concluded that the executive order would have denied the counties this interest with a

"complete lack of process" in violation of the counties' due process rights. 250 F. Supp. 3d at 536.

    The Defendants contend that, unlike in <u>County of Santa Clara v. Trump</u>, the Department

of Homeland Security's parole practices implicate no already-apportioned federal funds that New

Mexico and Albuquerque have accepted. <u>See</u> MTD at 23. New Mexico and Albuquerque respond

that <u>County of Santa Clara v. Trump</u> is inapposite, because "it merely outlines another

constitutionally-protected interest of state and local governments." Response at 29. Instead, New

Mexico and Albuquerque assert constitutionally protected interests in "the expenses they have

incurred or will incur and funds that they have been forced to expend and will expend based on

---

[18]The phrase "sanctuary city" has become colloquially used to describe places that limit how local law enforcement can cooperate with federal immigration agents. Jasmine C. Lee, "What are sanctuary cities?", N.Y. Times, Feb. 6, 2017, https://www.nytimes.com/interactive/2016/09/0 2/us/sanctuary-cities.html (last accessed March 21, 2019)("Sanctuary Cities"). "Policies limiting cooperation with immigration detainers are typically in place at the county and state level. . . . In cities, sanctuary policies often mean local officials do not ask about a person's immigration status, but there is no universal definition for a sanctuary city." Sanctuary Cities.

the termination of Safe Release." Response at 28. The Fifth Amendment's Due Process Clause protects legitimate claims of entitlement, which must be more than a desire or unilateral expectation. See Bd. of Regents v. Roth, 408 U.S. at 577. Accordingly, the Supreme Court in National Federation of Independent Businesses v. Sebelius, in the context of analyzing the Spending Clause, conceptualizes States' protected property interest in federal funds as a contract between the States and Congress. See 567 U.S. at 676. Here, in contrast, New Mexico and Albuquerque have no such interest in the Department of Homeland Security's exercise of its discretionary parole authority. New Mexico and Albuquerque claim a protected property interest in suffering no externalities or negative effects from that discretionary parole authority. That is merely a desire or unilateral expectation, and not a legitimate claim of entitlement. Accordingly, New Mexico and Albuquerque's procedural due process allegation does not state a claim. See Fed. R. Civ. P. 12(b)(6).

New Mexico and Albuquerque also assert "interests in their sovereignty and home rule," and argue that the Constitution protects these interests, because New Mexico and Albuquerque, "as a state and a political subdivision of a state, cannot be forced by the federal government to implement and pay for a federal regulatory program without having any say in the matter." Response at 28-29. While the Court understands this argument to be grounded in the Tenth Amendment's anti-commandeering principles, see, e.g., New York v. United States, 505 U.S. 144, 161 (1992), New Mexico and Albuquerque assert these interests to support their procedural due process claims, see Response at 29. The Defendants note that Albuquerque and New Mexico "cite no authority to suggest that such interests constitute a recognized property or liberty interest for procedural due process purposes." Reply at 12. New Mexico and Albuquerque cite, however, National Federation of Independent Businesses v. Sebelius to support their procedural due process

- 95 -

argument, although they cite the case to phrase their Tenth Amendment assertion as a procedural due process claim.  The phrase "procedural due process" does not appear in National Federation of Independent Businesses v. Sebelius, but the Supreme Court considered States' interest in appropriated funds as a kind of contract interest.  See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. at 576-77 ("'We have repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a contract.'"  (quoting Barnes v. Gorman, 536 U.S. 181, 186 (2002))).  The Supreme Court noted that the Tenth Amendment constrains Congress' Spending Clause powers, such that the legitimacy of Congress' exercise of its spending power "'rests on whether the State voluntarily and knowingly accepts the terms of the contract.'"  Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. at 576 (quoting Pennhurst State Sch. and Hosp. v. Halderman, 451 U.S. 1, 17 (1981)).  Here, alternatively, New Mexico and Albuquerque allege no contract or federal funds at stake.  As such, New Mexico and Albuquerque's argument is more properly based in the Tenth Amendment than in the Fifth Amendment's Due Process Clause.  Accordingly, as New Mexico and Albuquerque do not have any protected property interest in the Defendants' discretionary exercise of their parole authority, New Mexico and Albuquerque do not state a procedural due process violation, and the Court dismisses the Complaint's Count II for failure to state a claim.

## V.  AMENDING THE COMPLAINT WOULD BE FUTILE.

Although New Mexico and Albuquerque never formally moved to amend the Complaint, they indicated a desire to do so at the Hearing.  See Tr. at 85:16-23 (Torres).  New Mexico and Albuquerque requested leave to amend the Complaint to assert a substantive due process allegation, an equal protection violation, and First Amendment retaliation claim.  See Tr. at 85:14-22 (Torres).  "Although Fed. R. Civ. P. 15(a) provides that leave to amend shall be given freely, the district court may deny leave to amend where amendment would be futile.  A proposed

amendment is futile if the complaint, as amended, would be subject to dismissal." <u>Jefferson Cty.</u> <u>Sch. Dist. v. Moody's Investor's Servs.</u>, 175 F.3d 848, 859 (10th Cir. 1999). The Court concludes that amending the Complaint would be futile under rule 15(c) of the Federal Rules of Civil Procedure.

### A. AMENDING THE COMPLAINT TO ADD A TENTH AMENDMENT CLAIM WOULD BE FUTILE.

The Supreme Court has held that the "Federal Government cannot compel the States to enact or administer a federal regulatory program." <u>New York v. United States</u>, 505 U.S. at 188. The United States cannot command States' Legislatures to adopt certain policies, <u>see</u> <u>New York</u> <u>v. United States</u>, 505 U.S. at 188, command their executives to carry out federal programs, <u>see</u> <u>Printz v. United States</u>, 521 U.S. 898 (1997), or otherwise "coerce them into adopting a federal regulatory system as their own," <u>Nat'l Fed'n of Indep. Bus. v. Sebelius</u>, 567 U.S. at 577-78.

Unlike the federal statutes in <u>New York v. United States</u> and <u>Printz v. United States</u>, the Defendants' post-parole practices do not conscript the States to enforce federal law. New Mexico and Albuquerque face no federal retribution were they to meet the Defendants' abandonment of the Safe Release program with inaction. The United States has not conditioned federal money on New Mexico and Albuquerque's treatment of abandoned asylees, and while New Mexico and Albuquerque may feel obliged to direct their resources to those asylees' care, in doing so, they are selecting and carrying out their own policy of humanitarian aid. As discussed <u>supra</u>, there is no federal statute or regulation that mandates the federal government to develop such a policy, so New Mexico and Albuquerque are pursuing their own ends, not the United States' ends. New Mexico and Albuquerque may wish that the United States share their concern for asylees' wellbeing. The Tenth Amendment, however, protects the States from being forced to adopt, carry

out, or enforce federal policy; it does not require the United States to adopt, carry out, or enforce

the States' preferred policies.  New Mexico and Albuquerque, accordingly, do not state a Tenth

Amendment violation.

## B.     AMENDING THE COMPLAINT TO ADD AN EQUAL PROTECTION CLAIM WOULD BE FUTILE.

The Court concludes that amending the Complaint to add an equal protection allegation

would be futile.  The Equal Protection Clause of the Fourteenth Amendment guarantees that "no

states shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S.

Const. amend. XIV, § 1.  Despite its reference to States, the Equal Protection Clause also constrains

the United States.  See Bolling v. Sharpe,  347 U.S. 497 (1954).  "The Equal Protection Clause

'keeps governmental decision makers from treating differently persons who are in all relevant

respects alike.'"  Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger

v. Hahn, 505 U.S. 1, 10 (1992)).  See Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219,

1233 (10th Cir. 2009)("Equal protection 'is essentially a direction that all persons similarly

situated should be treated alike.'")(quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S.

432, 439 (1985)).  The Supreme Court has "recognized successful equal protection claims brought

by a class of one, where the plaintiff alleges that she has been intentionally treated differently from

others similarly situated and that there is no rational basis for the difference in treatment."

Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

The Complaint does not allege a class of similarly situated States or municipalities, so the

Court construes New Mexico and Albuquerque each to allege a class of one.  Alternatively, even

if New Mexico and Albuquerque alleged a class of similarly situated States or municipalities, they

invoke no protected characteristics that would trigger heightened scrutiny.  Accordingly, the

Defendants' abandonment of the Safe Release program does not run afoul of the Equal Protection Clause so long as that abandonment is rational. The Court concludes that the Defendants have demonstrated that their abandonment of the Safe Release program is rational. The Defendants note the recent surge of migrants requesting asylum at the southern border. See Complaint ¶¶ 24-25, at 6; MTD at 3. This surge has placed a strain on the Defendants' ability to detain those asylum seekers en masse. The Defendants also note a recent settlement directing them to adopt a policy favoring parole for unaccompanied minors and "family units." MTD at 8 (citing Flores v. Lynch, 828 F.3d 898, 901 (9th Cir. 2016). The Defendants contend they simply lack the resources to continue the Safe Release policy. Given that the Defendants' current needs and resource constraints differ from the context in which the Safe Release policy began, the Court cannot call the Defendants' abandonment of the Safe Release policy irrational. Accordingly, amending the Complaint to add an equal protection claim would be futile.

## C. AMENDING THE COMPLAINT TO ADD A SUBSTANTIVE DUE PROCESS CLAIM WOULD BE FUTILE.

For similar reasons, New Mexico and Albuquerque's potential substantive due process claim is not viable. The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d 567, 573 (10th Cir. 1995). The Due Process Clause is not a guarantee of a minimal level of safety and security. See DeShaney v. Winnebago Cty Dep't of Soc. Servs., 489 U.S. 189, 195 (1989). Accordingly, a cognizable substantive due process claim against an executive official is one that alleges behavior that shocks the conscience or falls "at the ends of the tort law's spectrum of

culpability." <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 848 (1994)("Lewis"). Justice Souter's opinion in <u>Lewis</u> notes that the shock-the-conscience standard properly takes into consideration the complicated calculus executive officials must balance when addressing an ongoing or unfolding emergency. <u>See</u> 523 U.S. at 853-55. Accordingly, something more akin to intent or motive to harm is necessary for a substantive due process claim against an executive official, but even then the degree of fault necessary to establish a violation will vary with the gravity of the circumstances with which the official is confronted. <u>See</u> <u>Lewis</u>, 523 U.S. at 853-54 (noting that, "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed'" (quoting <u>Daniels v. Williams</u>, 474 U.S. 327, 332 (1986))).

Chief Judge Tymkovich summarizes the proper test for alleged substantive due process violations involving executive officials:

> What differentiates a constitutional transgression from an ordinary common law tort is a "level of executive abuse of power . . . that . . . shocks the conscience." [<u>Lewis</u>, 523 U.S. at 846.] In other words, the executive abuse represents "arbitrary action of government" and requires a showing of government officials "abusing their power, or employing it as an instrument of oppression." [<u>Lewis</u>, 523 U.S. at 845-46] (quotations and brackets omitted). While recognizing "no calibrated yard stick," [<u>Lewis</u>, 523 U.S. at 847], the Supreme Court instructs that the "constitutional concept of conscience shocking duplicates no traditional category of common-law fault," [<u>Lewis</u>, 523 U.S. at 848].

> The Supreme Court has also explained, "[r]ules of due process are not . . . subject to mechanical application in unfamiliar territory." [<u>Lewis</u>, 523 U.S. at 850]. What

> > shocks [the conscience] in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstance before any abuse of power is condemned as conscience shocking.

[Lewis, 523 U.S. at 850]. Thus, the cases recognize that common-sense distinctions exist between force in one setting (say, a prison) and force in another (say, a kennel business). The case law also recognizes official conduct may be more egregious in circumstances allowing for deliberation (such as when a person is in custody or under governmental control or supervision) than in circumstances calling for quick decisions (such as police chases or prison disturbances).

Williams v. Berney, 519 F.3d 1216, 1220-21 (10th Cir. 2008).

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience. See Lewis, 523 U.S. at 849. "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (quoting Moore v. Guthrie, 438 F.3d at 1040)(internal quotation marks omitted). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d at 574)(internal quotation marks omitted).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)). Here, the Court cannot say that the Defendants' abandonment of paroled asylees in New Mexico shocks the conscience. Even construing as true New Mexico and Albuquerque's assertion that the Defendants are abandoning paroled asylees around New Mexico

and in Albuquerque as retribution for New Mexico and Albuquerque's critical views on the Trump Administration's immigration policies, New Mexico and Albuquerque concede that the Defendants are confronted with an emergency situation at the border -- even before the emergent COVID-19 global pandemic. See Complaint ¶ 16, at 5. New Mexico and Albuquerque must therefore allege intentional misconduct that falls "at the ends of the tort law's spectrum of culpability." Lewis, 523 U.S. at 848. As the Court concludes, supra, that the Defendants' abandonment of the Safe Release program is rational, that abandonment does not shock the conscience. Similarly, the Defendants' act of abandoning paroled asylees around New Mexico and in Albuquerque does not approach the "precipitate recklessness" that Lewis, 523 U.S. at 853. contemplates. New Mexico is a border State and is thus nearest to the influx of asylum seekers; it shares a 180-mile border with Mexico. See World Atlas, "U.S. States That Border Mexico," https://www.worldatlas.com/articles/us-states-that-border-mexico.html (last accessed March 30, 2020). Albuquerque is a metropolitan area near to the border -- and so is equipped with infrastructure and outfitted as a transportation hub to the rest of the country. As the Defendants' actions are rational in light of the ongoing emergency, their abandonment of paroled asylees in New Mexico cannot shock the conscience. Accordingly, amending the Complaint to add a substantive due process allegation would be futile. See Fed. R. Civ. P. 15.

### D.   AMENDING THE COMPLAINT TO ADD A FIRST AMENDMENT CLAIM WOULD BE FUTILE.

As for their proposed First Amendment allegation, New Mexico and Albuquerque appear to allege that the Defendants are abandoning asylees in New Mexico and Albuquerque to punish New Mexico and Albuquerque for expressing opposition to the Trump Administration's immigration policies. See Tr. at 84:8-12 (Torres). The Court first notes that this new claim would

allege a separate wrongful action than does the Complaint. In the Complaint, New Mexico and Albuquerque point to the Defendants' abandonment of the Safe Release program without advance notice. See Complaint ¶¶ 40-59, at 12-14. New Mexico and Albuquerque's proposed First Amendment allegation, however, points more specifically to the Defendants' abandonment of paroled asylees in New Mexico as the wrongful action. Accordingly, New Mexico and Albuquerque could assert their proposed First Amendment claim separately from their APA claim. See Simmat v. U.S. Bureau of Prisons, 413 F.3d at 1233.

It is an open question whether States and municipalities have First Amendment rights against the United States. The Supreme Court's most recent word on the matter came in United States v. American Library Association, in which the Supreme Court declined to answer this question:

> The Government [argues that] Government entities [such as state and local libraries] do not have First Amendment rights. *See Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 139 (1973) (Stewart, J., concurring) ("The First Amendment protects the press from governmental interference; it confers no analogous protection on the government"); *id.*, at 139, n.7 ("'The purpose of the First Amendment is to protect private expression'" (quoting T. Emerson, *The System of Freedom of Expression* 700 (1970))) . . . . We need not decide this question.

United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 210 (2003). Additionally, then-Associate Justice Potter Stewart asserted, in a concurring opinion, that the First Amendment's Speech Clause does not apply to governmental entities. See Columbia Broad. Sys. v. Democratic Nat'l Comm., 412 U.S. at 139-42 (Stewart, J., concurring)(asserting that, were a broadcaster's receipt of federal funds sufficient to render that broadcaster a governmental entity, it would lose First Amendment protection, because "[t]he purpose of the First Amendment is to protect private expression"). More

recently, however, the Supreme Court expressed what some commentators view as an endorsement of First Amendment protections for States:

> Our determination that Texas's specialty license plate designs are government speech does not mean that the designs do not also implicate the free speech rights of private persons. We have acknowledged that drivers who display a State's selected license plate designs convey the messages communicated through those designs. . . . And we have recognized that the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees. . . . But here, compelled private speech is not at issue. And just as Texas cannot require SCV to convey "the State's ideological message," . . . SCV cannot force Texas to include a Confederate battle flag on its specialty license plates.

Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 570 U.S. 200, 135 S. Ct. 2239, 2253 (2015). See Eugene Volokh, "Do state and local governments have free speech rights?", Wash. Post (June 24, 2015), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/06/24/do-state-and-local-governments-have-free-speech-rights/ (last accessed March 25, 2020). The quoted passage pertains, however, not to Texas' right to speech that is free from federal regulation. Instead, it pertains to private parties' inability to use the First Amendment to coerce government speech. See Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. at 2253.

The Tenth Circuit has not ruled whether the First Amendment protects State or municipal expression. The majority of courts that have considered the issue, however, have answered that the First Amendment works in one direction: it protects people and private entities, not governments. See, e.g., NAACP v. Hunt, 891 F.2d 1555, 1565 (11th Cir. 1990); Student Gov't Ass'n v. Bd. of Trs. of the Univ. of Mass., 868 F.2d 473, 482 n.10 (1st Cir. 1989); Serra v. U.S. Gen. Servs. Admin., 847 F.2d 1045, 1048 (2d Cir. 1988); Muir v. Ala. Educ. Television Comm'n, 688 F.2d 1033, 1038 n.12 (5th Cir. 1982)(en banc); Aldrich v. Knab, 858 F. Supp. 1480, 1491

(W.D. Wash. 1994)(Zilly, J.). These courts conclude that the First Amendment restricts -- rather than protects -- State actors. See, e.g., Muir v. Ala. Educ. Television Comm'n, 688 F.2d at 1038 n.12 (holding that "[g]overnment expression" is "unprotected by the First Amendment"). The majority rule appears to be based on the principle that the First Amendment protects individuals' expression against government, not States' expression against the United States. Nonetheless, most courts that consider the issue "typically acknowledge[] Justice Stewart's concurrence without critical reflection." David Fagundes, State Actors as First Amendment Speakers, 100 Nw. U. L. Rev. 1637, 1643 (2006).

The minority position is that, at least in some contexts, it makes functional sense to recognize First Amendment protections for States and municipalities, or at least extend certain First Amendment defenses like those defenses against defamation claims. See, e.g., Nizam-Aldine v. City of Oakland, 54 Cal. Rptr. 2d 781, 788 (Cal. Ct. App. 1996). Still other courts conclude that municipalities may enjoy First Amendment protection, at least where a municipality speaks as its citizens' representative or advocates policies that those residents have electorally endorsed. Under this view, municipalities' First Amendment rights derive from their citizens' First Amendment rights. As the Honorable Richard Posner, then-Chief Circuit Judge for the United States Court of Appeals for the Seventh Circuit, noted, because "a municipality is the voice of its residents -- is, indeed, a megaphone amplifying voices that might not otherwise be audible -- a curtailment of its right to speak might be thought a curtailment of the unquestioned First Amendment right of those residents." Creek v. Vill. of Westhaven, 80 F.3d 186, 193 (7th Cir. 1996). Some academics argue that government in a liberal democracy is obliged to "promote contested views of the good," recognizing that "government speech can help foster debate, fleshing out views, and leading toward a more educated citizenry and a better chance of reaching the right

answer." Abner S. Greene, <u>Government of the Good</u>, 53 Vand. L. Rev. 1, 2, 11 (2000).  California

courts also have concluded that the First Amendment can serve as a shield for state actors.  <u>See</u>

<u>Nadel v. Regents of the Univ. of Cal.</u>, 34 Cal. Rptr. 2d 188, 197 (Cal. Ct. App. 1994)(concluding

that state actors may invoke <u>New York Times v. Sullivan</u>'s actual malice defense against

defamation suits (citing <u>N.Y. Times v. Sullivan</u>, 376 U.S. 254, 279-80 (1964)).  California courts

also have concluded that California's anti-SLAPP (Strategic Lawsuits Against Public

Participation) statute,[19] Cal. Civ. Proc. Code § 425.16, protects state actors.  <u>See</u> <u>Bradbury v.</u>

<u>Superior Court</u>, 57 Cal. Rptr. 2d 207, 212 (Cal. Ct. App. 1997).  The California courts recognize

that government is uniquely situated to inform the public on important matters, a function that

furthers the First Amendment's purposes.  <u>See</u> <u>Mission Oaks Ranch, Ltd. v. Cty. of Santa Barbara</u>,

77 Cal. Rptr. 2d 1, 10-12 (Cal. Ct. App. 1998).  The Court also notes that the Takings Clause, a

constitutional protection that expressly refers to private property, has been held to protect States

when the United States seizes State property.  <u>See</u> <u>United States v. 50 Acres of Land</u>, 469 U.S. 24,

31 (1984).  Nonetheless, the Court has found no cases holding that the First Amendment affords

government a cause of action, as is sought in this case.

 Despite lucid and well-reasoned arguments to the contrary, <u>see</u> David Fagundes, <u>State</u>

<u>Actors as First Amendment Speakers</u>, 100 Nw. U. L. Rev. 1637, 1643 (2006), the Court suggests

---

[19]Section § 425.16 provides:

 A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1).

an alternative analysis. A more limited interpretation of the First Amendment's Speech Clause seems compelled by the First Amendment's text and purposes, as well as by institutional concerns and the inevitable inconsistency of incorporating too many values into the First Amendment. The Court concludes that the First Amendment provides no cause of action for States and municipalities to contest federal retaliation against States and municipalities' speech. First, as a textual matter, the First Amendment is expressly a restraint on government: "Congress shall make no law abridging the freedom of speech." U.S. Const. amend. I. The First Amendment's text is, therefore, object-neutral; it provides who may not abridge the freedom of speech, but it does not specify whose speech it protects. As the First Amendment also applies to State and local governments, however, the First Amendment would constrain nothing if government has free speech rights. The First Amendment would, conceptually, cease to make sense. Further, although the Court has not seen convincing citations to legislative history in the scholarship promoting a First Amendment cause of action for States and municipalities, the canon of interpretation of expressio unius est exclusio alterius would dictate that the First Congress' intent was not to extend First Amendment rights to States and local governments. At a minimum, there is an absence of the First Congress' clear intent to decide this constitutional issue. <u>See</u> David Fagundes, <u>State Actors as First Amendment Speakers</u>, 100 Nw. U. L. Rev. at 1652 ("The debates over the Bill of Rights provide no direct evidence indicating whether the framers intended government speech to be included in the Constitution's speech protections."). It might be argued that, because the First Amendment does not state that it applies only to citizens, it applies to States and municipalities. As discussed below, however, such a conclusion could have dramatic implications for federalism, individual liberties, and the constitutional framework. Given those implications, more than an absence of contrary original intent is needed to conclude that the First Amendment provides a

cause of action for aggrieved States and local governments. That no federal court has expressly found such a right in 250 years also indicates that the First Congress did not intend for the First Amendment to be read so broadly.

Instead, the Constitution, and its State counterparts, act as a whole to limit governmental powers. The Constitution, accordingly, already binds the federal government in myriad ways. For example, the First Amendment itself includes a built-in limitation of governmental expression in the Establishment Clause, see, e.g., Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290 (2000), and the Equal Protection Clause prohibits government speech that promotes discrimination on the basis of race, religion, national origin, or gender, see, e.g., Anderson v. Martin, 375 U.S. 399, 402 (1964)(holding that the Equal Protection Clause prohibits States from requiring political candidates be identified racially on ballots and nominating papers). Further, recognizing governmental First Amendment protections would muddle the bulk of First Amendment caselaw that provides that individual speech trumps the government's speech. See, e.g., Wooley v. Maynard, 430 U.S. 705 (1977). Some of the earliest roots of the Supreme Court's constitutional rights caselaw show that the Supreme Court has framed those rights as vested within individuals:

> While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

Meyer v. Nebraska, 262 U.S. 390, 399 (1923). The Supreme Court also has been sensitive lately, at least in some contexts, to individuals' right to be free from compelled association. See Janus v. American Fed. of State, Cty., and Mun. Employees, Council 31, 138 S. Ct. 2448 (2018). Dissenters

- 108 -

would be hard-pressed to avoid such compelled association were their governments endowed with constitutional rights to express majority opinion. When government stifles or regulates individual speech, the government engages in speech; by suppressing one view, it necessarily expresses a contrary view. In short, extending First Amendment protections to governments flips the Constitution on its head. Rights belong to people, whereas governments have powers. Instead of protecting individual liberty at government's expense, a First Amendment cause of action for government would protect government's powers at the expense of individual liberty.

Similarly, as a matter of constitutional interpretation, the Court should avoid First Amendment issues when possible. Doing so without articulable principles based in the First Amendment's text risks usurping the legislative function. The doctrine of constitutional avoidance confines the judiciary to its proper role in construing the Constitution, which is to give effect to the Framers' and the First Congress' intentions. The ability of any court to apply neutrally the law is questionable if there is a First Amendment right for states and localities to sue the federal government for retaliation. Depending on how eager they are to reach the constitutional issues, courts may in many cases reshape Congressional or executive action to fit the courts' views. Such flexibility to avoid or decide constitutional issues, and to reach judges' preferred ends, strains the Court's need to be a court and provides little institutional limit on its antidemocratic powers.

Further, the majority approach makes functional sense. Giving States and local governments the right to sue the federal government for First Amendment retaliation creates more problems that such a right would resolve. First, consider the conceptual problems that arise in defining government speech. Government acts in myriad ways that are nearly too infinite to catalog in today's bureaucratic society.

> Is government speaking when it acts as educator, principal, or school board? Does it speak as curator of a museum, as librarian, or as a patron of artistic work in the private sector? Does it speak when it acts as a manager of spaces, physical and metaphysical? Does government speak when it acts as a journalist, a broadcaster, or an owner or controller of the channels of distribution of speech? Does it speak when it acts as a distributor of funds? As an imposer of taxes or fees? As a sponsor of research, a tenure committee, or a speakers' committee?

Randall P. Bezanson & William G. Buss, <u>The Many Faces of Government Speech</u>, 86 Iowa L. Rev. 1377, 1383 (2001)("<u>Government Speech</u>"). Accordingly, given the difficulty of defining speech and the extraordinarily varied manner in which a government "speaks," extending First Amendment protections to States and municipalities would expand dramatically the fodder for federal litigation to include all sorts of matters previously left for the political process to resolve. <u>See</u>, <u>e.g.</u>, <u>Marbury v. Madison</u>, 5 U.S. 137, 163-170 (1807).[20] Additionally, the Court respectfully disagrees that government speech can be a coherent proxy for citizens' speech or serve as a collective mouthpiece. As this case's facts demonstrate, a complex series of causes and effects intercede between the ballot box and government speech; bureaucracy is not a neutral or translucent reflection of voters' preference. It is therefore unrealistic to view government's speech as the collective speech of its citizens.

---

[20]As Chief Justice Marshall noted, the Constitution entrusts a field of discretion in some areas to the "executive department alone." <u>Marbury v. Madison</u>, 5 U.S. 137, 164 (1807). Accordingly:

> The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable.

5 U.S. at 166.

Extending a cause of action against federal retaliation also conflicts with the First Amendment's purposes. Contrary to those purposes, the proposed cause of action would almost certainly result in less speech, rather than more speech. It is naïve to assume that, were government endowed with First Amendment protections, its speech would reflect majoritarian, consensus views. There are those who complain that the Supreme Court's instinct that more speech is always the answer has skewed the marketplace of ideas, because that marketplace necessarily favors those with access to amplifying resources, such that it is not always the best idea that prevails in the marketplace, but rather the loudest or the wealthiest. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 473-74 (2010)(Stevens, J., joined by Ginsburg, Breyer, and Sotomayor, J.J., concurring in part and dissenting in part)(asserting that the government should protect against distortion of the marketplace and prevent corporate "domination"). Governmental free speech would only worsen such asymmetry, however, as the government could circumvent typical supply and demand in the market by expressing -- say, through legislation -- speech to which all must listen.

> The First Amendment's competitive assumptions suppose that people can simply ignore or reject ideas, without more, and that, if enough people do so, collective action based on those ideas will simply not occur, because collective action is, and should be, difficult and time consuming. But with government speech, the collective action has already occurred by the government's very decision to speak, and thus rejection of collective action based on an unacceptable idea requires resort to collective political action.

Government Speech, 86 Iowa L. Rev. at 1507. Government speech, accordingly, could not just dominate the market but rather override it. Government, unlike private actors, could impose speech that would otherwise gain no foothold in a private marketplace of ideas. In such a situation, citizens would be responsible for policing the market "only through resort to full-scale democratic processes -- such as electing a different president[ or] getting Congress to [enact new, contrary

laws]. In this sense the government as speaker cannot claim that it is just a 'participant' in the market. Government participation necessarily alters the market." <u>Government Speech</u>, 86 Iowa L. Rev. at 1508.

There would accordingly be a significant risk of less speech if States and local municipalities could sue the federal government for free speech retaliation. There would be less national speech. It would be ironic if a minority of the nation, who amounted to a majority within a State or municipality, could decrease the speech and expressive actions of a majority of the nation represented in the national government. It would enable the minority to stymy the majority. It is doubtful that the Framers of the Constitution or the Bill of Rights intended to move those political disputes between States and the federal government into the federal courts under the guise of the First Amendment. And if, conversely, the United States could sue the States and local governments and assert First Amendment retaliation claims, there would be less speech and deliberation at the local level. All this is not to discount the important role that State and local governmental speech plays -- and has historically played -- in maintaining the principles of federalism and protecting individual liberty. The foregoing counsels, however, that State and local government speech is best protected in the political process, and not through resort to the federal courts.

Because extending constitutional speech protections to States and municipalities is inconsistent with the First Amendment's text, purpose, and function, the Court concludes that, New Mexico and Albuquerque do not state a First Amendment retaliation claim.[21] Accordingly,

---

[21]Amending the Complaint would also be futile were the appellate courts to recognize that the First Amendment protects States and municipalities. "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" <u>Hartman v. Moore</u>, 547 U.S. 250, 256 (2006)(quoting <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 n.10

(1998)). It is therefore "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. at 256 (citation omitted). In addition to prohibitive laws, the Constitution also proscribes "[g]overnment retaliation . . . in as much as retaliatory actions tend to chill individuals' exercise of constitutional rights." How v. City of Baxter Springs, 217 F. App'x 787, 797 (10th Cir. 2007)(unpublished). See Perez v. Ellington, 421 F.3d 1128, 1131 (10th Cir. 2005)("The First Amendment bars retaliation for exercising the right of association."). The Tenth Circuit has explained that "any form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." How v. City of Baxter Springs, 217 F. App'x at 797 (quoting Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)). To establish a claim of retaliation for exercising the right to associate guaranteed under the First Amendment, a plaintiff must establish three elements: (i) the plaintiff was engaged in constitutionally protected activity; (ii) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) the plaintiff's exercise of the constitutionally protected activity substantially motivated the defendant's adverse action. See Perez v. Ellington, 421 F.3d at 1131-32 (quoting Worrell v. Henry, 219 F.3d at 1212).

Here, New Mexico and Albuquerque allege that they exercised their First Amendment rights to endorse immigrant-friendly policies and to criticize the Trump Administration's policy. See Tr. at 84:8-12 (Torres). They also assert that the Defendants are abandoning paroled asylees in New Mexico as reprisal for New Mexico and Albuquerque's expression, and that, by doing so, States and municipalities would tend to refrain from endorsing immigrant-friendly policies or from criticizing the Trump Administration's immigration policies. See Tr. at 84:8-12 (Torres). It is not implausible that New Mexico and Albuquerque's views on immigration motivated the Defendants' decision to abandon paroled asylees around New Mexico and Albuquerque. See Jessica Taylor, "Trump Threatens to Send Detained Immigrants to 'Sanctuary Cities' as Retaliation," Texas Pub. Radio (April 12, 2019), https://www.tpr.org/post/trump-threatens-send-detained-immigrants-sanctuary-cities-retaliation (last accessed March 25, 2020)(quoting a Tweet in which President Trump stated: "Due to the fact that Democrats are unwilling to change our very dangerous immigration laws, we are indeed, as reported, giving strong considerations to placing Illegal Immigrants in Sanctuary Cities only[.] The Radical Left always seems to have an Open Borders, Open Arms policy -- so this should make them very happy!" (quoting Donald Trump (@realDonaldTrump), Twitter (April 12, 2019 10:38 AM) https://twitter.com/realDonaldTrump/status/1116742282286440448?ref_src=twsrc%5Etfw); Rachael Bade and Nick Miroff, "White House proposed releasing immigrant detainees in sanctuary cities, targeting political foes," Wash. Post (April 11, 2019), https://www.washingtonpost.com/immigration/white-house-proposed-releasing-immigrant-detainees-in-sanctuary-cities-targeting-political-foes/2019/04/11/72839bc8-5c68-11e9-9625-01d48d50ef75_story.html (last accessed March 25, 2020). That the Defendants' abandonment of the Safe Release program is within their lawful powers does not necessarily negate New Mexico and Albuquerque's potential retaliation claim. In Lozman v. City of Riviera Beach, 138 S. Ct. 1945 (2018), the Supreme Court held that First Amendment retaliation claims are viable even where probable cause supports an allegedly retaliatory arrest. See 138 S. Ct. at 1955.

the Court denies New Mexico and Albuquerque's oral motion to amend the Complaint to add a

First Amendment retaliation claim against the Defendants.

---

Nonetheless, the Court concludes that, under recent Supreme Court precedent, even were the appellate courts to recognize First Amendment protections for States and municipalities, New Mexico and Albuquerque do not state a valid First Amendment retaliation claim. In Trump v. Hawaii, 138 S. Ct. 2392 (2018), the Supreme Court considered an executive order barring several Muslim-majority nations' citizens, as well as placing restrictions on citizens from Venezuela and North Korea, from entering the United States for ninety days. See 138 S. Ct. at 2403. A previous version of the order applied only to seven Muslim-majority countries, but the Trump administration, in the face of preliminary injunctions by lower courts, added the restrictions to citizens of North Korea and Venezuela. See 138 S. Ct. at 2403. On the campaign trail, President Trump had repeatedly asserted that he would permanently ban all Muslims from entering the United States, and these comments formed the basis of a claim that religious animus motivated the executive order. See 138 S. Ct. at 2417. Opponents of the final order asserted that the provisions relating to North Korea and Venezuela were mere fig leaves designed to cover the President's anti-Muslim animus.

In evaluating the executive order's validity under the Equal Protection Clause, Chief Justice John Roberts wrote that the issue was "not whether to denounce [President Trump's] statements," but rather how to craft that doctrine that would address executive action borne out of hybrid motivation. 138 S. Ct. at 2418. The Chief Justice noted that the Supreme Court's doctrine must apply not only to "a particular President," but rather to "the authority of the Presidency itself." 138 S. Ct. at 2418. The Supreme Court, faced with controversial executive action, focused primarily not on the President's statements -- Chief Justice Roberts devoted a mere three paragraphs to the President's statements, despite asserting that those statements were "the heart of" the States' constitutional contention, 138 S. Ct. at 2417-18 -- but rather on the action itself to frame the action's validity. Although each President is unique, and perhaps none more so than the current President, the Supreme Court focused instead on the Presidency and its powers' continuity. Under that analytical lens, the Supreme Court upheld that executive order as a valid exercise of the President's statutory authority. See 138 S. Ct. at 2418-19.

The Court concludes that, were the appellate courts to recognize a First Amendment cause of action for New Mexico and Albuquerque, would view similarly the Defendants' parole practices. Although the President's statements may evince an animus for New Mexico and Albuquerque's immigration policies, the Defendants' actions themselves -- the actions at issue in this case -- are within the Defendants' statutorily endowed discretion. Just as the President's statements evincing animus did not predetermine the Supreme Court's analysis in Trump v. Hawaii, his analogous statements do not predetermine the Court's analysis here. The Executive's statutory and constitutional authority guide the Court's analysis. This President's political statements do not. Accordingly, the Court concludes that, even if the First Amendment protects States and municipalities' speech, amending the Complaint to add a First Amendment retaliation claim would be futile.

- 114 -

**IT IS ORDERED** that: (i) the Defendants' Motion to Dismiss And Opposition To Plaintiffs' Motion For Preliminary Injunction And Supporting Memorandum, filed December 11, 2019 (Doc. 28), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Matthew L. Garcia
   Chief General Counsel to Governor Michelle Lujan Grisham
Jonathan J. Guss
   Deputy General Counsel to Governor Michelle Lujan Grisham
Santa Fe, New Mexico

   *Attorneys for Plaintiff State of New Mexico*

Esteban Aguilar
   City Attorney for the City of Albuquerque
Winter L. Torres
   Deputy City Attorney for the City of Albuquerque
Lindsay Van Meter
   Assistant City Attorney for the City of Albuquerque
Albuquerque, New Mexico

   *Attorneys for Plaintiff City of Albuquerque*

John C. Anderson
   United States Attorney
Manuel Lucero
   Assistant United States Attorney
Tiffany L. Walters
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Defendants*